UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:25-cv-20647-BB

EUCLID TURNAROUND OPPORTUNITY
FUND LP,

    Plaintiff,

vs.

AMERANT EQUIPMENT FINANCE, A
DIVISION OF AMERANT BANK, N.A.,
ALLIANCE METALS LLC, TECHNOCON
INTERNATIONAL, INC., ALLIANCE METALS
ALABAMA, LLC, LARRY Y. GITMAN, AND
JACOB GITMAN

    Defendants.
_____/

## AMENDED VERIFIED COMPLAINT

Plaintiff, Euclid Turnaround Opportunity Fund LP ("Euclid") hereby sues Defendants Amerant Equipment Finance, a Division of Amerant Bank, N.A. ("Amerant"), Alliance Metals LLC ("Alliance Metals" or "Borrower"), Technocon International, Inc. ("Technocon"), Alliance Metals Alabama, LLC ("Alliance Metals Alabama"), Larry Y. Gitman ("L. Gitman"), and Jacob Gitman ("J. Gitman"), and alleges as follows:

## JURISDICTION

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between Plaintiff, a citizen of Delaware, and Defendants, citizens of Florida and Alabama, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

1

## VENUE

2.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district; a substantial part of the property that is the subjection of this action is situated in this district; and the assignment agreement at issue in this case prescribes this district as the venue for actions such as this.

## PARTIES

3.     Plaintiff Euclid is a Delaware limited partnership with its principal place of business in Houston, Texas.  Its general partner, Euclid Partners GP LLC, is a Delaware limited liability company with its principal place of business in Texas.  Its remaining partners, Core Holdings US I LLC, Core Holdings US II LLC, Core Holdings US III LLC, Core Holdings US IV LLC, Core Holdings US V LLC (collectively, the "Limited Partners"), are each Delaware limited liability companies with their principal place of business in Delaware.  The Limited Partners each have one sole member, which is a Cayman Island entity.  The Cayman Island entity has one sole member, who is a citizen of, and domiciled in, a foreign country, and is neither a citizen of nor domiciled in Florida or Alabama.

4.     Defendant Amerant is a Florida corporation with its principal place of business in Coral Gables, Florida.  It is a Florida citizen.

5.     Defendant Alliance Metals is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. It is a Florida citizen.  According to prior representations by representatives of Alliance Metals to Plaintiff, Alliance Metals' sole members are a Florida corporation and an individual who is a citizen of Florida.

6.     Defendant Alliance Metals Alabama is an Alabama limited liability company with its principal place of business in Leighton, Alabama.  It is a citizen of Alabama and Florida.

According to prior representations by representatives of Alliance Metals to Plaintiff, Alliance Metals' sole member is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

7. Defendant Technocon is a Florida corporation with its principal place of business in Miami-Dade County, Florida. It is a Florida citizen.

8. Defendant L. Gitman is an individual residing in Miami-Dade County, Florida. He is a Florida citizen.

9. Defendant J. Gitman is an individual residing in Miami-Dade County, Florida. He is a Florida citizen.

**INTRODUCTION**

10. This action arises out of the Defendants' willful and flagrant attempt to usurp Euclid's superior property rights in certain promissory notes, guarantees, and underlying collateral. Defendant Amerant unconditionally agreed to sell, assign, and transfer its property rights to Euclid, the acquisition of which was essential to Euclid's strategy to enter the secondary aluminum smelting market. But, before the rights were formally transferred, and while the notes were still in Amerant's possession, Amerant secretly purported to sell those same rights to John Doe 1[1] at a price higher than the amount it had previously and unconditionally agreed to accept from Euclid.

11. Amerant did not work alone. On information and belief, it secretly colluded with John Doe 1 and the remaining defendants, who were fully aware of Amerant's prior assignment agreement with Euclid but nonetheless engaged in a campaign to interfere with the assignment agreement and prevent Euclid from receiving its property.

---

[1] Euclid has removed John Doe 1 as a Defendant in this lawsuit because it does not yet know his name, which Defendant Amerant has refused to provide despite multiple requests. To be clear, Euclid has no understanding or basis to believe that John Doe 1 is a citizen of the same state or states as Plaintiff.

12. Now, Amerant refuses to fulfill its legal obligation to transfer the note and related loan documents to Euclid, astoundingly claiming that it "no longer [has] a note" available to sell, assign, or transfer.

