**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-cv-20647-BLOOM/Elfenbein

EUCLID TURNAROUND OPPORTUNITY
FUND LP,

      Plaintiff,

v.

AMERANT EQUIPMENT FINANCE, *et al.*,

      Defendants.

_____/

## ORDER ADOPTING REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon (1) Defendant Amerant Equipment Finance

("Amerant")'s Motion to Dismiss Counts I, II, V, VI, VII and IX of Third Amended Complaint,

to Strike Claims for Punitive Damages, and for Enlargement of Time to Answer Count VIII (the

"Amerant Motion"), ECF No. [131]; (2) Defendants Alliance Metals LLC ("Alliance Metals"),

Technocon International, Inc. ("Technocon"), Alliance Metals Alabama, LLC ("Alliance

Alabama"), Larry Y. Gitman ("L. Gitman"), and Jacob Gitman ("J. Gitman")'s (collectively,

"Alliance Defendants") Motion to Dismiss Plaintiff's Third Amended Complaint with Prejudice

(the "Alliance Motion"), ECF No. [132]; and (3) Defendants SB Ecliptica LLC ("Ecliptica"),

Truewind Management LLC ("Truewind"), America1 Industries LLC ("America1 Industries"),

America1 Holdings LLC ("America1 Holdings"), and Sergei Bratushev ("Bratushev")'s

(collectively, "America1 Defendants") Motion to Dismiss Third Amended Complaint and to Strike

Request for Punitive Damages[1] (the "America1 Motion"), ECF No. [137]. The Court referred the

---

[1] America1 Defendants requested oral argument for their Motion. However, because the Court is able to decide the Motion on the briefings, the request is denied.

Motions to Judge Marty Fulgueira Elfenbein for a Report and Recommendation. ECF No. [138]. On October 6, 2025, Judge Elfenbein issued a Report and Recommendation on Motions to Dismiss ("R&R"), ECF No. [175]. Alliance Defendants, Amerant, and America1 Defendants filed Objections. ECF Nos. [189]; [190]; [191]. Plaintiff Euclid Opportunity Fund L.P. filed Responses to each Objection. ECF Nos. [202]; [201]; [203]. The Court has considered the Motion, the R&R, the supporting and opposing submissions, the applicable law, and is otherwise fully advised. For the reasons that follow, the Objections are overruled and the R&R is adopted in full.

## I.    BACKGROUND

The Court assumes the parties' familiarity with the case and adopts the background section contained in the R&R. ECF No. [175] at 2-17. The Court provides only the background necessary to resolve the instant Motions.

This case arises out of an attempted business deal between Plaintiff Euclid Turnaround Opportunity Fund LP ("Euclid") and Amerant. Euclid is a "limited partnership fund that focuses on turnaround investments in companies experiencing financial distress" that it "believes can be restored to productive operating businesses." ECF No. [111] at 3, 10. Amerant is a "national banking association." *Id.* at 4. "In 2022 and 2023, Amerant loaned a total of $8,658,083.09 to" Alliance Metals, a Florida limited liability company that until May 2024 "conducted a secondary aluminum smelting business." *Id.* at 4, 7-8. The loan was "evidenced by two promissory notes" (the "Notes"), which were "personally guaranteed" by Alliance Alabama, Technocon, L. Gitman, and J. Gitman. *Id.* at 7. "L. Gitman and J. Gitman control and direct" Alliance Metals, Alliance Alabama, and Technocon. *Id.* at 4.

Alliance Metals used the loan money to buy "major items of unique heavy machinery and equipment" for its smelting business, and it "integrated" that machinery and equipment "into the real estate" at its facility in Alabama, which Alliance Alabama owns. *Id.* at 7-8. Alliance Metals

gave Amerant "a first lien security interest in" the machinery and equipment as collateral for the loan. *Id.* at 7. In June 2024, Alliance Metals' business became "inactive due to . . . financial distress," and it "failed to make the monthly payment due on the Notes on June 1, 2024" and any monthly payment due after that. *See id.* at 7, 10. For that reason, in August 2024, Amerant filed a state-court lawsuit for breach of the Notes and the Guarantees, "which carried an accelerated balance due of more than $8.9 million." *Id.* at 10.

Euclid identified Alliance Metals as "a potential turnaround candidate" and "began a review of the company" to assess "the capital that would be required to address the creditor claims against" it and "re-start the dormant business." *Id.* at 10. After that review, Euclid discussed a "potential acquisition investment with representatives of Alliance Metals, including J. Gitman and L. Gitman. During those discussions, Alliance Metals provided financial information about the company, including projections for a period following an anticipated re-start of operations." *Id.* at 10. Ultimately, however, Euclid and the "representatives of Alliance Metals were unable to reach an agreement on the terms of an acquisition investment," and the discussions ended. *Id.* at 11.

Euclid still wanted to pursue a turnaround investment in Alliance Metals, so it approached Amerant "to seek a discounted purchase of the obligations owed" on the Notes and the Guarantees by Alliance Metals, Alliance Alabama, Technocon, and the Gitmans (collectively, the "Alliance Defendants"). *See id.* at 11. The purchase at a discounted price "was a key element of structuring" the turnaround investment, and because Amerant believed its prospect of obtaining collection from the Alliance Defendants "was limited," Euclid and Amerant "promptly reached an agreement for the sale and purchase of the loans at a discount." *See id.* at 11. On December 30, 2024, Euclid and Amerant entered into a written Loan Sale and Assignment Agreement (the "Assignment Agreement"). *Id.* at 11; ECF No. [111-1].

Under the Assignment Agreement, Amerant "became unconditionally obligated" to sell, assign, and transfer to Euclid all its rights under, title to, and interest in the loan, the loan documents, the Guarantees, the machinery/equipment collateral, and the state-court collection lawsuit. ECF No. [111] at 11. Euclid, for its part, had to pay (and did pay) a "10% good-faith escrow deposit." *Id*. "Amerant's obligations under the Assignment Agreement" were "absolute, and it had no right to terminate for any reason." *Id.* at 12. Euclid, on the other hand, "was afforded the opportunity through January 24, 2025, to complete due diligence with a unilateral option to terminate if the results of that diligence were not satisfactory." *Id*. Diligence clauses like this one are "typical in such transactions." *Id*.

The "main element" of the diligence clause allowed Euclid to inspect the machinery/equipment collateral, and the "Assignment Agreement expressly required that Amerant cooperate with" Plaintiff "to permit such an inspection." *Id*. Euclid "engaged a third-party engineering consultant to conduct that inspection and sought to confirm inspection dates of January 14 and 15 to allow ample time to meet the" January 24 deadline in the Assignment Agreement. *Id*. To facilitate the inspection, Euclid asked Amerant to seek a court order in the state-court collection lawsuit that would compel Alliance Metals to allow the inspection, but "Amerant's attorneys resisted that request and instead sought to proceed by means of an agreement with" Alliance Metals through its attorney. *Id.* at 12-13. When the time came for the inspection on January 14, Euclid's engineering consultants arrived at the Alabama facility after traveling from Michigan, but Alliance Metals "reneged on its agreement and refused to allow them to enter and inspect." *Id.* at 13. "Ultimately, after further delay and after the consultants had returned to Michigan, Amerant's attorneys obtained a court order compelling an inspection." *Id*.

Despite not being able to complete the inspection as intended on January 14, Euclid notified Amerant on January 17 that the diligence clause was "satisfied and requested wire-transfer

instructions for payment of the balance of the purchase price in accordance with the Assignment Agreement." *Id*. In response, Amerant told Euclid that the Notes had been paid off earlier that day and "as a result" were no longer for sale. *Id*. Because, "as the assignee of the Notes, any payoff would be payable to" Euclid and not to Amerant, on January 22, Euclid "demanded turnover" of the "net proceeds" of the payoff. *Id*. In response to that request, on January 27, Amerant's Chief Commercial Banking Officer told Euclid that he had "entered into a payoff agreement to accept $3.5 million as a purported payoff in satisfaction of the $8.9 million loan." *Id*. "Shortly thereafter, Amerant changed its story yet again. Contrary to its prior representations, Amerant disclosed for the first time that the loan had not been paid off by" Alliance Metals but instead had been sold to Ecliptica "for a purchase price higher than the purchase price in" the Assignment Agreement between Amerant and Euclid. *Id*. Amerant "purported to sell the Notes" to Ecliptica despite having "already sold" them to Euclid. *Id*.

"Unbeknownst to" Euclid, when Ecliptica, Truewind, America1 Holdings, and Bratushev (collectively, the "Bratushev Defendants") and the Alliance Defendants "became aware" that Euclid "had entered into the Assignment Agreement, they worked with Amerant to interfere with the contract" and Euclid's "business relationship and deprive" Euclid "of its property rights." *See id*. at 14. After Euclid and Amerant executed the Assignment Agreement on December 30, Euclid's "representatives informed the Alliance Defendants of the Assignment Agreement." *Id*. "From January 3, 2025 through January 8, 2025," Euclid's "representatives exchanged text messages with the Alliance Defendants, including L. Gitman and J. Gitman, in which the Alliance Defendants refused to cooperate with" Euclid unless Euclid "agreed to demands from the Alliance Defendants for cash and an equity interest in the re-started business." *Id*.