13. The decision was driven by a senior officer of Amerant, Juan Esterripa, who consciously chose to flout the bank's contractual commitments in exchange for a gain. Even worse, Amerant – a public, regulated bank – initially misled Euclid by misrepresenting that the note had been "paid off," when in fact the borrower had not paid off anything. Amerant simply tried to get a better deal, from a different buyer, on a note in which it no longer held a beneficial property interest.

14. John Doe 1 is believed to be acting in collusion with the Borrower and guarantors of the subject loans. On information and belief, Amerant has referred to John Doe 1 as a Russian national. However, notwithstanding repeated demands, Amerant has refused to identify John Doe 1 to Euclid.

15. Through this action, Euclid seeks all applicable remedies for Defendant Amerant's blatant and intentional breach of its contractual obligations and the remaining defendants' tortious interference.

**GENERAL ALLEGATIONS**

16. Until May 2024, Defendant Alliance Metals conducted a secondary aluminum smelting business. The business has since been inactive due to Alliance Metals' financial distress.

17. In 2022 and 2023, Amerant loaned a total of $8,658,083.09 to Alliance Metals for the purchase of major items of unique heavy machinery and equipment to be used in its smelting business, evidenced by two promissory notes (the "Notes"). The remaining defendants – Alliance Metals Alabama, Technocon, L. Gitman, and J. Gitman (together, the "Guarantors") – personally guaranteed the Notes (the "Guarantees"). As collateral, Alliance Metals granted to Amerant a first

4

lien security interest in certain unique heavy equipment and machinery purchased with the Amerant loan proceeds (the "Collateral"), which is used in the Borrower's business, including the following:[2]







5



18.     The Borrower failed to make the monthly payment due on the Notes on June 1, 2024, and failed to make any monthly payments thereafter.  Therefore, in August 2024, Amerant filed a separate lawsuit (the "Collection Suit") in Miami-Dade County for breach of the Notes and the Guarantees.

19.     Plaintiff Euclid is a limited partnership fund that focuses on turnaround investments in companies experiencing financial distress that Euclid believes can be restored to productive operating businesses.  Euclid identified Alliance Metals as such a potential turnaround candidate.  It began a review of the company and an assessment of the capital that would be required to address the creditor claims against the company and to re-start the dormant business.  As a result of that review, Euclid determined to proceed to structure an acquisition investment.

20.     Initially, Euclid discussed the potential acquisition investment with representatives of Alliance Metals.  During those discussions, Alliance Metals provided financial information

---

2   In order, the equipment reflected in the pictures are a 240,000 pound Reverb, a 120,000 CFM Baghouse, a 110 Ft. Ingot Line, and an X-Ray Metal Separation System.

about the company, including projections for a period following an anticipated re-start of operations.

21. Ultimately, Euclid and representatives of Alliance Metals were unable to reach an agreement on the terms of an acquisition investment by Euclid, and those discussions terminated.

22. Euclid next approached the lender, Amerant, to seek a discounted purchase of the obligations owed by the Borrower and Guarantors. The purchase was a key element of structuring a turnaround investment. At the time, Amerant was owed more than $8.9 million of defaulted debt from a non-operating business. It had commenced the Collection Suit seeking full collection, but based on discussions, it was clear that Amerant believed its prospect of obtaining collection from the Borrower and Guarantors was limited. Against this backdrop, Amerant and Euclid promptly reached an agreement for the sale and purchase of the loans at a deep discount.

23. On December 30, 2024, Amerant and Euclid entered into a written Loan Sale and Assignment Agreement (the "Assignment Agreement") (**Exhibit A**). Pursuant to the Assignment Agreement, Amerant became unconditionally obligated to "sell, assign and transfer" to Euclid all of Amerant's "right, title and interest in, to, and under" the loan, loan documents, the Guarantees, the Collateral and the separate Collection Suit. The Assignment Agreement provided for a 10% good-faith escrow deposit, which Euclid paid at the time of executing the Assignment Agreement. The two parties then coordinated on legal strategy in the Collection Suit.

24. The deeply discounted purchase price formed the cornerstone for Euclid to develop an overall acquisition plan to restart the business and to determine the necessary capital requirements. In reliance on the Assignment Agreement, Euclid engaged legal counsel and engineering and financial consultants to develop a comprehensive re-start plan and devoted very substantial internal time and resources to that purpose.

25. As is typical in such transactions, the Assignment Agreement contained a "diligence" contingency by which Euclid was afforded the opportunity through January 24, 2025, to complete due diligence with a *unilateral* option to terminate if the results of that diligence were not satisfactory (the "Diligence Contingency"). Amerant's obligations under the Assignment Agreement were, however, absolute, and it has no right to terminate for any reason.