"At the same time, between January 3, 2025, and January 6, 2025," the Bratushev Defendants and Amerant "entered into negotiations on a loan purchase and sale agreement nearly

identical to the Assignment Agreement that" Euclid and Amerant had "executed days earlier." *Id*. "During these negotiations, and no later than January 6, 2025, Amerant's in-house counsel informed" the Bratushev Defendants "that Amerant had already entered into the Assignment Agreement" with Euclid. *Id*. "In fact, Amerant's in-house counsel sent the" Bratushev Defendants a "draft backup Loan Sale and Assignment Agreement on January 6, 2025, which disclosed that Amerant had already entered into a primary Loan Sale and Assignment Agreement, that is, the Assignment Agreement with" Euclid. *Id*. "Just two days later, on January 8, 2025, even though Amerant remained bound by the Assignment Agreement," its in-house counsel, "at the direction of" its Chief Commercial Banking Officer (who is its "senior loan officer") sent the Bratushev Defendants "a revised draft of a loan and sale agreement for the Notes that deleted references to Amerant's prior obligations to" Euclid, "reflecting Defendants' intent to erase" Euclid's "property rights." *See id.* at 14-15.

"Over the next week, the" Bratushev Defendants "and Amerant, with the knowledge, agreement, and assistance of the Alliance Defendants, negotiated the details of an agreement for Ecliptica to purchase the Notes from Amerant for a price several hundred thousand dollars higher than the price Amerant agreed to accept from" Euclid in the Assignment Agreement. *Id.* at 15. "The Alliance Defendants preferred for the" Bratushev Defendants to buy the Notes instead of Euclid because the Bratushev Defendants "agreed to allow the Alliance Defendants to maintain an ownership and operational interest in the underlying aluminum smelting business, whereas" Euclid "would not accept the Alliance Defendants' unreasonable demands." *Id*.

To give the Bratushev Defendants and Amerant "time to work out the details of their illicit deal," the Bratushev Defendants, Amerant, and the Alliance Defendants "colluded to delay" Euclid's "completion of its due diligence, particularly" its "inspection of the Alliance Metals' facility and" the machinery/equipment collateral, despite Euclid's "urgent requests to expedite the

process." *Id*. "Representatives of Alliance Metals and Alliance Alabama misled representatives of" Euclid "regarding the scheduling of an inspection and refused to permit an inspection at the times" Euclid requested. *Id*. The "inspection delay allowed the" Bratushev Defendants, Amerant, and the Alliance Defendants to delay both Euclid's notification that the diligence clause had been satisfied and its transfer of the balance of the purchase price to Amerant under the Assignment Agreement. *Id*. Once Euclid "insisted on filing an emergency motion in the" state-court collection lawsuit to permit the inspection, Amerant's Chief Commercial Banking Officer and its in-house counsel "rushed to complete Amerant's transaction with the" Bratushev Defendants. *Id*.

"On Tuesday, January 14 — the same day" Euclid "brought specialists from Michigan to Alabama to perform a scheduled inspection, only to be turned away by the Alliance Defendants — Amerant's in-house counsel texted counsel for the" Bratushev Defendants, "in conscious disregard" of Euclid's "contractual rights and equitable title to the Notes" to say: "Any updates on whether your client is going to close today[?] We need to close this week. Otherwise, we will proceed with the primary contract." *Id.* at 15-16. "The primary contract, of course, was" the Assignment Agreement between Euclid and Amerant. *Id.* at 16. "Armed with this knowledge and assistance from Amerant and the Alliance Defendants, and" at the time "unbeknownst to" Euclid, the Bratushev Defendants "quickly entered into a loan and sale agreement with Amerant to purchase the Notes on or around January 15, 2025." *Id*. The next day, January 16, "Amerant accepted payment under its agreement with the" Bratushev Defendants, "contrary to Amerant's internal procedures" and "despite warnings from its in-house counsel that such an agreement would lead Amerant to breach its obligations to" Euclid. *Id*.

The "Alliance Defendants invoked these moves to resist" Euclid's "eventual effort to seek injunctive relief, claiming on February 19, 2025, that the Alliance Defendants already took steps to reorganize the business in reasonable reliance on the consummated sale" with the Bratushev

Defendants, "including entering into agreements and delivering a mortgage on the unsecured real property on which the relevant metal-working equipment now sits." *Id*. at 16-17. "This representation indicates that the Alliance Defendants had Alliance Alabama, as the owner of the real property on which the relevant metal-working equipment now sits, encumber the real property on which" the machinery/equipment collateral is installed. *Id*. at 17.

The Defendants' "scheme also is evident from the formation of two America1 entities on January 21, 2025, less than a week after Ecliptica entered into its agreement with Amerant." *Id*. One of those entities is Defendant America1 Industries, in which the Bratushev Defendants and the Alliance Defendants "share an ownership interest." *Id*. America1 Industries "now purports" through its "public website" to "solicit aluminum smelting business in association with the same Leighton, Alabama, address listed on Alliance Metals' public website." *Id*. "America1 Industries subsequently filed applications to transact business in Alabama on January 29, 2025, and in Florida on February 7, 2025." *Id*. "Similarly, on January 29, 2025, counsel for the" Bratushev Defendants "instructed Amerant to file a substitution of parties document in the" state-court collection lawsuit "substituting America1 Holdings for Amerant because Ecliptica had, according to two of its attorneys, assigned the Notes to America1 Holdings," which the Bratushev Defendants also control. *Id*. Later, however, counsel for the Bratushev Defendants "submitted a declaration purporting to walk back his earlier representation regarding the re-assignment to America1 Holdings" in an "effort to shield America1 Holdings from discovery in this matter." *Id*.

"Either way, the back and forth and quick formation and overlap of entities demonstrates that the entities that make up the Alliance Defendants and the" Bratushev Defendants "are not independent corporate entities, but instead are shareholder dominated to such an extent that they have no independent existence, such that the shareholders are the alter egos of the corporations." *Id*. at 18. It also demonstrates that "the corporate form was used fraudulently or for an improper

purpose — to hinder, delay, and ultimately defeat" Euclid's "ability to enforce its rights and profit from its investment under the Assignment Agreement and shield Defendants' assets from liability for their wrongdoing." *Id*. "All the facts that have now become known to" Euclid "make clear not only an intentional course of conduct by Defendants in flagrant and purposeful breach of the Assignment Agreement, but also a calculated, secret alliance between Amerant, America1 Industries," the Bratushev Defendants, and the Alliance Defendants to "strip" Euclid "of its rights under that Assignment Agreement." *Id*.

For that reason, "Defendants are personally guilty of intentional misconduct." *Id*. Specifically, "Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that it would harm" Euclid, but they still "intentionally pursued that course of conduct, resulting in" harm. *Id*. "Those Defendants that are corporations or limited liability companies are liable for the intentional misconduct of their managing agents." *Id*. "As a direct and proximate result of Defendants' wrongful conduct," Euclid "has suffered and continues to suffer substantial damages." *Id*.

In the operative Third Amended Complaint, Euclid asserts nine claims against some or all Defendants: (1) Conversion against Amerant, Ecliptica, and America1 Holdings ("Count 1"); (2) Aiding and Abetting Conversion against all Defendants except Ecliptica ("Count 2"); (3) Tortious Interference with Contract against all Defendants except Amerant ("Count 3"); (4) Aiding and Abetting Tortious Interference with Contract against all Defendants except Amerant and Ecliptica ("Count 4"); (5) Tortious Interference with Business Relationship against all Defendants except Alliance Metals and Alliance Alabama ("Count 5"); (6) Aiding and Abetting Tortious Interference with Business Relationship against all Defendants except Ecliptica, Alliance Metals, and Alliance Alabama ("Count 6"); (7) Civil Conspiracy against all Defendants ("Count 7"); (8) Breach of Contract against Amerant only ("Count 8"); and (9) Declaratory Judgment against all Defendants

("Count 9"). Euclid also requested punitive damages based on Defendants' egregious conduct. *See* ECF No. [111].

In June 2025, all eleven Defendants filed motions to dismiss. *See* ECF Nos. [131]; [132]; [137]. They did so in three groups: Amerant filed the Amerant Motion on its own, ECF No. [131]; the Alliance Defendants filed the Alliance Motion together, ECF No. [132]; and the Bratushev Defendants, together with America1 Industries (collectively, the "America1 Defendants"), filed the America1 Motion, ECF No. [137]. In the R&R, Judge Elfenbein recommends that the Motions be granted in part and denied in part. ECF No. [175].

## II.   LEGAL STANDARD

"In order to challenge the findings and recommendations of the magistrate judge, a party must file written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.*, 208 F. App'x 781, 783 (11th Cir. 2006) (quoting *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)) (alterations omitted). The objections must also present "supporting legal authority." S.D. Fla. L. Mag. J.R. 4(b). The portions of the R&R to which an objection is made are reviewed *de novo* only if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3). If a party fails to object to any portion of the magistrate judge's report, those portions are reviewed for clear error. *Macort*, 208 F. App'x at 784; *see also Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001). However, "[a] district court reviewing a magistrate judge's discovery order is, in general, limited by statute and rule to reversing that order only if it is 'clearly erroneous or contrary to law.'" *Wausau Underwriters Ins. Co. v. Danfoss, LLC*, 310 F.R.D. 689, 690 (S.D. Fla. 2015) (quoting *SEC v. Merkin*, 283 F.R.D. 699, 200 (S.D. Fla. 2012)).

"It is improper for an objecting party to . . . [submit] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R." *Marlite, Inc. v. Eckenrod*, No. 10-cv-23641, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012) (quoting *Camardo v. Gen. Motors-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)). A court, in its discretion, need not consider arguments that were not, in the first instance, presented to the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009). A district court may accept, reject, or modify a magistrate judge's R&R. 28 U.S.C. § 636(b)(1).