26. The main element of the Diligence Contingency was an inspection of the Collateral by Euclid. The Assignment Agreement expressly required that Amerant cooperate with Euclid to permit such an inspection. Euclid engaged a third-party engineering consultant to conduct that inspection and sought to confirm inspection dates of January 14 and 15 to allow ample time to meet the outside Diligence Contingency date. Euclid requested that Amerant seek a court order in the Collection Suit compelling the Borrower to allow an inspection; however, Amerant's attorneys resisted that request and instead sought to proceed by means of an agreement with the Borrower, through its attorney. When the engineering consultants arrived on site on January 14 after travelling from Michigan to Alabama, the Borrower reneged on its agreement and refused to allow them to enter and inspect. Ultimately, after further delay and after the consultants had returned to Michigan, Amerant's attorneys obtained a court order compelling an inspection.

27. On January 17, Euclid notified Amerant that the Diligence Contingency had been satisfied and requested wire-transfer instructions for payment of the balance of the purchase price in accordance with the Assignment Agreement.

28. In response to that notification, Amerant dropped a bombshell – "Please be advised that the note was paid off earlier today . . . and as a result there is no longer a note available for sale."

29.     The notion that somehow the long-defaulted debt of more than $8.9 million was suddenly "paid off" was difficult to fathom.  Nonetheless, as the assignee of the Notes, any "payoff" would be payable to Euclid – not Amerant.  Therefore, on January 22, Euclid demanded turnover of those net proceeds.

30.     On January 27, Amerant communicated a second, and even more stunning, bombshell.  Amerant's Chief Commercial Banking Officer, Juan Esterripa, stated to Euclid that he had entered into a "payoff agreement" to accept $3.5 million as a purported payoff in satisfaction of the $8.9 million loan.

31.     Shortly thereafter, Amerant changed its story yet again.  Contrary to its prior representations, Amerant disclosed for the first time that the loan had not been "paid off" by the Borrower.  Rather, Amerant had purported to sell the Notes – which it had already sold to Euclid – to John Doe 1 for a purchase price higher than the purchase price in its agreement with Euclid. The third party, John Doe 1, has, on information and belief, been referred to by Amerant as a Russian national.  However, Amerant has refused to disclose the name of John Doe 1 to Euclid, notwithstanding repeated requests.

32.     Amerant admits that John Doe 1 and the other Defendants knew of Amerant's prior assignment of the Notes to Euclid.  They nevertheless proceeded to negotiate the purported purchase with Amerant in conscious disregard of Euclid's contractual rights and equitable title to the Notes.  Indeed, upon information and belief, Amerant's agreement with John Doe 1 is virtually identical to the Assignment Agreement and even references the Assignment Agreement.

33.     On information and belief, John Doe 1, in concert with the other defendants, intends to foreclose on the Collateral and, just as Euclid planned to do, restart future operations.

34. Based on publicly available information and belief, John Doe 1 to date has not taken any action to document his purported interest in the Notes and Guarantees, such as canceling the Notes or releasing the liens in the underlying Collateral. However, absent an injunction, Euclid is faced with the imminent threat that John Doe 1 will seek to do so.

35. All the facts that have now become known to Euclid make clear not only an intentional course of conduct by Amerant in flagrant and purposeful breach of the Assignment Agreement, but also a calculated, secret alliance between Amerant, John Doe 1, and the other defendants to strip Euclid of its rights under that Assignment Agreement.

36. As a direct and proximate result of Amerant's breach and the participation of the Defendants to promote that breach, Euclid has suffered and continues to suffer damages that are difficult to quantify, and which, even if they could be, would not adequately compensate Euclid for the lost business opportunity.

37. By this action, Euclid seeks (among other things) specific performance requiring Amerant to honor its contractual obligation to transfer the Notes, the Guarantees, and its rights in the Collateral and all related loan documents and obligations thereunder to Euclid. Euclid also seeks a temporary, preliminary, and permanent injunction enjoining Defendants and anyone in active concert or participation with them from purporting to take actions related to the Notes and Guarantees, in which only Euclid has beneficial ownership, including: (i) transferring to John Doe 1 the Notes, Guarantees, security interests and liens in the Collateral, and related UCC-1 statements; (ii) canceling, releasing, or further transferring the Notes, Guarantees, and security interests and liens in the Collateral; (iii) foreclosing on the liens or otherwise transferring any assets of Alliance Metals and Alliance Metals Alabama; and (iv) taking any action, including in

any other legal proceeding, that would materially affect Euclid's rights and interest in the Notes, Guarantees, and Collateral without Euclid's prior written consent.