## III.   DISCUSSION

### A.  Amerant's Objections

In the R&R, Judge Elfenbein recommended that Amerant's Motion be denied as to Counts 1 (Conversion); 2 (Aiding and Abetting Conversion); 7 (Civil Conspiracy); and 9 (Declaratory Judgment). ECF No. [175] at 40-46. Judge Elfenbein also recommended that the Court deny Amerant's motion to strike Euclid's request for punitive damages and grant Amerant's motion for an extension of its deadline to answer Count 8 (Breach of Contract). *Id.* at 45, 46. Amerant objected, arguing (1) the R&R did not address the threshold issue of whether the tort claims seek "independent, separate, and distinct damages"; (2) the R&R erred in limiting its analysis to whether allegations were required to prove breach of contract instead of whether the conduct was independent of the contract; (3) the cases upon which the R&R relied to permit the theory that a party can hold equitable title outside of the real estate context are not applicable; (4) because Euclid has failed to state a claim for conversion, the aiding and abetting conversion claim does not survive; (5) regarding the civil conspiracy claim, the R&R only analyzed the conversion claim as the underlying wrongdoing against Amerant and the conspiracy claim fails if the underlying claims

11

are not viable; (6) the R&R did not address Amerant's argument that Euclid has not sufficiently

alleged specific acts or wrongdoing to support punitive damages; and (7) the Court should not

exercise its discretion to permit a declaratory judgment claim because Euclid no longer seeks

ownership of the loan documents. ECF No. [190]. Euclid responds that the R&R (1) properly

concluded that Euclid's tort claims are valid under the independent tort doctrine; (2) correctly

upheld Euclid's tort claims for conversion, aiding and abetting conversion, and civil conspiracy;

(3) correctly recommended denying Amerant's request to strike Euclid's request for punitive

damages; and (4) correctly recommended denying Amerant's Motion to Dismiss Euclid's claim

for declaratory relief. ECF No. [201].

### i.       Independent Tort Doctrine

As Judge Elfenbein has pointed out:

> [t]he Florida Supreme Court has recognized that a party may bring "causes of action based
> upon torts independent of the contractual breach even though there exists a breach of
> contract action." *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies*, Inc., 110
> So. 3d 399, 402 (Fla. 2013) (citation omitted). "Where a contract exists, a tort action will
> lie for either intentional or negligent acts considered to be independent from the acts that
> breached the contract." *Id*. (citation omitted). The Court has explained that claims are
> "independent tort[s]" when they "require[] proof of facts separate and distinct from the
> breach of contract." *See id*. (citation omitted); *cf. Lamm v. State St. Bank & Tr.*, 749 F.3d
> 938, 947 (11th Cir. 2014) (noting that "the exact contours of" the independent tort doctrine,
> "as applied post-*Tiara*, are still unclear," but that "the standard appears to be that where a
> breach of contract is combined with some other conduct amounting to an independent tort,
> the breach can be considered negligence" (quotation marks omitted)).

ECF No. [175] at 35.

Amerant first argues that Judge Elfenbein's analysis failed to address the requirement that

plaintiffs "plead damages for tort claims 'independent, separate and distinct from the damages

sustained from the contract's breach." ECF No. [190] at 4 (quoting *Merch. One, Inc. v. TLO, Inc*.,

No. 19-cv-23719, 2020 WL 248608, at *4 (S.D. Fla. Jan. 16, 2020)). Because Euclid "seeks the

identical damages for the contract and tort claims[,]" specifically, "compensatory damages + lost

profits)", Amerant argues Counts 1, 2, and 7 should be precluded by the independent tort doctrine. *Id.* (citing ECF No. [111] ¶¶ 62-64, 65-69, 91-97, 104-109).

Indeed, this Court has previously recognized that "[w]here damages sought in tort are the same as those for breach of contract a plaintiff may not circumvent the contractual relationship by bringing an action in tort." *Merch. One*, 2020 WL 248608, at *4 (quoting *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994)). The Court also stated, "[h]owever, the independent tort doctrine does not bar claims where the plaintiff alleges conduct independent from acts that breach the contract, and do not in and of themselves constitute a breach of the contract." *Id.* (citing *XP Glob. Inc. v. AVM, L.P.*, No. 16-cv-80905, 2016 WL 4987618, at *4 (S.D. Fla. Sept. 19, 2016)). As Euclid points out, it alleged "that Amerant's misconduct involved 'far more' than a simple breach of its obligation to show up [to] the closing or failure to transfer the notes to Euclid." ECF No. [201] at 7-8 (quoting ECF No. [175] at 38). The R&R described in detail the allegations that support Counts 1, 2, and 7, but are not "necessary to prove [Euclid's] breach-of-contract claim." ECF No. [175] at 37-39. These additional allegations of Amerant's "affirmative and intentional acts" included:

- Proactively negotiating a separate agreement with the SB Defendants to sell the loans to SB Ecliptica for several hundred thousand dollars more than it agreed to accept from Euclid. TAC ¶ 48.
- Obstructing Euclid's due-diligence, as Amerant resisted seeking a court order to permit Euclid's inspection of the collateral. *Id.* ¶ 38.
- Colluding with the SB Defendants to speed up the completion of the separate, more lucrative transaction with the SB Defendants, during the time when Euclid's due diligence was delayed and when it became clear that Euclid wanted to move forward. *Id.* ¶ 50.
- Misrepresenting the status of the loans repeatedly to hide the competing sale and prevent Euclid from taking immediate action to block the separate transaction with the SB Defendants. *Id.* ¶ 52.

ECF No. [201] at 8.

As this Court has previously held, "the independent tort doctrine will not bar tort claims based on an 'action beyond and independent of breach of contract that amounts to an independent tort.'" *Pearson v. Deutsche Bank AG*, No. 21-cv-22437, 2023 WL 5905958, at *9 (S.D. Fla. Sept. 11, 2023) (quoting *Reagan Wireless Corp. v. Apto Sols., Inc.*, No. 18-cv-61147, 2018 WL 4901127, at *3 (S.D. Fla. Oct. 9, 2018)). The R&R described in detail the allegations of Counts 1, 2, and 7 that were not "necessary to support a breach-of-contract claim." ECF No. [175] at 37-39. The Court agrees with the R&R's analysis.

Amerant also argues that the R&R erred because, even if Euclid alleged conduct that is "not necessary for a contract claim, the question is whether the alleged conduct is independent of the contract and not itself a breach of the contract." ECF No. [190] at 7. Because the "supposed extra-contract allegations" all "arise from and are related to the contract" the independent tort doctrine bars Counts 1, 2, and 7. *Id.* at 7-8. Euclid responds that Amerant "advances an interpretation of the independent tort doctrine irreconcilable with Florida law" and "makes no effort to reconcile its broad 'arises from or related to' rule with binding Florida precedent that permits tort claims bearing some relationship to a contract to proceed." ECF No. [201] at 9 (citing *Masvidal v. Ochoa*, 505 So. 2d 555, 556 (Fla. 3d DCA 1987) ("[W]e are not persuaded by the argument that no civil theft or conversion occurred in this case because there was a contractual relationship between the parties."); *Duncan v. Kasim, Inc.*, 810 So. 2d 968, 971 (Fla. 5th DCA 2002) ("This court held that the mere existence of a contractual relationship between the parties does not preclude actions for civil theft and conversion."); *Pershing Indus., Inc. v. Estate of Sanz*, 740 So. 2d 1246, 1248 (Fla. 3d DCA 1999) (holding that independent tort doctrine "does not preclude independent tort claims that fall outside the scope of a breach of contract," including conversion)). Although there must be a "'meaningful' or 'substantive' distinction[] between the tort claim and the breach of contract claim[,]" Amerant urges the Court to impose a lower standard

14

for applying the independent tort doctrine. *Kanen v. BBQ Holdings, Inc.*, No. 23-cv-62173, 2024 WL 5508197, at *11 (S.D. Fla. Nov. 8, 2024). Euclid responds that "[n]one of the authorities that Amerant cites involved affirmative, extracontractual misconduct like Amerant engaged in here. To the contrary, most of the cases concerned the simple failure of a defendant to pay a debt or some other amount owed to the plaintiff." ECF No. [201] at 7.

For example, Amerant argues that, in *ReneG*, this Court dismissed "claims for civil theft, conversion and violation of Fla. Stat. § 674.401 as not independent from the deposit agreement, which covered subject matter of tort claims[.]" ECF No. [190] at 8. However, in *ReneG*, this Court found that these claims were barred by the independent tort doctrine because "each claim is premised on" the alleged breach of contract and "Plaintiff has failed to allege any independent act that would support the tort claims." *ReneG*, 2025 WL 2239263, at *4. Similarly, in *Alhassid v. Bank of Am., N.A.*, which Amerant also cites, this Court found that the "minimal facts alleged by Plaintiffs to substantiate their claim for civil conspiracy are identical to their remaining breach of contract allegations." 60 F. Supp. 3d 1302, 1318 (S.D. Fla. 2014). Therefore, the Court determined that the plaintiffs "have not pleaded any breach or injury separate and apart from their breach of contract claims." *Id.* The same is not true here as Euclid has alleged several affirmative, independent acts that are distinct from the breach of contract claim.