## COUNT I – DECLARATORY JUDGMENT
### (As to Amerant)

38. Euclid realleges and incorporates the allegations contained in paragraphs 1 through 37 above as if fully set forth herein.

39. Euclid and Amerant entered into a valid and enforceable contract in the form of the Assignment Agreement.

40. Under the Assignment Agreement, Amerant had an unconditional obligation to sell, assign, and transfer to Euclid all Amerant's right, title and interest in, to, and under all obligations of the Borrower and Guarantors owed to Amerant, including the Notes, Guarantees and Collateral, with Euclid to step into Amerant's shoes in the Collections Suit to enforce its rights to repayment of the Notes and Guarantees.

41. Upon execution of the Assignment Agreement, Amerant retained only bare legal title to the Notes, the Guarantees, the security interests and liens in the Collateral, and other related obligations, whereas Euclid held equitable title.

42. Euclid has performed all conditions precedent to the transfer of this title.

43. As the holder of only legal title after December 30, 2024, Amerant had no right to agree to a loan sale agreement with John Doe 1 or to in any way amend, modify, or waive any provisions of the Notes, the Guarantees, the security interests and liens in the Collateral, and other related obligations in which Euclid holds equitable title.

44. A bona fide dispute exists between Euclid and Amerant as to the validity of Amerant's purported transfer of title to the Notes and Guarantees to John Doe 1.

11

45. There is a justiciable question as to the existence and superiority of Euclid's rights under the Assignment Agreement and in the Notes and Guarantees.

46. In the absence of a declaration, Euclid is in doubt of these rights.

47. There is a bona fide and actual need for a declaration by this Court as to the existence and superiority of Euclid's rights in the Notes and Guarantees. In the absence of such a declaration, Euclid faces imminent and present harm.

48. Accordingly, Euclid requests a final judgment by this Court declaring Euclid's superior rights, interests, and title to the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations.

## COUNT II – BREACH OF CONTRACT
### (As to Amerant)

49. Euclid realleges and incorporates the allegations contained in paragraphs 1 through 37 above as if fully set forth herein.

50. Euclid and Amerant entered into a valid contract in the form of the Assignment Agreement.

51. Under the Assignment Agreement, Amerant had an unconditional obligation to sell, assign, and transfer to Euclid all its right, title and interest in, to and under the loan obligations due from Alliance Metals together with the related Notes, Guarantees and Collateral, with Euclid to step into Amerant's shoes in the Collection Suit to enforce its rights to repayment of the Notes and Guarantees.

52. Amerant anticipatorily breached the Assignment Agreement when it expressly refused to transfer to Euclid all the rights and interests it was obligated to deliver under the Assignment Agreement. The breach was material because it involved the very essence of the Assignment Agreement.

53. Euclid is entitled to specific performance of Amerant's contractual obligations. Euclid has performed under the Assignment Agreement; Amerant has not. Euclid has no adequate remedy at law. Monetary damages are insufficient to remedy Amerant's breach because the Notes, Guarantees, and other rights purchased by Euclid are unique, form the basis for Euclid's reinvestment strategy, and are not easily valued in light of Euclid's intended purpose. Here the Collateral as currently installed is unique and specialized for a singular purpose that would allow Euclid to restart and conduct a secondary aluminum smelting business. The grant of specific performance is the only way to allow for such a restart and future business operations. Enforcement by this Court of the Assignment Agreement would be equitable and serve the interests of justice as Amerant and the other Defendants were aware of the reason for Euclid's purchase of Amerant's rights.

54. Accordingly, Plaintiff is entitled to judgment against Defendants for specific performance, preliminary and permanent injunctive relief, and all other relief permitted by law.

## COUNT III – CONVERSION
**(As to Amerant)**

55. Euclid realleges and incorporates the allegations contained in paragraphs 1 through 37 above as if fully set forth herein.

56. Amerant has wrongfully deprived Euclid of its right to possession of the Notes, the Guarantees, and related documentation concerning its property interests in the Collateral and all other rights and obligations in relation thereto.

57. Amerant's sale of the Notes, the Guarantees, and all other rights and obligations in relation thereto to John Doe 1 is inconsistent with Euclid's ownership of all rights and obligations under the Assignment Agreement. Furthermore, on information and belief, Amerant continues to exert dominion over the Notes, Guarantees, and related documentation, rather than transferring

those documents to Euclid. Amerant's dominion over those documents is inconsistent with Euclid's property right.