To the extent Amerant argues that Euclid "seeks the identical damages for the contract and tort claims," Amerant relies upon the fact that in Counts 1, 2, and 7, Euclid states it is entitled to "compensatory damages and lost profits." ECF No. [111] ¶¶ 64, 69, 97, 103, 108. However, these are broad categories of damages that apply across a wide range of causes of action. The mere fact that Euclid alleges that it is "entitled to judgment against Defendants for compensatory damages [and] lost profits" cannot be interpreted to mean that it is therefore asking for identical damages

for every claim. In making this argument, Amerant misinterprets *Peebles v. Puig*, in which the Court stated it is "well settled that, for an alleged misrepresentation regarding a contract to be actionable, the damages stemming from that misrepresentation must be independent, separate and distinct from the damages sustained from the contract's breach." 223 So. 3d 1065, 1068 (Fla. 3d DCA 2017). As Euclid notes, *Peebles* "was decided post-trial, after all evidence was presented, and stands for the proposition that a plaintiff may not *recover* 'duplicate damages.'" ECF No. [201] at 12 (quoting *Peebles*, 223 So. 3d at 1069). Euclid also argues that "[t]his case is not like *Merch. One* . . . where damages were limited to a defendant's failure to pay a defined sum. Rather, Euclid alleges a complex scheme resulting in various forms of harm, including substantial lost profits." *Id.* (citing *Merch. One*, 2020 WL 248608 at *4). Therefore, the R&R properly concluded that the independent tort doctrine does not bar Counts 1, 2, and 7. ECF No. [175] at 39.

### ii.     Conversion; Aiding and Abetting Conversion

To state a claim for conversion against Amerant, Euclid "must allege Amerant wrongfully asserted dominion over [Euclid]'s property in a way that was inconsistent with [Euclid's] ownership interest." ECF No. [175] at 40 (citing *Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co.,* 125 F. Supp. 2d 1093, 1099 (S.D. Fla. 2000)). The R&R noted that Euclid alleged "Amerant 'secretly sold' the Notes and Guarantees to Ecliptica and that the sale 'was inconsistent with'" Euclid's ownership rights under the Assignment Agreement. *Id.* (quoting ECF No. [111] at 6, 19). Euclid also alleged that Amerant "exerted wrongful dominion and control over the Notes, Guarantees, and related documentation, rather than transferring those documents to" Euclid, despite Euclid's demand for their return. *Id.* (quoting ECF No. [111] at 19). Therefore, Judge Elfenbein concluded that the allegations "are sufficient to satisfy the elements of conversion." *Id.* (citing *Bove v. PBW Stock Exch., Inc.*, 382 So. 2d 450, 452 (Fla. 2d DCA 1980)).

16

The R&R rejected Amerant's argument, now raised again in its Objections, that Euclid "does not have a sufficient ownership interest in the Notes and related rights because Florida has not recognized that a party can hold equitable title outside of the real estate context, so there cannot be 'equitable conversion' here." *Id.* at 41 (citing ECF No. [131] at 8-9). Judge Elfenbein relied upon the caselaw Euclid "cite[d] in its Response, including decisions in which Florida courts recognized conversion of equitable owners' interests in a stock exchange seat and a jet (albeit without explicitly calling the interests equitable)[.]" *Id.* This caselaw, the R&R concluded, "suggests that Florida law would in fact permit the theory in this context." *Id.* (citing *Bove*, 382 So. 2d at 452-54; *Un2jc Air 1, LLC v. Whittington*, 324 So. 3d 1, 4-5 (Fla. 4th DCA 2021)).

Judge Elfenbein also addressed Amerant's argument, now raised again in its Objections, that even if "equitable conversion does apply in this context," Euclid did not acquire an interest in the Notes "because it never paid the full purchase price of the Assignment Agreement, which was a condition precedent to Amerant delivering the Notes, and because Amerant never treated [Euclid] as a de facto owner, which was a feature of [Euclid's] main supporting authority (*Bove*)." *Id.* (citing ECF No. [153] at 5-6). The R&R concluded that, although those arguments may ultimately preclude Euclid "from *proving* conversion against Amerant, they do not make [Euclid's] allegations inadequate to *state a claim* for conversion, particularly because the Court must accept all factual allegations in the Third Amended Complaint as true and take them in the light most favorable" to the plaintiff. *Id.* (citing *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016); *Campos v. INS*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998)).

In its Objections, Amerant first argues that the R&R erred in relying upon *Bove* and *Whittington* to conclude that "'Florida law would in fact permit the theory' that a party can hold equitable title outside of the real estate context[,]" because those cases are distinguishable. ECF No. [190] at 10 (quoting ECF No. [175] at 40-41). In *Bove*, the plaintiff

paid defendant for a seat on defendant's stock exchange and made a trading account deposit. Because Bove was not a licensed stockbroker, Bove associated with a licensed broker, Byrne, and the seat was formally taken in Byrne's name with an entity owned by Bove and Byrne listed as the exchange member. However, everyone knew that Byrne was [the] *de facto* (and thus equitable) owner of the seat. After a dispute arose between defendant and Byrne, defendant sold the seat to another party without notice to Bove [and] Bove sued for conversion. The court reversed a summary judgment for defendant finding the record disputed the conversion claim.

*Id.* (citing *Bove*, 382 So. 2d at 452).

Euclid responds that *Bove* is persuasive because "the Second DCA expressly held that '[a]n equitable owner can maintain the action' for conversion, and the plaintiff sought 'both compensatory and exemplary damages.'" ECF No. [201] at 12-13 (quoting *Bove*, 382 So. 2d at 452). Euclid further argues that "[t]he Fourth DCA's decision in *Whittington*, 324 So. 3d at 3, also defeats Amerant's argument" because "the court held that the plaintiff had alleged a 'superior interest' in the plane based on its allegations that it had fulfilled its obligations under the contract, which sufficed to establish the ownership element for a conversion claim." *Id.* at 15 (citing *Whittington*, 324 So. 3d at 2).

Amerant's argument that *Bove* is differentiable because "Euclid did not pay the purchase price to Amerant and Euclid was never treated as a *de facto* owner[,]" is unavailing because, as the R&R stated "'those arguments may ultimately preclude [Euclid] from *proving* conversion against Amerant," but they do not make Euclid's "allegations inadequate to state a claim for conversion." ECF No. [175] at 41. To the extent Amerant argues that "the alleged conversion had already occurred before Euclid could even claim to be an equitable owner or entitled to possession," ECF No. [190] at 12, Judge Elfenbein correctly stated that on a motion to dismiss, the Court must accept all factual allegations in the Third Amended Complaint as true and take them in the light most favorable to Euclid. ECF No. [175] at 41. Euclid alleged that it "had a right to possession of the Notes, the Guarantees, and related documentation concerning property

interests in the Collateral and all other rights and obligations in relation thereto[.]" ECF No. [111] ¶ 61. As Amerant acknowledges, Euclid pled that "by entering into the Assignment Agreement, Amerant was 'unconditionally obligated to sell, assign and transfer' the Loan Documents to Euclid[.]" ECF No. [190] at 11 (quoting ECF No. [111] at 32). Euclid also alleged that Amerant "'exerted wrongful dominion and control over the Notes, Guarantees, and related documentation, rather than transferring those documents to' [Euclid], despite [Euclid's] demand for their return." ECF No. [175] at 40 (citing ECF No. [111] at 19). As Judge Elfenbein concluded, "[t]hose allegations are sufficient to satisfy the elements of conversion. *See Bove*, 382 So. 2d at 452 (explaining that the wrongful sale of another's property is conversion)." *Id.*

Amerant's objection as to the R&R's reliance upon *Whittington* is similarly unavailing. Amerant argues that in *Whittington*, "the court found that conversion was properly pled because as lessee of the aircraft, plaintiff was entitled to immediate possession." ECF No. [190] at 11 (citing *Whittington*, 324 So. 3d at 3). Although *Whittington* does not mention equitable ownership or title, as Euclid noted, the plaintiff in *Whittington*

> entered into a contract to purchase a plane similar to the Loan Sale Agreement between Amerant and Euclid, in that it required the plaintiff to make "monthly payments" to the defendant, which "would continue to retain ownership of the jet until all payments" were made. [*Whittington*, 324 So. 3d] at 2. When the plaintiff failed to make a monthly payment, which it claimed was permissible due to the cost of repairs, the defendant retook possession of the plane. *Id*. Reversing the dismissal of the plaintiff's conversion claim, the court held that the plaintiff had alleged a "superior interest" in the plane based on its allegations that it had fulfilled its obligations under the contract, which sufficed to establish the ownership element for a conversion claim. *Id*. at 3-4. As the plane purchaser in *Whittington* did not hold formal title to the plane, its ownership interest was no different than Euclid's here.

> ECF No. [201] at 15.

To the extent Amerant argues that *Whittington* is distinguishable because the plaintiff in *Whittington* was entitled to immediate possession whereas "the Assignment Agreement conditions delivery of the Loan Documents only against Amerant's receipt of the purchase price proceeds from Euclid, which never occurred (and has not been alleged)[,]" ECF No. [190] at 11, the Court again agrees with Judge Elfenbein's conclusion. Such an argument "may ultimately preclude [Euclid] from *proving* conversion against Amerant, [but] they do not make [Euclid's] allegations inadequate to *state a claim* for conversion." ECF No. [175] at 41. Euclid alleged that it had "superior property rights in certain promissory notes, guarantees, and underlying collateral and real estate" and "Defendant Amerant unconditionally agreed to sell, assign, and transfer its property rights to Euclid," but "Amerant secretly sold those same rights to Ecliptica at a price higher than the amount it had previously and unconditionally agreed to accept from Euclid." ECF No. [111] ¶ 19. Therefore, Euclid has stated a claim for conversion. Because Euclid has stated a claim for conversion, Amerant has not raised any basis for dismissing the claim of aiding and abetting conversion. *See* ECF No. [190] at 13.