58. Euclid is therefore entitled to the imposition of a constructive trust requiring Amerant to turn over the Notes, the Guarantees, and all related loan documents.

59. Accordingly, Plaintiff is entitled to judgment against Defendants for preliminary and permanent injunctive relief, a constructive trust, and all other relief permitted by law.

### COUNT IV – IMPOSITION OF A CONSTRUCTIVE TRUST
(As to Amerant)

60. Euclid realleges and incorporates the allegations contained in paragraphs 1 through 37 above as if fully set forth herein and further alleges:

61. When it entered into the Assignment Agreement with Euclid, Amerant expressly promised to sell and transfer legal title to the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations to Euclid. Furthermore, at that time, Amerant impliedly promised to hold legal title to the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations in trust for Euclid until Euclid paid the remaining purchase price.

62. In direct contravention of the Assignment Agreement, Amerant, on information and belief, wrongfully purported to sell the legal title to the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations, which it held in trust for Amerant, to John Doe 1.

63. A confidential relationship existed between Euclid and Amerant. Under Florida law, confidential relationships are "not confined to the strict fiduciary relationship existing between those having definite, well-recognized legal relations of trust and confidence, but extend to every possible case in which a fiduciary relation exists as a fact, though it may be a moral,

14

social, domestic, or merely personal relationship." *Mayer v. Cianciolo*, 463 So. 2d 1219, 1222 n.1 (Fla. 3d DCA 1985).

64. Amerant has been unjustly enriched by its actions described above, including by having received a windfall from John Doe 1 when it purported to sell John Doe 1 property that rightfully belongs to Euclid and which Amerant agreed to hold in trust for Euclid.

65. The imposition of a constructive trust is necessary to prevent unjust enrichment and ensure fairness.

66. Accordingly, Plaintiff, is entitled to judgment against Defendants imposing a constructive trust in its favor, specific performance, preliminary and permanent injunctive relief, and all other relief permitted by law.

### COUNT V – TORTIOUS INTERFERENCE
### (As to Alliance Metals, Technocon, Alliance Metals Alabama, L. Gitman, and J. Gitman)

67. Euclid realleges and incorporates the allegations contained in paragraphs 1 through 37 above as if fully set forth herein and further alleges:

68. Euclid and Amerant entered into the Assignment Agreement, a valid, enforceable contract.

69. Alliance Metals, Technocon, Alliance Metals Alabama, L. Gitman, and J. Gitman (the "Interfering Defendants") knew that Euclid and Amerant had entered into the Assignment Agreement. *See Amerant Equip. Fin. v. Alliance Metals LLC et al.*, No. 2024-015430-CA-01 (Fla. 11th Jud. Cir.) at Doc. 39 ¶ 17 (disclosing in the Collections Suit that "[i]n December 2024, Amerant entered into an agreement for the purchase of the loans at issue. Accordingly, an

inspection of the Collateral is required before the due diligence period expires."). Upon information and belief, John Doe 1 also had knowledge about Euclid's Assignment Agreement.

70. Upon becoming aware of the Assignment Agreement, the Interfering Defendants embarked on a concerted and sustained campaign to frustrate and interfere with Euclid's rights thereunder, including Euclid's rights to receive the property Amerant was obligated to deliver. That campaign included egregious actions to interfere with and delay Euclid's inspection right. Most troubling in that regard was the telling reneging by the Interfering Defendants on their agreement to permit inspections on January 14 and 15, 2025, after Euclid's engineering consultants made the trip from Michigan to Alabama only to be denied admittance to the facility.

71. The Interfering Defendants, on information and belief, then urged Amerant to deal with them and/or John Doe 1 instead of Euclid and were ultimately successful in securing Amerant's agreement to "sell" John Doe 1 the same rights that Amerant was obligated to convey to Euclid under the Assignment Agreement.

72. On information and belief, John Doe 1, with the aid of the other Interfering Defendants, undertook its campaign to frustrate and interfere with Euclid's rights under the Assumption Agreement with the conscious aim of capitalizing on the same opportunity that Euclid intended to realize.

73. As a direct and proximate result of the Interfering Defendants' tortious interference, Euclid has suffered and continues to suffer damages in an amount to be determined at trial.