### iii.    Civil Conspiracy

Amerant contends that Count 7 "alleges that Amerant conspired to commit conversion, tortious interference with a business relationship and tortious interference with contract[,]" but the R&R "only analyzed the conversion claim as the underlying wrongdoing against Amerant." ECF No. [190] at 13. Because the "conspiracy claim fails if the underlying claims are not viable[,]" Amerant argues Count 7 should be dismissed. ECF No. [190] at 14. However, in light of the Court's holding that Euclid has stated a claim as to Counts 1 and 2, Amerant's Objection as to Count 7 also fails.

Amerant also points out that Count 7 alleges that "Defendants conspired together to commit conversion, tortious interference with a business relationship, and tortious interference with a

contract[,]" ECF No. [111] ¶ 99, however, tortious interference with a contract, Count 3, is not asserted against Amerant and, in its Response to Amerant's Motion, Euclid agreed to dismiss Counts 5 and 6 against Amerant. *See* ECF No. [175] at 36 (citing ECF No. [140] at 1 n.1). Therefore, Amerant argues that neither claim is a proper predicate claim for conspiracy against Amerant. ECF No. [190] at 14. However, because the Court found that Euclid has stated a claim for conversion against Amerant, which may serve as a predicate claim for civil conspiracy, Euclid has also stated a claim for civil conspiracy against Amerant. *Alhassid*, 60 F. Supp. 3d at 1317 ("[S]o long as a valid claim is alleged to have been committed, and the named Defendants are alleged to have conspired with the primary tortfeasor, the civil conspiracy claim may proceed.") (internal alterations omitted) (quoting *Liva v. Mendolia,* 2014 WL 2118814, at *4 (S.D. Fla. May 21, 2014)).

### iv.    Punitive Damages

Amerant argues that, in recommending the denial of its Motion to Strike Euclid's punitive damages claim, the R&R erred by failing to address "Amerant's argument that Euclid has not sufficiently alleged specific acts or wrongdoing, rather than conclusory allegations or labels, reflecting malice, moral turpitude, wantonness, willfulness or reckless indifference by Amerant to Euclid's rights." ECF No. [190] at 15-16. Euclid responds that the basis for punitive damages "is the very same extra-contractual conduct that the R&R thoroughly analyzed in its discussion of the independent tort doctrine." ECF No. [201] at 18.

As Euclid points out, the Complaint

> explicitly alleges that "Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that it would harm Euclid, but nevertheless intentionally pursued that course of conduct." (TAC ¶ 57.) It alleges a "calculated, secret alliance" (TAC ¶ 56) to defraud Euclid for profit, and that Amerant proceeded "despite warnings from its in-house counsel that such an agreement would lead Amerant to breach its obligations to" Euclid. (TAC ¶ 51). These are not

conclusory labels; they are specific allegations that support a claim for punitive damages. (ECF No. 190 at 16.).

*Id.*

As such, the R&R properly found that Euclid's "requests for punitive damages, which are rooted in its intentional tort claims, are appropriately included in the Third Amended Complaint." ECF No. [175] at 44 (citing, *e.g., Cerny v. Boulevard Del, Inc.,* No. 18-cv-1808, 2019 WL 5291208, at *8 (M.D. Fla. July 11, 2019) ("Punitive damages are also recoverable for conversion.")).

### v.    Declaratory Judgment

Amerant argues that Euclid's declaratory judgment claim is duplicative in light of the Third Amended Complaint "because Euclid has dropped its claims for specific performance, constructive trust and other claims to determine proper ownership of the Loan Documents and seeks only damages." ECF No. [190] at 17 (citing ECF No. [140] at 3). Because "[t]here is no existing claim that any party other [than] Ecliptica 'lawfully owns' the Loan Documents; only that Euclid was damaged when Amerant did not sell to Euclid[,]" Amerant argues that the declaratory judgment claim "duplicates the contract claim and is due to be dismissed." *Id.* Euclid responds that the "dismissal of a claim for declaratory relief is not mandatory when a claim for damages is brought simultaneously" and "[d]eclaratory relief can still serve the useful purpose of clarifying and settling the legal relations in issue, even when damages are also sought." ECF No. [201] at 19 (internal quotations omitted); *see United Church of Marco Island v. Lexington Insurance Co.,* No. 2:23-cv-331- JES-KCD, 2023 WL 4865729, at *2 (M.D. Fla. July 31, 2023) (denying motion to dismiss parallel declaratory relief claim).

Amerant does not dispute that the Court has discretion to permit the declaratory judgment claim to proceed at the motion to dismiss stage. *See* ECF No. [190] at 16-17. Instead, it argues that

an exercise of that discretion is not warranted because the declaratory judgment claim "provides the plaintiff with no relief unavailable under its other claims." *Id.* at 17 (citing *Cooseman's Miami, Inc. v. Aspen Specialty Ins. Co.*, No. 22-cv-23264, 2023 WL 315803, at *2 (S.D. Fla. Jan. 19, 2023); *Arch Ins. Co. v. A3 Dev., LLC,* No. 23-CV-23524, 2025 WL 1504176, at *8 (S.D. Fla. May 27, 2025)).

In *Cooseman*, the court agreed with the defendant that the plaintiff could not "prevail on its breach of contract claim unless the Court determines that Plaintiff's loss is covered by the policy. Accordingly, 'the declaratory judgment count would serve no useful purpose because the issues will be resolved by another claim[.]'" 2023 WL 315803, at *2 (quoting *Organo Gold Int'l Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1377 (S.D. Fla. 2019)). By contrast, here, "[t]he breach-of-contract claim seeks to determine whether Amerant breached its contract in the past and seeks damages for that alleged breach. The rights that claim decides are between [Euclid] and Amerant alone." ECF No. [175] at 46. However, the declaratory judgment claim "will impact all parties with an interest in the Notes, not just [Euclid] and Amerant. And when a declaratory judgment claim is forward-looking in that way instead of retrospective, it is not duplicative." *Id.* (citing *Mena Catering, Inc. v. Scottsdale Ins. Co.*, 512 F. Supp. 3d 1309, 1322 (S.D. Fla. 2021); *Cooseman's*, 2023 WL 315803, at *2).

Additionally, in *Arch*, this Court found that "litigating the question of breach in both the Declaratory Judgment and Breach of Contract claims would be 'inefficient and unnecessary' since resolution of the Breach of Contract claims will afford Plaintiff full and complete relief," thereby warranting dismissal of the declaratory judgment action. 2025 WL 1504176, at *8. Here, however, resolution of the breach of contract claim, as to Amerant, would not inherently "declar[e] Euclid's superior rights, interests, and title to the Notes, Guarantees, the security interests and liens in the Collateral, and other related obligations." ECF No. [111] ¶ 120. Although Euclid does not seek

specific performance, it seeks a declaration of "the existence and superiority of Euclid's rights and the non-existence of Ecliptica's rights in the Notes and Guarantees." *Id.* ¶ 119. Therefore, the Court exercises its discretion and permits the declaratory judgment claim. Accordingly, Amerant's Objections are overruled.

### B. Alliance Defendants' Objections

Alliance Defendants objected to the R&R, arguing that it failed to dismiss (1) Count 2, the aiding and abetting conversion claim, despite the absence of a present possessory interest and the inapplicability of equitable conversion to negotiable instruments; (2) Counts 5 and 6, the tortious interference and aiding and abetting claims, by rewarding conclusory pleading and misapplying the "stranger" doctrine; and (3) Count 7, the civil conspiracy claim, despite conclusory allegations. ECF No. [189].

### i.    Absence of Present Possessory Interest and Inapplicability of Equitable Conversion

Alliance Defendants argue that the Court may not apply equitable principles to negotiable instruments because the UCC governs negotiable instruments. ECF No. [189] at 5 (citing Fla. Stat. § 673.1021). Cases such as *Bove* and *Whittington* involved "an identifiable, tangible asset," however, the instant case involves a negotiable instrument. *Id.* at 4. Therefore, Alliance Defendants argue, "[b]ecause Article 3 [of the UCC] comprehensively governs negotiable instruments . . . doctrines like 'equitable conversion' have no role." *Id.* (citing Fla. Stat. ch. 673). In Response, Euclid notes "the UCC itself defeats the Alliance Defendants' argument" because it states that the "law applicable to conversion of personal property applies to instruments." ECF No. [202] at 9 (quoting Fla. Stat. § 673.4201).

Alliance Defendants' argument that *Bove* and *Whittington's* expansion of equitable conversion is not applicable to the instant case because those cases involved "personal property"

is unpersuasive. The UCC states that "[t]he law applicable to conversion of personal property applies to instruments." Fla Stat. § 673.4201. To the extent Alliance Defendants argue that "Article 3 displaces equitable analogies here[,]" it does not explain why equitable conversion cannot be read into the UCC. ECF No. [189] at 5. Indeed, Section 671.103 states that "[u]nless displaced by the particular provisions of this code, the principles of law and equity . . . shall *supplement* its provisions." Fla Stat. § 671.103 (emphasis added).