74. Plaintiff is entitled to judgment against the Interfering Defendants for preliminary and permanent injunctive relief, actual losses, consequential and special damages, pre- and post-judgment interest, and all other relief permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Euclid respectfully requests that this Court enter judgment in its favor as follows:

a) Declaring that Euclid is the equitable owner of the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations formerly owned by Defendant Amerant;

b) Ordering that Defendant Amerant perform its obligations under the Assignment Agreement;

c) Imposing a constructive trust in Euclid's favor over the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations;

d) Granting temporary, preliminary, and permanent injunctive relief enjoining Defendants and anyone in active concert or participation with them from purporting to take actions related to the Notes and Guarantees, in which only Euclid has beneficial ownership, including: (i) transferring to John Doe 1 the Notes, Guarantees, security interests and liens in the Collateral, and related UCC-1 statements; (ii) canceling, releasing, or further transferring the Notes, Guarantees, and security interests and liens in the Collateral; (iii) foreclosing on the liens or otherwise transferring any assets of Alliance Metals and Alliance Metals Alabama; and (iv) taking any action, including in any other legal proceeding, that would materially affect Euclid's rights and interest in the Notes, Guarantees, and Collateral without Euclid's prior written consent.

e) Against the Interfering Defendants for all actual losses, consequential and special damages, pre- and post-judgment interest, and all other relief permitted by law; and

f) For such other and further relief as the Court deems just, proper, and equitable.

Dated: February 14, 2025　　　　　　　　　　**MCDERMOTT WILL & EMERY LLP**

　　　　　　　　　　　　　　　　　　　　　　*s/ Audrey Pumariega*
　　　　　　　　　　　　　　　　　　　　　　Audrey Pumariega (FBN 85206)
　　　　　　　　　　　　　　　　　　　　　　apumariega@mwe.com
　　　　　　　　　　　　　　　　　　　　　　Corey Kraftsow (FBN 1058684)
　　　　　　　　　　　　　　　　　　　　　　ckraftsow@mwe.com
　　　　　　　　　　　　　　　　　　　　　　333 SE 2nd Avenue
　　　　　　　　　　　　　　　　　　　　　　Suite 4500
　　　　　　　　　　　　　　　　　　　　　　Miami, Florida 33131-4336
　　　　　　　　　　　　　　　　　　　　　　Tel: (305) 358-3500
　　　　　　　　　　　　　　　　　　　　　　Fax: (305) 347-6500

　　　　　　　　　　　　　　　　　　　　　　Debbie E. Green (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　2501 North Harwood Street, Suite 1900
　　　　　　　　　　　　　　　　　　　　　　Dallas, Texas 75201
　　　　　　　　　　　　　　　　　　　　　　Tel: (214) 210-2821
　　　　　　　　　　　　　　　　　　　　　　Fax: (972) 528-5765
　　　　　　　　　　　　　　　　　　　　　　dgreen@mwe.com

　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Euclid Turnaround Opportunity Fund LP*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on **February 14, 2025**, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. A copy will be contemporaneously served via email to all parties on the below Service List below.

## **SERVICE LIST**

VIA CM/ECF
David S. Garbett, Esq.
dgarbett@garlawfirm.com
Brian P. Yates, Esq.
byates@garlawfirm.com
Garbett, Allen, Roza & Yates, P.A.
80 SW 8th Street Suite 3100
Miami, Florida 33130-3004
T: 305.536.8866
F: 305.579.4722

*Counsel for Amerant Equipment Finance, a Division of Amerant Bank, N.A.*

VIA EMAIL
Alliance Metals LLC
Technocon International, Inc.
Alliance Metals Alabama, LLC
Larry Y. Gitman
Jacob Gitman
C/O Stok Kon + Braverman
Attn: Joshua R. Kon, Esq.
    jkon@stoklaw.com
    gortiz@stoklaw.com
    service@stoklaw.com
    Yosef Y. Kudan, Esq.
    ykudan@stoklaw.com
    Mitchell J. Cohen, Esq.
    mcohen@stoklaw.com
One East Broward Boulevard, Suite 915
Fort Lauderdale, Florida 33301
T: 954.237.1777
F. 954.237.1737

*/s/ Audrey Pumariega*
Audrey Pumariega

## **VERIFICATION**

I, Howard Siegel, am the Manager of the General Partner of Euclid Turnaround Opportunity Fund LP.  I declare under penalty of perjury under the laws of the United States of America that, except with respect to those allegations made on information and belief, the factual allegations in the foregoing Verified Complaint are true and correct to the best of my knowledge and belief.

Executed on this 14th day of February 2025

*s/ Howard Siegel*
Howard Siegel