Courts have found, within the context of secured transactions governed by the UCC, "once default has occurred, a secured creditor has the right to possess the collateral and is authorized to take possession of the collateral." *Beach Cmty. Bank v. Disposal Servs., LLC*, 199 So. 3d 1132, 1134 (Fla. DCA 1st 2016). In *Beach Cmty*, Beach was the successor in interest of creditors that made loans to the Debtor, which was secured by Containers worth $400,800. *Id.* at 1133. Without notice to Beach, the Debtor sold the Containers to Disposal, but did not apply the sale proceeds to the loans and subsequently defaulted on its loan obligations to Beach. *Id.* "Following Disposal's acquisition of the Containers and Debtor's default on the loans, Beach made [a] written demand to Disposal for either repayment of the loans in full or return of the Containers." *Id.* The Court held that, "[r]egardless of whether Disposal acquired rightful possession of the Containers when it purchased them from Debtor, once the Debtor defaulted on its loan obligations, Beach gained the right to possess the Containers as collateral securing the debt." *Id.* at 1135. After Beach "informed Disposal that Beach was a creditor with rights to possess the Containers and demanded their return, Disposal had the opportunity to comply with the proper demand. By refusing to comply with Beach's lawful demand, Disposal took an overt action inconsistent with Beach's possessory rights, thereby completing the necessary elements for a claim of conversion." *Id.*

A similar analysis can be applied to Euclid's possessory interest here. Euclid alleged that it had "a right to possession of the Notes, the Guarantees, and related documentation concerning

property interests in the Collateral" and Euclid "demanded return of such property; but Defendants did not relinquish such property to Euclid." ECF No. [111] ¶ 67. Accordingly, the R&R correctly concluded that case law "suggests that Florida law would in fact permit the theory" of conversion of equitable owners' interests "in this context." ECF No. [175] at 41.

To the extent Alliance Defendants argue that Euclid did not have a present possessory interest in the notes, such an argument "may ultimately preclude [Euclid] from *proving* [aiding and abetting] conversion" however, "they do not make [Euclid's] allegations inadequate to *state a claim* for [aiding and abetting] conversion, particularly because the Court must accept all factual allegations in the Third Amended Complaint as true and take them in the light most favorable to [Euclid]." ECF No. [175] at 41 (citing *Dusek*, 832 F.3d at 1246; *Campos*, 32 F. Supp. 2d at 1343).

### ii.    Conclusory Pleading as to Counts 5 and 6

Alliance Defendants argue that the R&R improperly applied a "'relaxed' standard" as to Counts 5 and 6 and drew "inferences from purely conclusory recitals." ECF No. [189] at 6. Specifically, Alliance Defendants argue that the only allegation "supporting inferences of intent and knowledge is the alleged January 2024 inspection delay. . . . Yet the Complaint alleges nothing about what any specific Alliance Defendant said or did in relation to that inspection, when those acts occurred, or who from Euclid allegedly communicated with them." *Id.* Similarly, regarding Count 6, Alliance Defendants argue the Complaint "identifies no basis for knowledge, no act of assistance, and no individual actor." *Id.* at 7. Although the Complaint "fails to apportion its allegations among the Defendants, leaving it entirely unclear who engaged in which acts, made which communications, or possessed which knowledge[,]" Alliance Defendants argue that the R&R improperly "treat[ed] these conclusory allegations as sufficient." *Id.* Euclid responds that the Complaint directly alleges knowledge and "sets forth affirmative acts taken by the Alliance Defendants to enable, facilitate, and ultimately effectuate the conversion of Euclid's property

rights, including post-conversion actions taken by the Alliance Defendants to conceal and defeat Euclid's ability to reclaim the converted property rights." ECF No. [202] at 10.

In order to state a claim for tortious interference with a business relationship, Euclid must allege: "(1) the existence of a business relationship under which the plaintiff has legal rights; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the business relationship." *Bortell v. White Mountains Ins. Grp., Ltd.*, 2 So. 3d 1041, 1048 (Fla. 4th DCA 2009) (quoting *N. Am. Van Lines, Inc. v. Ferguson Transp., Inc.,* 639 So. 2d 32, 33 (Fla. 4th DCA 1994)).

The Eleventh Circuit has held that a plaintiff "need not have pled [the defendant's] knowledge of the relevant contracts[2] with specificity[.]" *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018). The fact that the plaintiff "expressly alleged that [the defendant] knew of the . . . contracts with [the plaintiff]" is sufficient. *Id.* As the R&R points out, Euclid "explicitly alleged the Alliance Defendants knew about both the Assignment Agreement with Amerant (the relevant contract in Count 3) and its prospective business relationship with Alliance Metals and Alliance Alabama, a business relationship which, according to [Euclid]'s allegations, existed by virtue of the Assignment Agreement (the relevant business relationship in Count 5)." ECF No. [175] at 51 (citing ECF No. [111] at 21-24). Euclid adds further detail to the knowledge element, "by alleging its 'representatives informed the Alliance Defendants of the Assignment Agreement' and then 'exchanged text messages with the Alliance Defendants, including L. Gitman and J. Gitman,' between January 3 and 8 trying (but

---

[2] Although *Sun Life* involved a claim for tortious interference with a contract, the Eleventh Circuit has recognized that "[t]ortious interference with a contract and tortious interference with a business relationship are basically the same cause of action . . . The only material difference appears to be that in one there is a contract and in the other there is only a business relationship." *Pilkington v. United Airlines*, 112 F.3d 1532, 1540 (11th Cir. 1997) (internal citations omitted).

failing) to secure their cooperation with restarting the business." *Id.* at 51-52 (citing ECF No. [111] at 14). Therefore, Euclid properly alleges knowledge.

As to the intentional interference element, Euclid alleges "[t]he Alliance Defendants preferred for the SB Defendants, rather than Euclid, to purchase the Notes, because the SB Defendants agreed to allow the Alliance Defendants to maintain an ownership and operational interest in the underlying aluminum smelting business, whereas Euclid would not accept the Alliance Defendants' unreasonable demands." ECF No. [111] ¶ 48. Therefore, in order to "give the SB Defendants and Amerant time to work out the details of their illicit deal, SB Defendants, Amerant, and the Alliance Defendants colluded to delay Euclid's completion of its due diligence, particularly Euclid's inspection of the Alliance Metals' facility and Collateral, despite Euclid's urgent requests to expedite the process." *Id.* ¶ 49. Although Alliance Defendants argue that the Complaint "alleges nothing about what any specific Alliance Defendant said or did in relation to that inspection, when those acts occurred, or who from Euclid allegedly communicated with them[,]" such specificity is not required. ECF No. [189] at 6. *See ECB USA, Inc. v. Savencia Cheese USA, LLC,* 148 F.4th 1332, 1349 (11th Cir. 2025) ("[W]e apply the less demanding pleading standard" to a tortious interference claim). Because the Complaint contains "more than . . . a formulaic recitation of the elements[,]" Euclid has stated a claim for tortious interference with a business relationship. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

In order to state a claim for aiding and abetting tortious interference, Euclid must allege "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Letidas Logistics, LLC v. Citibank, N.A.*, 789 F. Supp. 3d 1121, 1128 (S.D. Fla. 2025)).

The R&R found that "the same allegations described . . . as to the Alliance Defendants' knowledge of and substantial assistance with Ecliptica's conversion apply to the Gitmans' and Technocon's knowledge of and substantial assistance with Ecliptica's tortious interference." ECF No. [175] at 61. Specifically, Ecliptica tortiously interfered with the "prospective business relationship" between Euclid and Alliance Metals and Alliance Alabama. *Id.* Therefore, "the reasons the Gitmans and Technocon knew about Ecliptica's conversion would also be the reasons they knew about its tortious interference and that the ways in which the Gitmans and Technocon substantially assisted Ecliptica's conversion would also be the ways they substantially assisted its tortious interference." *Id.*

Euclid has alleged an underlying claim for tortious interference with a business relationship. Additionally, Euclid has alleged that in order to "give the SB Defendants and Amerant time to work out the details of their illicit deal, SB Defendants, Amerant, and the Alliance Defendants colluded to delay Euclid's completion of its due diligence, particularly Euclid's inspection of the Alliance Metals' facility and Collateral, despite Euclid's urgent requests to expedite the process." ECF No. [111] ¶ 49. Therefore, Alliance Defendants were aware of the underlying tortious interference with the business relationship between Euclid and Alliance Metals and Alliance Alabama. *Id.* ¶ 92. Because Alliance Defendants "colluded to delay Euclid's completion of its due diligence, particularly Euclid's inspection of the Alliance Metals' facility and Collateral, despite Euclid's urgent requests to expedite the process[,]" Alliance Defendants rendered substantial assistance in the underlying tortious interference with the business relationship. *Id.* ¶ 49.

### iii.    Application of Florida's Stranger Doctrine

Alliance Defendants argue that the R&R misapplied "Florida's 'stranger' doctrine" as to the tortious interference claim "and ignore[d] the qualified privilege that shields interested parties

from liability." ECF No. [189] at 8. Euclid responds that the R&R properly rejected this argument because (1) the question of whether a defendant's interference is privileged is an affirmative defense, not properly addressed at the motion to dismiss stage; (2) even those who have a privilege to interfere in a business relationship to protect their own economic interests may be liable for tortious interference if they do so in bad faith; and (3) Alliance Defendants were not parties to the Euclid-Amerant Assignment Agreement, therefore, their interference was not privileged or justified, regardless. ECF No. [202] at 12-18.

As an initial matter, this Court has previously recognized that "the assertion of a privilege to interfere in an otherwise protected business relationship is an affirmative defense," therefore, the "privilege argument . . . is unavailing on a motion to dismiss." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1239 (S.D. Fla. 2015) (quoting *Persaud v. Bank of Am., N.A.*, No. 14-21819-CIV, 2014 WL 4260853, at *15 (S.D. Fla. Aug. 28, 2014)). And, in a thorough review of Florida's law on tortious interference with a business relationship, Judge Elfenbein stated

> [t]hough it explicitly declined to decide the issue, the Eleventh Circuit has noted Florida "apparently places the burden on the plaintiff to show unjustified interference, but then requires the defendant to prove that the interference was lawful" — or, stated another way, "once the plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to justify the propriety of its conduct." *Austral Insulated*, 262 F.3d at 1158-59 (quotation marks omitted). Still, "when courts talk about a party's act as unjustified or unlawful, they essentially are talking about the same thing." *Id*. at 1158 (quotation marks omitted). For that reason, many courts have declined to dismiss tortious interference claims based on the justification/privilege component. *See, e.g., Peacock*, 432 So. 2d at 144-45 ("[W]ithout undertaking on this record to state definitively where counterclaimants' burden to allege unjustified interference ends and where [the defendant's] burden to allege its privilege begins, we conceive that the complaint alleges tortious conduct . . . sufficiently to withstand a motion to dismiss." (footnotes and quotation marks omitted)) . . . .

ECF No. [175] at 25.

Euclid has established a *prima facie* case of tortious interference with a business relationship. The Court agrees with the R&R's conclusion that the parties' arguments as to whether

Alliance Defendants had a privilege to interfere or were justified in their interference "highlight the difficulty of assessing a privilege/justification defense at the motion-to-dismiss stage. As many courts have recognized, it is far from clear where [Euclid]'s burden to allege unjustified interference ends and where the Alliance Defendants' burden to allege privilege begins." *Id.* at 54 (citing *Peacock*, 432 So. 2d at 144-45; *Austral Insulated*, 262 F.3d at 1158; *Berkley Ins. Co. v. Banc of Am. Cmty. Dev. Co., LLC*, 386 So. 3d 623, 625 (Fla. 2d DCA 2024); *Glob. Marine Expl., Inc. v. Republic of France*, 151 F.4th 1296, 1312-13 (11th Cir. 2025)).

Although Alliance Defendants argue that they "are the source of the relationship at issue" because their "property and debts gave rise to the Assignment Agreement," ECF No. [189] at 8, "neither L. Gitman, J. Gitman, nor Technocon is a party to the alleged business relationship" in Count 5. ECF No. [175] at 54. Therefore, on the face of the Complaint, "the Alliance Defendants are, at most, interested third parties[,]" who may "assert the privilege to interfere . . . but they cannot use improper means to do so[.]" *Id.* at 54-55 (citing *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1339 (11th Cir. 2020); *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001); *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998)).

Even if Alliance Defendants are "interested third parties," as Euclid notes, the Complaint alleges that the Alliance Defendants "had actual knowledge of the wrongfulness of their conduct and the high probability that it would harm Euclid, but nevertheless intentionally pursued that course of conduct, resulting in said harm." ECF No. [111] ¶ 57. Indeed, the Complaint specifically alleges Alliance Defendants' motives: "Euclid's representatives exchanged text messages with the Alliance Defendants, including L. Gitman and J. Gitman, in which the Alliance Defendants refused to cooperate with Euclid unless Euclid agreed to demands from the Alliance Defendants for cash and an equity interest in the re-started business" and "Alliance Defendants preferred for the SB

Defendants, rather than Euclid, to purchase the Notes, because the SB Defendants agreed to allow the Alliance Defendants to maintain an ownership and operational interest in the underlying aluminum smelting business, whereas Euclid would not accept the Alliance Defendants' unreasonable demands." *Id.* ¶¶ 45, 48. To the extent Alliance Defendants argue that the actions they were alleged to have taken in the Complaint do not qualify as "improper means," the definition of improper means is not as restrictive as Alliance Defendants suggest. ECF No. [189] at 9. "Ultimately, to determine whether interference is justified or privileged requires a commonsense consideration of whether the conduct was 'sanctioned by the rules of the game' and what is 'right and just' under the circumstances." *Bluesky Greenland Env't Sols., LLC v. 21st Century Planet Fund, LLC*, 985 F. Supp. 2d 1356, 1367 (S.D. Fla. 2013). "Improper means" include "physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct and threats of illegal conduct." *Id.* "Misrepresentations" include false statements or omissions of material facts. *Id.* (citing *Boldstar Technical LLC v. Home Depot,* 517 F. Supp. 2d 1283 (S.D. Fla. 2007); *Berg v. Capo,* 994 So. 2d 322 (Fla. 3d DCA 2007)). As Euclid notes, the "improper means" alleged in the Complaint include:

> (a) "misl[eading] representatives of Euclid regarding the scheduling" of the diligence inspection in order to buy Amerant and Ecliptica more time to deprive Euclid of its contractual and property rights under the Assignment Agreement, TAC ¶¶ 49, 51; (b) refusing, in bad faith, to permit the diligence inspection, again, to grant the co-conspirators more time to accomplish the interference, TAC ¶¶ 49, 51; (c) colluding and conspiring with the SB Defendants to accomplish the Amerant-Ecliptica deal in secret, TAC ¶¶ 44, 51, 56; (d) reorganizing Alliance Metals and Alliance Alabama to interfere with Euclid's rights to the collateral, TAC ¶ 52; and (e) creating a new entity to conceal and protect the collateral in an attempt to defeat Euclid's property and contractual rights, TAC ¶¶ 53–54

ECF No. [202] at 13.

The Court agrees with the R&R's conclusion that these allegations of misrepresentation and conspiratorial conduct are sufficient to avoid dismissal.

iv.     **Conclusory Allegations as to Civil Conspiracy**

In order to state a claim for civil conspiracy, a plaintiff must allege "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

Alliance Defendants argue that the R&R's analysis regarding Count 7 "repeats the same fundamental pleading errors that infect its analysis of Counts 5 and 6." ECF No. [189] at 10. Specifically, Alliance Defendants contend the Complaint "fails to allege any actual agreement, communication, or overt act" and relies on "collective, undifferentiated accusations that 'Defendants' acted 'together' to interfere with [Euclid's] transaction." *Id.* at 10, 11. In Response, Euclid argues that the R&R conducted the proper analysis. ECF No. [202] at 18-9.

In the R&R, Judge Elfenbein rejected the arguments Alliance Defendants' now raise as Objections. She concluded that, although Euclid's "general allegations of conspiracy are inadequate[,]" Euclid has "alleged its civil conspiracy claim with enough specificity to survive dismissal." ECF No. [175] at 62. Although Euclid does not allege in the count-specific allegations "which particular Defendants took each action, earlier allegations fill in those details." *Id.* at 63. Indeed, the R&R notes that the Complaint alleges

> "the Alliance Defendants colluded" with Amerant and the Bratushev Defendants "to delay" [Euclid's] "completion of its due diligence, particularly" its "inspection of the Alliance Metals' facility and" the machinery/equipment collateral. *See* ECF No. [111] at 15. [Euclid] alleges "[r]epresentatives of Alliance Metals and Alliance Alabama misled" [Euclid's] representatives "regarding the scheduling of an inspection and refused to permit an inspection at the times" [Euclid] requested, which caused a delay in [Euclid's] ability to notify Amerant that the diligence clause was satisfied and to transfer the rest of the purchase price. *See* ECF No. [111] at 15. And [Euclid] alleges "the Alliance Defendants invoked these moves to resist" [Euclid's] "eventual effort to seek injunctive relief, claiming on February 19, 2025, that the Alliance Defendants already took steps to reorganize the business in

reasonable reliance on the consummated sale, including entering into agreements and delivering a mortgage on the unsecured real property on which the relevant metal-working equipment now sits." *See* ECF No. [111] at 16–17.

ECF No. [175] at 63-64.

To the extent Alliance Defendants argue that each of the alleged overt acts, "site access, forming entities, [and] encumbering property[,]" are "lawful self-protective conduct[,]" ECF No. [189] at 11, the overt act need only be "in pursuance of the conspiracy," and Alliance Defendants cite no authority for the proposition that the overt act must be illegal in and of itself. *See ECB*, 148 F.4th at 1347. Additionally, "[e]ach coconspirator need not act to further a conspiracy[,] each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his [or her] coconspirators[.]'" *Plastiquim, S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1274 (Fla. 3d DCA 2022) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008)). Therefore, the Court agrees with the R&R's analysis and its conclusion that the allegations in the Complaint are "sufficient to allow the Court to draw the reasonable inference that the Alliance Defendants are liable for the misconduct alleged" in Count 7. ECF No. [175] at 64.

## C.  America1 Defendants' Objections

America1 Defendants objected to the R&R, arguing (1) Euclid's claim for conversion and aiding and abetting conversion should be dismissed because it failed to allege that it had possession of the Notes or an immediate right to possess the notes; (2) the Assignment Agreement evidences that Euclid had no immediate right to possess the Notes and controls; and (3) because there can be no claim for conversion, the aiding and abetting claim must also be dismissed. ECF No. [191]. In Response, Euclid states the America1 Defendants "repeat the same arguments raised by Amerant and the Alliance Defendants concerning possession, equitable title, and negotiable instruments," which the R&R rejected. ECF No. [203] at 1. Additionally, America1 Defendants' argument "that

34

the Amerant-Euclid agreement was illusory . . . lacks merit, as [Euclid] adequately alleged a valid agreement with consideration." *Id.* at 2.

America1 Defendants argue that the R&R erred by "fail[ing] to consider the mandatory and quintessential element for conversion—that is, the existence of a claimant's 'immediate right to possession.'" ECF No. [191] at 2 (quoting *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 499 (Fla. 3d DCA 1994)). However, the R&R stated that this argument "does not comport with the concept of holding equitable title, which the Court has already determined Florida law would likely recognize in this context." ECF No. [175] at 71. Indeed, the Court has already concluded that Florida law would likely recognize holding of equitable title within the context of a conversion claim. America1 Defendants' argument that the Assignment Agreement directly contradicts Euclid's allegation that it had an immediate right to possession is similarly unavailing. ECF No. [191] at 12. America1 Defendants argue that "a plain reading of the Assignment Agreement confirms that any rights created by the Assignment Agreement, equitable or otherwise, could not vest in [Euclid] unless and until the Assignment Agreement became effective and the Purchase Price paid in full." *Id.* However, in the Complaint, Euclid alleged that Amerant was "unconditionally obligated to 'sell, assign and transfer' to Euclid all of Amerant's 'right, title and interest in, to, and under' the loan, loan documents, the Guarantees, the Collateral and the separate Collection Suit." ECF No. [111] ¶ 32. Although the Assignment Agreement reflects that the transfer of the "right, title and interest in, to and under the Loan and Collateral Documents" would take place "[o]n the Effective Date" and "in exchange for payment to Assignor of the Purchase Price[,]" ECF No. [111-1], Euclid's contention is that it had an equitable interest in the Notes because Amerant was obligated to eventually sell the Notes to Euclid on the Effective Date. ECF No. [111] ¶ 32. Euclid further alleges that its equitable interest is supported by the fact that it had the "*unilateral* option to terminate" the Assignment Agreement if the results of the due diligence

contingency were not satisfied and Amerant "had no right to terminate for any reason." *Id.* ¶ 37. Therefore, the fact that the Notes were not in fact transferred does not speak to Euclid's allegations in the Complaint.

America1 Defendants also argue that the Assignment Agreement was not enforceable, and the R&R erred in determining that the allegations in the Complaint were sufficient to support a finding that a valid contract existed. ECF No. [191] at 12-14. Specifically, America1 Defendants contend that the Assignment Agreement is "a quintessential illusory contract which lacks mutuality of obligation and which is entirely inequitable and not enforceable." *Id.* at 13.

"To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). The R&R concluded that these elements had been satisfied because the Complaint alleges that

> on December 30, 2024, Amerant and [Euclid] "entered into a written Loan Sale and Assignment Agreement" in which Amerant "became unconditionally obligated to 'sell, assign, and transfer'" to [Euclid] "all of Amerant's 'right, title and interest in, to, and under" the loan, loan documents, the Guarantees, the Collateral and the separate Collection Suit." *See* ECF No. [111] at 11. Further, the Third Amended Complaint attaches a copy of the Assignment Agreement, containing all the specific terms agreed upon between [Euclid] and Amerant. *See* ECF No. [111-1]. It further alleges the existence of consideration, and the attached Assignment Agreement confirms as much, when stating that [Euclid] paid a "10% good-faith escrow deposition" upon the execution of the agreement. *See* ECF No. [111] at 11; ECF No. [111- 1]. At this juncture, the Court must accept all of [Euclid's] allegations as true and view them in the light most favorable to [Euclid], so based on the current allegations, the Third Amended Complaint alleges the existence of a valid contract.

ECF No. [175] at 73-74.

The R&R determined that America1 Defendants' argument that "the Assignment Agreement was nothing more than a sham contract because only [Euclid] had termination rights and [Euclid] had no obligation to provide any consideration prior to the effective date of the agreement, making it illusory[,]" was "better suited for summary judgment or trial where they can

test the validity of the contract." *Id.* (citing *Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1341 (S.D. Fla. 1998) (declining to find that no binding contract existed at the motion-to-dismiss stage when the court was "bound to accept plaintiff's allegations as true")). However, America1 Defendants argue that the Court may properly find that the Assignment Agreement "is a quintessential illusory contract" at the motion to dismiss stage. ECF No. [191] at 13. America1 Defendants rely upon *Miami Coca-Cola Bottling Co. v. Orange-Crush Co*., in which the Court noted that "[t]he instrument purports to convey a perpetual franchise to the complainant within the counties of Dade and Broward, upon the proviso that the bottler (the complainant) may upon giving written notice to the grantor (the defendant) cancel the franchise at any time desired." 291 F. 102, 103 (S.D. Fla. 1923). The Court held that because the complainant could cancel the contract "at any time" but the defendant could cancel "only in case any of the terms of the franchise are violated" by the complainant, the contract was "wanting in mutuality as to remedies." *Id.* Therefore, the Court dismissed the complaint. *Id.* America1 Defendants argue that the Diligence Contingency in the Assignment Agreement here is similar to that in *Miami Coca-Cola*. However, "[t]he legal principle requiring mutuality in contracts does not require that in every case each party have the same remedy." *Bossert v. Palm Beach Cnty. Comprehensive Cmty. Mental Health Ctr., Inc.*, 404 So. 2d 1138, 1139 (Fla. 4th DCA 1981). Indeed, "[c]ourts have found unilateral termination clauses valid where the termination clause contains a notice requirement." *Energy Smart Indus., LLC v. Big R of Lamar, Inc.*, No. 11-23627-CIV, 2012 WL 3061600, at *11 (S.D. Fla. July 26, 2012). The Diligence Contingency acknowledged that Euclid "is conducting, and has not yet completed its due diligence" therefore, the parties agreed that "it shall be a condition of [Euclid's] obligation to pay the Purchase Price and otherwise perform hereunder that [Euclid] be satisfied, in its sole and absolute discretion, with the results of that due diligence." ECF No. [111-1] ¶ 4. Euclid was required to "provide written notice . . . on or before January 24, 2025 whether

or not this Diligence Contingency has been satisfied." *Id.* Therefore, Euclid's ability to terminate the Assignment Agreement was restricted to "certain definite circumstances," which "does not, as a matter of law, render the contract unenforceable for want of mutuality." *Bossert*, 404 So. 2d at 1139. Therefore, Euclid has sufficiently alleged the existence of an enforceable contract.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  The R&R, **ECF No. [175],** is **ADOPTED IN FULL.**

2.  The Alliance Defendants', Amerant's, and America1 Defendants' Objections, **ECF Nos. [189]; [190]; [191]** are **OVERRULED.**

3.  The Amerant Motion, **ECF No. [131],** is **GRANTED in part and DENIED in part** as follows:

    a.  **Count 5** (Tortious Interference with Business Relationship) and **Count 6** (Aiding and Abetting Tortious Interference with Business Relationship) are **DISMISSED as to Amerant**;

    b.  Amerant's request for an enlargement of time to file an Answer to Count 8, which is unopposed, *see* ECF No. [131] at 1, 18, is **GRANTED**; and

    c.  Amerant's Motion to Strike Euclid's request for punitive damages, *see* ECF No. [131] at 16, is **DENIED**.

4.  The Alliance Motion, **ECF No. [132],** is **GRANTED in part and DENIED in part** as follows:

    a.  **Count 3** (Tortious Interference with a Contract), **Count 4** (Aiding and Abetting Tortious Interference with a Contract), and **Count 9** (Declaratory Judgment) are **DISMISSED WITHOUT PREJUDICE as to the Alliance Defendants**; and

    b. Euclid may **AMEND Counts 3 and 4** to the extent it can, in good faith, allege that conduct on the part of any Defendant was unjustified or without privilege and **AMEND Count 9** to the extent it seeks to resolve a justiciable question as to the existence and superiority of its rights versus those of the Alliance Defendants in the Assignment Agreement, Notes, and Guarantees.

5. The America1 Motion, **ECF No. [137],** is **GRANTED in part and DENIED in part** as follows:

    a. **Count 3** (Tortious Interference with a Contract), **Count 4** (Aiding and Abetting Tortious Interference with a Contract), and **Count 9** (Declaratory Judgment) are **DISMISSED WITHOUT PREJUDICE as to the America1 Defendants;**[3]

    b. Euclid may **AMEND Counts 3 and 4** to the extent it can, in good faith, allege that conduct on the part of any Defendant was unjustified or without privilege and **AMEND Count 9** to the extent it seeks to resolve a justiciable question as to the existence and superiority of its rights versus those of America1 Industries, Truewind, and Bratushev in the Assignment Agreement, Notes, and Guarantees;

    c. The America1 Defendants' Motion to Strike Euclid's request for punitive damages is **DENIED**; and

    d. The America1 Defendants' request for an oral hearing, *see* ECF No. [137] at 17, is **DENIED**.

6. Euclid shall file its Fourth Amended Complaint on or before **January 23, 2026.**

---

[3] Because Count 4 is against all America1 Defendants, except for Ecliptica, the dismissal without prejudice of this Count does not apply to Ecliptica.

7.   Amerant shall file an Answer to Count 8 on or before **February 6, 2026.**

**DONE AND ORDERED** in Chambers at Miami, Florida on January 9, 2026.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record