## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### (FT. LAUDERDALE DIVISION)

EUCLID TURNAROUND
OPPORTUNITY FUND LP,                    CASE NO.: 1:25-cv-20647-BB

      Plaintiff,

v.

AMERANT EQUIPMENT FINANCE, A
DIVISION OF AMERANT BANK, N.A.,
ALLIANCE METALS LLC, TECHNOCON
INTERNATIONAL, INC., ALLIANCE
METALS ALABAMA, LLC, LARRY Y.
GITMAN, JACOB GITMAN, SB ECLIPTICA
LLC, TRUEWIND MANAGEMENT LLC,
AMERICA1 INDUSTRIES LLC, AMERICA1
HOLDINGS LLC, AND SERGEI BRATUSHEV,

      Defendants.
_____/

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendants, Alliance Metals LLC ("Alliance Metals"), Technocon International, Inc. ("Technocon"), Alliance Metals Alabama, LLC ("Alliance Alabama"), Larry Y. Gitman ("L. Gitman"), and Jacob Gitman ("J. Gitman") (collectively, the "Alliance Defendants"), file their Answer and Affirmative Defenses to the Plaintiff's Corrected Fourth Amended Complaint [D.E. 223], and in support, the Alliance Defendants state:

## JURISDICTION, VENUE, AND PARTIES

1.    Denied.

2.    Admitted for jurisdictional purposes only, otherwise denied.

3.    Admitted for jurisdictional purposes only, otherwise denied.

4.    The Alliance Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegation and the allegation is therefore denied.

5.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

6.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

7.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

8.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

9.      Admitted.

10.      Admitted.

11.      Admitted.

12.      Denied.

13.      Admitted that J. Gitman is a Florida citizen. The remainder of the allegation is denied.

14.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

15.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

16.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

17.      The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

18.     Denied as phrased.

## INTRODUCTION

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

## GENERAL ALLEGATIONS

25.     Denied as phrased.

26.     Denied as phrased.

27.     Admitted.

28.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

29.     Admitted.

30.     Admitted.

31.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

32.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

33.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

34.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

35.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

36.     Denied.

37.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

38.     Denied.

39.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

40.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

41.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

42.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

43.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

44.     Denied.

45.     Denied.

46.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

47.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

48.     Denied.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

49.     Denied.

50.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

## COUNT I
## CONVERSION
**(as against Amerant, Ecliptica, and America1 Holdings)**

59.     The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

60.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

61.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

62.     These allegations are not directed to any of the Alliance Defendants and, therefore,

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

63.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

64.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

## COUNT II
## AIDING AND ABETTING CONVERSION
### (as against all Defendants except Ecliptica)

65.     The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

## COUNT III
## TORTIOUS INTERFERENCE WITH A CONTRACT
### (as against all Defendants except Amerant)

70.     The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

71.     The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

72.     Denied.

73.     Denied.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

78.    Denied.

## COUNT IV
## AIDING AND ABETTING TORTIOUS INTERFERENCE WITH A CONTRACT
### (as against all Defendants except Ecliptica and Amerant)

79.    The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

80.    The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

81.    The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

82.    The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

83.    Denied.

84.    Denied.

85.    Denied.

86.    Denied.

## COUNT V
## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (as against all Defendants except Amerant, Alliance Metals, and Alliance Alabama)

87.    The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied.

92.    Denied.

## COUNT VI
## AIDING AND ABETTING TORTIOUS INTERFERENCE
## WITH A BUSINESS RELATIONSHIP
**(as against all Defendants except Ecliptica, Amerant, Alliance Metals, and Alliance Alabama)**

93.    The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

94.    Denied.

95.    The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

96.    The Alliance Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and the allegation is therefore denied.

97.    Denied.

98.    Denied.

99.    Denied.

## COUNT VII
## CIVIL CONSPIRACY
**(as against all Defendants)**

100.    The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

105.    Denied.

## COUNT VIII
## BREACH OF CONTRACT
### (as against Amerant only)

106.    The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

107.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

108.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

109.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

110.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

111.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

## COUNT IX
## DECLARATORY JUDGMENT
### (as against Amerant, Ecliptica, and America1 Holdings)

112.    The Alliance Defendants restate their answers to paragraphs 1-58 above as if fully set forth herein.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

113.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

114.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

115.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

116.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

117.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

118.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

119.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

120.     These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

Defendants deny the allegations.

121.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

122.    These allegations are not directed to any of the Alliance Defendants and, therefore, no response is required by them. To the extent a response is deemed required, the Alliance Defendants deny the allegations.

<div align="center"><strong><u>PRAYER FOR RELIEF</u></strong></div>

The Alliance Defendants deny that Plaintiff is entitled to any relief whatsoever against them and specifically deny each and every claim for relief asserted in the 4th Amended Complaint.

<div align="center"><strong><u>AFFIRMATIVE DEFENSES</u></strong><br><strong><u>FIRST AFFIRMATIVE DEFENSE</u></strong></div>

Euclid cannot establish the predicate tort of conversion because it never possessed, controlled, or had an immediate right to possess the Notes, Guarantees, loan documents, or Collateral. The Assignment Agreement was expressly contingent on completion of diligence and payment of the balance of the purchase price. Euclid never funded the transaction. Amerant retained possession of the original loan documents at all relevant times, as confirmed by the stipulation between Euclid and Amerant. And the Assignment Agreement was not an enforceable contract. Without an immediate possessory right, no conversion exists, and absent a primary tort, all aiding and abetting and conspiracy theories fail.

<div align="center"><strong><u>SECOND AFFIRMATIVE DEFENSE</u></strong></div>

Euclid's alleged rights under the Assignment Agreement were expressly conditioned upon satisfaction of contractual contingencies, including completion of diligence and payment of the purchase price. Euclid did not consummate the purchase, did not obtain endorsed instruments, and did not receive delivery of the Notes. Any alleged contractual or equitable interest never ripened

into an enforceable right. The failure of conditions precedent bars all claims predicated on alleged ownership or entitlement to the loan documents.

## **THIRD AFFIRMATIVE DEFENSE**

Each tortious interference-based claim fails because the Alliance Defendants were not strangers to the alleged contract or business relationship. Alliance Metals was the borrower on the underlying promissory notes. Alliance Metals Alabama owns the Leighton, Alabama facility where the smelting operations were conducted and where the collateralized equipment—including the reverb furnace, baghouse system, ingot line, and metal separation system—was permanently installed and integrated into the real property. Technocon International, Inc., Larry Gitman, and Jacob Gitman were guarantors of the same indebtedness and therefore remained directly exposed to personal and corporate liability exceeding $8.9 million at the time of the alleged events.

The alleged Assignment Agreement concerned the transfer of the very loan obligations owed by Alliance Metals and guaranteed by the Gitmans and Technocon, as well as the security interests encumbering equipment physically embedded in Alliance Alabama's facility. Any foreclosure, enforcement, or "restart" plan pursued by Euclid would have directly affected the Alliance Defendants' ownership interests in the real property, their equity in the operating business, their guarantor exposure, and their ability to reorganize or refinance the debt.

Euclid's own allegations confirm that its strategy was to acquire the lender's position, obtain summary judgment in the collection action, foreclose on the collateral and guarantor assets, and implement a turnaround that would have displaced the Alliance Defendants from operational control of the smelting facility. Thus, the Alliance Defendants were not third parties external to the transaction; they were the obligors, property owners, and economic stakeholders whose assets and contractual rights were the subject of the proposed transaction, and they had a direct economic

interest in having Ecliptica purchase the paper because it was working with the Alliance Defendants and not trying to execute a hostile takeover.

Because the Alliance Defendants had a direct financial, ownership, and legal interest in the loan, the collateral, the guarantees, and the facility, they cannot be deemed strangers to the alleged contract or business relationship. A party whose own debt obligations, pledged assets, real property, and guarantor liability are at issue cannot tortiously interfere with that relationship or contract.

## FOURTH AFFIRMATIVE DEFENSE

At the time of the alleged inspection dispute and any alleged "interference," the Alliance Defendants were not parties to and did not know about the Assignment Agreement. The Complaint relies on speculative group allegations but does not identify who knew what, when, or how. Without actual knowledge of a valid and enforceable contract, there can be no intentional procurement of breach and no aiding and abetting liability.

## FIFTH AFFIRMATIVE DEFENSE

Before the alleged interference, Howard Siegel, acting on behalf of Euclid, expressly communicated that any transaction involving the smelting business and loan documents was contingent upon the participation of both Amerant and the Alliance Defendants, and further withdrew the offer relating to the smelting business. Once withdrawn, no enforceable contract or protectable business expectancy existed. One cannot intentionally interfere with a relationship that the plaintiff has already extinguished.

## SIXTH AFFIRMATIVE DEFENSE

The allegations concerning the January inspection do not support any theory of tortious interference, aiding and abetting, or conspiracy because the events involved the lawful exercise of property and possessory rights by Alliance Alabama as the titled owner of the Leighton, Alabama

facility. The smelting plant, including the buildings, infrastructure, and integrated heavy industrial equipment serving as collateral, is located on real property owned by Alliance Metals Alabama, LLC. The equipment at issue is permanently installed and physically integrated into that facility.

Euclid was not a party to any agreement with the Alliance Defendants granting it inspection rights. Any inspection contemplated under the Assignment Agreement was an arrangement between Euclid and Amerant. The Alliance Defendants were not signatories to that agreement, did not assume any contractual obligation to provide Euclid access to the premises, and had no obligation to allow Euclid on its property to conduct a due diligence inspection. And Amerant had no contractual right to force the Alliance Defendants to allow an inspection for a third-party's due diligence.

The inspection dispute arose after Amerant contacted Wayne Perry and represented that access had been authorized for specific dates. But Euclid improperly co-opted Perry and thus was not acting as an employee of the Alliance Defendants when he assented to the inspection. And Amernat's representations were made before scheduling was properly coordinated through Alliance Alabama. Upon learning that the inspection had been scheduled without accurate confirmation, Alliance exercised its right to control access to its private industrial facility. Thereafter, Alliance agreed to permit inspection upon proper coordination and entry of a court order in the pending collection action.

At all relevant times, the Alliance Defendants retained the legal right to determine who could enter their industrial facility, under what conditions, and at what time. The temporary denial or rescheduling of access to privately owned commercial property, particularly where the requesting party held no ownership interest and no direct contract with the property owner,

constitutes the exercise of lawful property rights. The Alliance Defendants' insistence on proper coordination and legal authorization is not wrongful conduct.

The exercise of a lawful right of exclusion and property control does not constitute intentional interference, does not amount to substantial assistance in any alleged tort, and does not evidence an agreement to commit an unlawful act. Rather, it reflects routine property management and the protection of ownership and security interests in a heavy industrial facility.

### SEVENTH AFFIRMATIVE DEFENSE

The Alliance Defendants did not provide substantial assistance. They did not negotiate the alleged resale transaction, did not control Amerant's decisions, did not possess the Notes, and did not facilitate transfer of loan documents. The Complaint identifies no affirmative act that meaningfully advanced any alleged conversion or breach.

### EIGHTH AFFIRMATIVE DEFENSE

The aiding and abetting claims fail because the Alliance Defendants did not have actual knowledge of any alleged underlying tort. They were not parties to the Assignment Agreement between Euclid and Amerant, were not involved in Amerant's internal deliberations, and were not privy to any negotiations or alleged transaction between Amerant and SB Ecliptica. Amerant retained possession and control of the loan documents at all relevant times and made its own independent lending and sale decisions. And Amerant was adverse to the Alliance Defendants because it was suing them and sought sanctions against them.

Euclid alleges, at most, that the Alliance Defendants had a financial interest in the collateral and maintained prior business relationships with other parties. Economic overlap, guarantor exposure, or post-default restructuring discussions do not establish knowledge of a specific wrongful act. Allegations of suspicion, timing, or association do not constitute actual knowledge of an alleged conversion or breach and therefore cannot support an aiding and abetting theory.

## NINTH AFFIRMATIVE DEFENSE

The Complaint fails to identify any meeting of the minds among the Alliance Defendants and any other defendant to commit an unlawful act. Allegations of "collusion," "support," or "preexisting financial relationships" do not establish a specific agreement. Without a viable underlying tort and without a pleaded agreement, conspiracy fails.

## TENTH AFFIRMATIVE DEFENSE

All actions taken by the Alliance Defendants were undertaken to protect their legitimate economic and property interests following Alliance Metals' default. As borrower and guarantors facing an accelerated debt exceeding $8.9 million, and as the owner of the Leighton facility where the collateralized equipment is installed, the Alliance Defendants had direct financial exposure and ownership interests at stake. Efforts to preserve the facility, explore restructuring options, coordinate with secured parties, address creditor claims, or participate in post-default refinancing or reorganization discussions were commercially reasonable responses to financial distress.

The formation of affiliated entities, engagement in restructuring efforts, or negotiations with lenders or investors after default constitute lawful business conduct. Such actions reflect attempts to stabilize operations and mitigate losses, not wrongful interference or participation in any tort. Protected commercial self-interest and post-default restructuring cannot, as a matter of law, be transformed into tort liability.

## ELEVENTH AFFIRMATIVE DEFENSE

Amerant's decision to accept a higher purchase price from a third party was an independent business decision made by Amerant's officers. The Alliance Defendants did not control Amerant and did not cause Amerant's alleged breach. Any alleged injury flows from Amerant's independent conduct, not from any action by the Alliance Defendants.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

## TWELFTH AFFIRMATIVE DEFENSE

Euclid's claimed damages—projected restart profits in the hundreds of millions—are speculative, contingent, and unsupported by any operating history following cessation of business operations. The alleged expectancy was contingent on multiple uncertain events, including successful foreclosure, restart, market conditions, capital deployment, and the Alliance Defendants not seeking bankruptcy protection. Such speculative projections cannot form the basis of recoverable damages.

## THIRTEENTH AFFIRMATIVE DEFENSE

Euclid failed to mitigate its alleged damages by electing to proceed with funding despite unresolved diligence disputes and by failing to pursue contractual remedies directly against Amerant rather than expanding tort claims against economically interested non-parties.

## FOURTEENTH AFFIRMATIVE DEFENSE

Euclid initially represented that it sought a cooperative turnaround and obtained access to non-public financial and operational information from the Alliance Defendants under that premise. It later pivoted to a hostile takeover strategy designed to displace the Alliance Defendants. Equitable relief, including declaratory relief, is barred by unclean hands.

## FIFTEENTH AFFIRMATIVE DEFENSE

Euclid is estopped from asserting interference with a business relationship where its own agent made participation of the Alliance Defendants a condition precedent and subsequently withdrew the proposal. The Alliance Defendants relied on those communications in concluding that no enforceable transaction existed.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

## SIXTEENTH AFFIRMATIVE DEFENSE

As to Technocon, the Complaint does not allege that any individual acted in an official or representative capacity on its behalf in connection with the alleged wrongdoing. Corporate liability cannot be imposed absent conduct undertaken within corporate authority.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The Alliance Defendants owed no fiduciary or disclosure duty to Euclid regarding Amerant's lending decisions or third-party negotiations. Without a duty, no aiding and abetting theory based on omission can stand.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damage was caused by the independent and intervening actions of Amerant and other non-Alliance Defendants, including Amerant's representations, decisions regarding the sale of the Notes, and litigation strategy in the Collection Suit. These actions constitute superseding causes that break any alleged causal chain between the SB Defendants' alleged conduct and Plaintiff's claimed damages.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's allegation that the Alliance Defendants stopped an inspection that was coordinated with them fails because Amerant arranged the inspection with Plaintiff's own agent who Plaintiff wrongfully co-opted from the Alliance Defendants.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, for lack of subject matter jurisdiction. Plaintiff invokes diversity jurisdiction under 28 U.S.C. § 1332 but has failed to allege facts sufficient to establish complete diversity of citizenship. Plaintiff is a limited partnership whose ultimate member is a Cayman Islands segregated portfolio company ("SPC"), which is not

automatically treated as a corporation for purposes of diversity jurisdiction. Where a party is an unincorporated entity, its citizenship is determined by the citizenship of each of its members, which must be specifically alleged. Plaintiff has failed to adequately identify the citizenship of the SPC's members or otherwise plead sufficient facts to establish its citizenship. Because Plaintiff bears the burden of pleading and proving complete diversity, and because its jurisdictional allegations are insufficient to establish diversity jurisdiction, this Court lacks subject matter jurisdiction.

<u>**TWENTY-FIRST AFFIRMATIVE DEFENSE**</u>

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to allege facts sufficient to disregard the corporate separateness of the Alliance Defendant entities under Florida law. Each Alliance Defendant is and was at all relevant times a distinct legal entity or person(s), and Plaintiff has failed to allege facts demonstrating that any entity was organized or used for an improper or fraudulent purpose, or that the corporate form was misused to mislead or perpetrate a fraud. Plaintiff likewise has failed to allege facts sufficient to establish alter ego liability or to justify piercing the corporate veil. Plaintiff's claims impermissibly seek to impose liability without a legally sufficient basis to disregard corporate separateness.

<u>**TWENTY-SECOND AFFIRMATIVE DEFENSE**</u>

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver and estoppel. Plaintiff, through its conduct and representations, knowingly relinquished and abandoned any alleged right to obtain ownership, possession, or specific performance of the purported assignment of the Notes, Guarantees, and collateral. Plaintiff initially sought specific performance and injunctive relief to compel transfer of the Notes but later abandoned those claims and now seeks only monetary damages. In addition, Plaintiff entered into a Joint Stipulation with Amerant acknowledging, among other things, that Amerant had not endorsed, transferred, or delivered the

Loan Documents. Plaintiff's conduct, including its abandonment of equitable remedies and its stipulation regarding the status of the Loan Documents, is inconsistent with its present claims asserting superior ownership, possessory rights, or entitlement to the value of the Notes. Plaintiff is therefore barred, by waiver and estoppel, from asserting claims inconsistent with its prior conduct, positions, and representations.

## ALLIANCE DEFENDANTS' COUNTERCLAIMS AGAINST EUCLID

Defendants and Counter-Plaintiffs Alliance Metals LLC, and Alliance Metals Alabama, LLC (collectively, "Alliance Parties"), assert the following Counterclaims against Plaintiff/Counter-Defendants, Euclid Turnaround Opportunity Fund LP ("Euclid"), Howard Seigel ("Howard"), and Adam Seigel ("Adam") (collectively the "Euclid Defendants").

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and foreign jurisdictions and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      In the alternative, this Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because they arise out of the same transactions, occurrences, and operative facts that form the basis of Euclid's claims in this action. The Counterclaims arise from Plaintiff's conduct in connection with the alleged Assignment Agreement, the inspection dispute, the emergency motion practice, and the prosecution of this litigation.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Euclid commenced this action in this District, a substantial part of the events giving rise to the claims and counterclaims occurred in this District, and Euclid invoked this Court's jurisdiction and forum in

filing suit.

## PARTIES

4.     Counter-Plaintiff, Alliance Metals LLC, is a Florida limited liability company.

5.     Counter-Plaintiff, Alliance Metals Alabama, LLC, is an Alabama limited liability company whose principal place of business is in Leighton, Alabama.

6.     Counter-Defendant, Euclid Turnaround Opportunity Fund LP, is a Delaware limited partnership that has alleged in its Complaint that it is a citizen of Texas, the United Arab Emirates, and the Cayman Islands.

7.     Counter-Defendant, Howard Seigel, is a citizen of Texas and is sui juris.

8.     Counter-Defendant, Adam Seigel, is a citizen of Texas and is sui juris.

9.     Counter-Defendants Howard Seigel and Adam Seigel control and direct Counter-Defendant Euclid Turnaround Opportunity Fund LP, which is the alter ego of Howard Seigel and Adam Seigel. Howard Seigel, Adam Seigel, and Euclid Turnaround Opportunity Fund LP are collectively referred to herein as the "Euclid Defendants."

## GENERAL ALLEGATIONS

10.     Alliance Metals operates and owns a secondary aluminum smelting facility in Leighton, Alabama.

11.     The facility and the underlying real property are owned by Alliance Metals Alabama, LLC. The heavy industrial equipment securing the Amerant loans—including the reverb furnace, baghouse system, ingot line, and metal separation system—is permanently installed and physically integrated into that facility.

12.     The loans were personally guaranteed by Larry "Ariel" Gitman and Jacob Gitman and guaranteed by Alliance Metals Alabama, LLC. In late 2024, while Alliance Metals was experiencing financial distress, Alliance approached the Euclid Defendants, including Howard and

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

Adam Seigel, about pursuing a cooperative turnaround transaction.

13.     The Euclid Defendants, through their agent Howard Siegel, affirmatively represented to the Alliance Parties that any transaction would require the participation of both Amerant and the Alliance Parties and that it sought to restart operations in a manner that preserved value for existing stakeholders. The Euclid Defendants positioned themselves as a collaborative restructuring partner, not an adversarial debt acquirer.

14.     In reasonable reliance on those representations, the Alliance Parties provided the Euclid Defendants, including Adam and Howard Seigel, with certain confidential financial statements, operational data, vendor relationships, plant-level information, strategic assessments, and access to key personnel.

15.     The Alliance Parties disclosed sensitive information regarding production capacity, cost structure, liabilities, and operational vulnerabilities that would not have been disclosed to a hostile creditor or competitor. The Euclid Defendants obtained detailed insight into the facility's operations, plant layout, capital needs, and restructuring posture.

16.     At no time during these discussions did the Euclid Defendants disclose that they intended to pursue a unilateral strategy to acquire the lender's position and use foreclosure remedies as leverage—either to displace the Alliance Parties from ownership and operational control of the Alabama facility or to strong-arm them into an extremely unfavorable transaction under threat of foreclosure, if it could not reach an agreement with the Alliance Parties.

17.     After gaining access to confidential and strategically sensitive information, the Euclid Defendants abruptly pivoted away from the collaborative structure they had represented and pursued a discounted purchase of the defaulted loans from Amerant without the participation of the Alliance Parties.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

18.     While pursuing this strategy, the Euclid Defendants, including Howard and Adam Seigel, secretly entered into a consulting arrangement with Wayne Perry, the plant manager of the Leighton facility.

19.     At all relevant times, Perry was employed by the Alliance Parties and owed them fiduciary duties, duties of loyalty, and obligations of confidentiality as an officer of Alliance. As plant manager, Perry had access to operational strategy, vendor relationships, inspection logistics, equipment condition, restructuring discussions, and internal communications. His role placed him in a position of trust within the organizations.

20.     Without disclosure to or consent from the Alliance Parties, the Euclid Defendants entered into a "consulting agreement" with Perry while he remained employed as plant manager for the Alliance Parties, with the intent to obtain additional confidential information that the Alliance Parties did not disclose to the Euclid Defendants.

21.     The Euclid Defendants paid Perry at least $5,000 pursuant to that arrangement. The Euclid Defendants, including Howard and Adam Seigel, knew Perry was actively employed by the Alliance Parties when it contracted with him.

22.     The communications between the Euclid Defendants and Perry occurred before and during the inspection period, including the days immediately preceding the January inspection dispute.

23.     The Euclid Defendants' agreement with Perry created a direct conflict between his employment and fiduciary obligations and his financial relationship with the Euclid Defendants. By compensating him and placing him in a consulting role while he remained plant manager, the Euclid Defendants induced Perry to act contrary to his duties of loyalty and confidentiality.

24.     The Euclid Defendants used Perry as an inside source for operational information,

inspection timing, plant-level logistics, and internal strategy at a time when the Euclid Defendants were actively positioning themselves to acquire the secured debt, potentially foreclose on the facility, and conduct a hostile takeover of Alliance, and paid him to breach his duties of confidence and loyalty by disclosing confidential and protected proprietary information for the Euclid Defendants' strategic advantage.

25.     The January inspection dispute that the Euclid Defendants later characterized as "interference" occurred against the backdrop of their undisclosed communications and financial relationship with the plant manager.

26.     The inspection involved privately owned industrial property located on real estate owned by Alliance Alabama. The Euclid Defendants had no direct contractual relationship with the Alliance Parties granting it access rights to the facility. Any inspection rights arose, if at all, under Euclid's agreement with Amerant—an agreement to which the Alliance Parties were not parties and was not enforceable against them.

27.     Scheduling confusion arose when Amerant communicated inspection logistics with Perry who was then secretly working for the Euclid Defendants and without proper coordination through ownership and counsel. When the Alliance Parties learned that inspection dates had not been accurately confirmed through appropriate channels, they exercised their right to control access to their industrial facility. Thereafter, inspection was permitted upon proper coordination and court authorization. At no time did the Alliance Parties obstruct a court order.

28.     Nevertheless, the Euclid Defendants used the temporary scheduling delay to construct a narrative of tortious interference and collusion and filed their lawsuit based on the same.

29.     The Euclid Defendants then filed repeated emergency motions for temporary

restraining orders and preliminary injunctions naming the Alliance Parties and alleging imminent irreparable harm. Those motions required expedited briefing, immediate diversion of resources, and substantial legal expense.

30.     After imposing those costs, Euclid withdrew its emergency motions following a stipulation reached solely between Euclid and Amerant. The stipulation confirmed that Amerant retained possession of the loan documents at all relevant times, further undermining the Euclid Defendants' narrative that the Alliance Parties had participated in any conversion or transfer of the Notes.

31.     The Euclid Defendants' inclusion of the Alliance Parties in the emergency proceedings served no legitimate purpose. The dispute regarding possession and control of the loan documents was solely between Euclid and Amerant, and the Euclid Defendants knew that the Alliance Parties neither possessed nor controlled the instruments at issue, and injunctive relief was not available or necessary against the Alliance Parties.

32.     Nonetheless, the Euclid Defendants deliberately named them in their emergency filings to create transactional uncertainty, disrupt ongoing restructuring efforts, impose immediate and substantial litigation expense, and exert economic pressure unrelated to any proper injunctive objective.

33.     The Euclid Defendants' conduct—including their undisclosed consulting arrangement with the plant manager, their pivot from collaborative restructuring to hostile and adversarial debt acquisition, their use of confidential information obtained under cooperative pretenses, and its repeated emergency motion practice—was intended to and damaged the Alliance Parties.

34.     The Alliance Parties incurred substantial attorneys' fees and costs, suffered

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

disruption to internal operations and restructuring negotiations, experienced compromised trust within management, and were forced to defend against claims premised on conduct they did not commit.

35.     The Euclid Defendants' actions were not the product of misunderstanding or negligence. Rather, they failed to timely make a decision regarding diligence within the period mandated with Amerant, and as a result, forfeited the opportunity at issue.

36.     When Amerant elected to transact with another buyer at a higher price, the Euclid Defendants expanded their dispute with Amerant into tort claims against the borrowers, guarantors, and property owners whose assets were at issue.

37.     As a direct and proximate result of the Euclid Defendants' conduct, the Alliance Parties have sustained substantial damages, including but not limited to attorneys' fees and litigation expenses incurred in defending against claims and emergency motions that would not have been necessary but for the Euclid Defendants' improper conduct and the abuse of process for an ulterior purpose, disruption of restructuring and refinancing efforts, interference with internal operations and management relationships, and impairment of confidential business information.

38.     The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of its actions and the high probability that injury or damage would result to the Alliance Parties.

39.     Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

40.     The individual Euclid Defendants are personally guilty of intentional misconduct. Adam and Howard Seigel had actual knowledge of the wrongfulness of their conduct and the high

probability that it would harm the Alliance Parties, but nevertheless intentionally pursued that course of conduct, resulting in said harm. Euclid, the corporate entity is liable for the intentional misconduct of its managing agents.

41.     The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish Euclid and deter similar misconduct.

## <u>COUNT I- FRAUDULENT INDUCEMENT (AGAINST ALL)</u>

42.     The Alliance Parties realleges and incorporates the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

43.     In 2024, the Euclid Defendants, through their agents Howard and Adam Seigel, represented to the Alliance Parties that it sought to pursue a cooperative turnaround transaction involving the Leighton smelting facility.

44.     At the time, the Euclid Defendants affirmatively represented that any transaction would require the participation of both Amerant and the Alliance Parties and that the Euclid Defendants intended to work collaboratively to restart operations and preserve value for stakeholders.

45.     The Euclid Defendants further represented that they were evaluating a consensual acquisition structure and sought the Alliance Parties' cooperation, access to information, and operational transparency in furtherance of that objective.

46.     Those representations were statements of material fact because they concerned the Euclid Defendants' present intentions, transaction structure, and the nature of the proposed relationship with the Alliance Parties.

47.     At the time those statements were made, the Euclid Defendants knew that they were false or misleading because the Euclid Defendants were simultaneously intending to pursue a unilateral strategy to acquire the secured debt from Amerant and use enforcement remedies to displace the Alliance Parties from ownership and operational control.

48.     The Euclid Defendants did not disclose that they intended to retain the option of bypassing the Alliance Parties and acquiring the lender's position for strategic leverage in negotiations with the Alliance Parties.

49.     The Euclid Defendants made these representations with the intent that the Alliance Parties rely on them and provide confidential financial information, operational access, restructuring insight, and plant-level transparency.

50.     In reasonable reliance on the Euclid Defendants' representations, the Alliance Parties disclosed confidential financial data, projections, vendor relationships, restructuring strategies, and operational vulnerabilities that would not have been disclosed to an adverse debt purchaser.

51.     The Alliance Parties also permitted access to key personnel, including the plant manager, and engaged in good-faith discussions regarding restart logistics and capital needs.

52.     The Euclid Defendants' representations were false when made because the Euclid Defendants did not intend to limit themselves to a cooperative structure and instead intended to preserve or pursue a strategy directly adverse to the Alliance Parties.

53.     To the extent the Euclid Defendants' representations included promises of future cooperative action, those promises were made without a present intention to perform them or with a positive intention not to perform in the manner represented.

54.     The Alliance Parties reasonably relied on the Euclid Defendants' representations

because the Euclid Defendants presented themselves as a restructuring partner, not a hostile creditor, and expressly conditioned any transaction on the participation of both Amerant and the Alliance Parties.

55.     As a direct and proximate result of the Euclid Defendants' fraudulent inducement, the Alliance Parties suffered damages, including but not limited to the disclosure of confidential and strategically sensitive business information, disruption of restructuring efforts, internal operational harm, reputational injury, and substantial attorneys' fees and costs incurred as a foreseeable consequence of the Euclid Defendants' misconduct.

56.     The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

57.     Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position themselves to obtain control over the Alabama facility.

58.     The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

## COUNT II- FRAUDULENT CONCEALMENT (AGAINST ALL)

59.     The Alliance Parties reallege and incorporate the allegations contained in

paragraphs 1 through 41 above as if fully set forth herein.

60.     During 2024 negotiations, the Euclid Defendants, through their agents Howard and Adam Siegal, represented that they sought a cooperative and consensual turnaround transaction involving the Leighton facility and that any transaction would require the participation of both Amerant and the Alliance Parties.

61.     In connection with those representations, the Euclid Defendants requested and obtained confidential financial information, operational data, restructuring strategies, and plant-level access from the Alliance Parties.

62.     At the time the Euclid Defendants were making those representations and soliciting confidential information, the Euclid Defendants knowingly failed to disclose material facts, including:

> a)     That they were simultaneously intending to pursue a unilateral strategy to acquire Amerant's secured debt position without the Alliance Parties' participation;
>
> b)     That they intended to use the option of using foreclosure or debt enforcement remedies to displace the Alliance Parties from ownership and operational control;
>
> c)     That they had entered into, or was in the process of entering into, a consulting arrangement with Wayne Perry, the plant manager of the Leighton facility, while he remained employed by the Alliance Parties; and
>
> d)     That they were compensating Perry for consulting services while he owed fiduciary duties and duties of loyalty to the Alliance Parties.

63.     These facts were material because, had the Alliance Parties known that the Euclid Defendants were positioning themselves as a hostile debt acquirer and was compensating their plant manager while he remained employed, they would not have disclosed confidential information, permitted operational transparency, or engaged in cooperative negotiations.

64.     The Euclid Defendants knew that these material facts should have been disclosed

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

because they had created a relationship of trust and confidence by representing themselves as a cooperative restructuring partner and by soliciting non-public and strategically sensitive information.

65.     By affirmatively representing that they sought a consensual turnaround while simultaneously withholding material information about their adverse strategy and its financial relationship with the plant manager, the Euclid Defendants created a misleading partial disclosure that triggered a duty to disclose the full truth.

66.     A duty to disclose arose because the Euclid Defendants sought and obtained confidential information under circumstances in which the Alliance Parties had a right to know whether the Euclid Defendants' interests were aligned or adverse, and whether the Euclid Defendants were simultaneously engaging one of their key employees in a conflicting financial relationship.

67.     The Euclid Defendants knew that their concealment of these material facts would induce the Alliance Parties to continue providing information, access, and cooperation.

68.     The Alliance Parties reasonably relied on the Euclid Defendants' omissions and partial disclosures by continuing to provide certain confidential financial data, operational transparency, plant-level access, and restructuring insight.

69.     As a direct and proximate result of the Euclid Defendants' fraudulent concealment, the Alliance Parties suffered damages, including loss of control over confidential and proprietary information, disruption of restructuring efforts, internal operational harm, and substantial attorneys' fees and litigation costs incurred as a foreseeable consequence of the Euclid Defendants' concealed conduct and the litigation that followed.

70.     The Euclid Defendants' conduct, as alleged herein, was intentional, willful,

malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

71.     Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position themselves to obtain control over the Alabama facility.

72.     The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

## COUNT III- ABUSE OF PROCESS (AGAINST ALL)

73.     The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

74.     After failing to secure the loan purchase it sought from Amerant and the Alliance Parties and after the Alliance Parties elected to transact with SB and its affiliated entities (the "SB Parties"), the Euclid Defendants first tried to intervene in the State Court action and sought emergency injunction relief, and then, when that failed, initiated this action and immediately filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction against all Defendants, including the Alliance Parties.

75.     At the time the Euclid Defendants filed their emergency motions, they were aware that the Alliance Parties were engaged in restructuring discussions and arrangements with the SB

Parties concerning the Alabama facility and the secured debt.

76.    The Euclid Defendants thereafter filed multiple renewed emergency motions, each time invoking expedited judicial intervention and alleging imminent irreparable harm.

77.    Those emergency motions sought to restrain the transfer, enforcement, or control of loan documents that, at all relevant times, were in the possession and control of Amerant—not the Alliance Parties.

78.    Despite knowing that the Alliance Parties were borrowers, guarantors, and property owners—not custodians of the loan instruments— the Euclid Defendants named them in the emergency injunction proceedings and required them to respond on an expedited basis.

79.    The Court ordered expedited briefing in response to Euclid's emergency filings, requiring the Alliance Parties to divert substantial resources, interrupt restructuring efforts, and incur immediate legal expense.

80.    Shortly after forcing expedited responses, the Euclid Defendants withdrew their emergency motions following a stipulation entered solely between Euclid and Amerant.

81.    The stipulation confirmed that Amerant retained possession of the loan documents and that no injunctive restraint was necessary as to the Alliance Parties.

82.    The Euclid Defendants knew before filing their emergency motions that the Alliance Parties did not possess or control the loan documents and that no injunctive relief could properly be effectuated against them.

83.    The Euclid Defendants' use of emergency injunction process against the Alliance Parties was not designed to obtain legitimate injunctive relief from them. Rather, it was undertaken for the ulterior purpose of disrupting and destabilizing the Alliance Parties' developing arrangements with the SB Parties so as to undermine that transaction and cause it to fail.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

84.     The Euclid Defendants sought through emergency injunction practice to create uncertainty, delay, and transactional risk sufficient to impair or destroy the Alliance–SB arrangement, thereby positioning themselves to step into SB's shoes and pursue a hostile takeover of the secured debt and collateral.

85.     The repeated invocation of emergency judicial process against parties from whom no injunctive relief was properly obtainable constitutes a perverted and improper use of judicial process for a purpose other than that for which it was designed.

86.     The Euclid Defendants used the State Court's and this Court's emergency procedures as a tactical instrument to interfere with an ongoing commercial restructuring and to attempt to gain leverage in a competitive acquisition context, rather than as a legitimate vehicle to preserve rights pending adjudication.

87.     In response to each emergency motion, the Alliance Parties timely filed substantive oppositions demonstrating that they were not proper parties to the requested injunctive relief, that they did not possess or control the loan documents, and that the alleged dispute concerned the Euclid Defendants' contractual relationship with Amerant alone.

88.     The Alliance Parties made clear that no injunctive restraint could lawfully run against them and that any purported emergency was unrelated to their conduct.

89.     Despite being placed on express notice of these facts through formal briefing, the Euclid Defendants disregarded those clear deficiencies and proceeded to file subsequent renewed emergency motions repeating the same allegations, thereby compounding the improper use of judicial process and escalating litigation costs without any legitimate basis for relief against the Alliance Parties.

90.     As a direct and proximate result of the Euclid Defendants' abuse of process, the

Alliance Parties suffered damages, including substantial attorneys' fees and costs incurred in responding to expedited emergency motions, disruption of restructuring negotiations with the SB Parties, diversion of management resources, operational interference, and impairment of the Alliance Parties' ability to consummate their transaction free from coercive litigation pressure.

91.     The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

92.     Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct in order to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

93.     The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

## <u>COUNT IV- TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST ALL)</u>

94.     The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

95.     At all relevant times, the Alliance Parties maintained an ongoing business relationship with Wayne Perry, who served as plant manager of their Leighton, Alabama facility.

96.     That relationship was a continuing business relationship affording the Alliance

Parties existing and prospective economic rights, including the right to Perry's loyal services, management oversight, operational stewardship, and protection of confidential and proprietary information.

97.     The Alliance Parties had a reasonable and identifiable expectancy that this business relationship would continue unimpaired and that Perry would act solely in furtherance of their operational and economic interests.

98.     The Euclid Defendants knew of the existing business relationship between Perry and the Alliance Parties because Perry was publicly and internally identified as the plant manager of the Leighton facility, regularly participated in operational and restructuring discussions on behalf of the Alliance Parties, communicated with the Euclid Defendants in that representative capacity, and held himself out as acting within the scope of his managerial role during the parties' interactions.

99.     The Euclid Defendants further knew that Perry occupied a position of trust within the organization, had access to sensitive operational and strategic information, and played a central role in plant-level management and restructuring discussions.

100.     Notwithstanding that knowledge, the Euclid Defendants intentionally and unjustifiably entered into a separate consulting arrangement with Perry while he remained actively engaged in his business relationship with the Alliance Parties.

101.     The Euclid Defendants paid off Perry pursuant to that arrangement, including payment of at least $5,000, during the pendency of his ongoing managerial role.

102.     The consulting relationship created a direct conflict between Perry's ongoing business relationship with the Alliance Parties and his financial alignment with the Euclid Defendants, whose interests were adverse to the Alliance Parties.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

103.     By creating and funding that conflicting relationship, the Euclid Defendants intentionally and unjustifiably interfered with the Alliance Parties' ongoing business relationship with Perry and undermined the reasonable expectancy that he would act solely in their interests.

104.     The Euclid Defendants were a stranger to the business relationship between Perry and the Alliance Parties and had no legally protected interest in that relationship that would privilege or justify its interference because it was neither a party to, beneficiary of, nor participant in Perry's managerial role with the Alliance Parties, had no ownership interest in the Alliance entities, no supervisory authority over Perry, no contractual rights arising from his employment, and no legally protected economic interest in the continuation or structure of that relationship.

105.     The Euclid Defendants' interference was undertaken for its own strategic advantage to leverage a hostile takeover of the Alliance Parties business and not to safeguard any preexisting legal or economic right within the Perry relationship.

106.     As a direct and proximate result of the Euclid Defendants' intentional and unjustified interference, the Alliance Parties suffered damages, including disruption of management cohesion, impairment of internal trust, exposure of confidential business information, operational instability, and substantial attorneys' fees and litigation costs.

107.     The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

108.     Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct in order to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

109.     The Euclid Defendants' actions constituted intentional misconduct and a conscious

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

## COUNT V- VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (§ 501.201, et seq., Fla. Stat.) (AGAINST ALL)

110.    The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

111.    At all relevant times, the Euclid Defendants were engaged in "trade or commerce" within the meaning of section 501.203(8), Florida Statutes, including but not limited to holding themsleves out as a cooperative turnaround fund for struggling businesses, soliciting distressed companies for restructuring opportunities, negotiating and attempting to acquire secured commercial debt, entering into consulting arrangements, and pursuing related commercial transactions.

112.    Section 501.204(1), Florida Statutes, declares unlawful any unfair or deceptive acts or practices committed in the conduct of any trade or commerce.

113.    The Euclid Defendants engaged in unfair and deceptive acts and practices in the conduct of trade or commerce by representing, through Howard and Adam Seigel, that they sought to pursue a cooperative and consensual restructuring transaction with the participation of the Alliance Parties while simultaneously concealing their intent to preserve or pursue a unilateral, adversarial acquisition strategy.

114.    The Euclid Defendants further entered into and funded a consulting arrangement

38

with the Alliance Parties' plant manager while he remained actively employed in a position of trust, without disclosure to or consent from the Alliance Parties.

115. The Euclid Defendants' conduct constituted deceptive acts because it involved material misrepresentations and misleading omissions made in connection with ongoing commercial negotiations, which were likely to mislead a reasonable counterparty under the circumstances.

116. The Euclid Defendants' conduct constituted unfair acts because it offended established public policy favoring good-faith and transparent commercial dealings, was unethical and unscrupulous in that it involved holding themselves out as a cooperative restructuring partner while concealing adverse strategic intentions and engaging a key managerial employee in a conflicted financial relationship, and was substantially injurious to the Alliance Parties by undermining management integrity, disrupting restructuring efforts, impairing confidential business relationships, and causing direct economic harm.

117. The Euclid Defendants' actions were not merely aggressive competition; rather, they involved the strategic use of misleading representations, concealment of material facts, and conflicted employee inducement in order to try and engage in a hostile takeover of the Alliance Parties' business.

118. The Euclid Defendants' unfair and deceptive conduct occurred in the course of a commercial transaction and business dealings and therefore falls squarely within the scope of section 501.204.

119. As a direct and proximate result of the Euclid Defendants' unfair and deceptive acts, the Alliance Parties suffered actual damages, including but not limited to the loss of control over confidential business information, disruption of restructuring efforts, impairment of internal

management relationships, diversion of operational resources, and litigation expenses directly attributable to the Euclid Defendants' misconduct.

120.    Pursuant to section 501.211(2), Florida Statutes, the Alliance Parties, as "persons" who have suffered a loss as a result of a violation of FDUTPA, are entitled to recover actual damages, together with attorneys' fees and court costs.

WHEREFORE, the Alliance Parties requests judgment against the Euclid Defendants for actual damages, attorneys' fees and costs pursuant to section 501.2105, Florida Statutes, and such further relief as the Court deems just and proper.

### COUNT VI- MISAPPROPRIATION OF TRADE SECRETS
### (Alabama Trade Secrets Act, Ala. Code § 8-27-1 et seq.) (AGAINST ALL)

121.    The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

122.    The Leighton, Alabama smelting facility is located in Alabama, and the information at issue concerns operations, processes, and business activities conducted in Alabama. Accordingly, the Alabama Trade Secrets Act ("ATSA"), Ala. Code § 8-27-1 et seq., governs this claim.

123.    At all relevant times, the Alliance Parties possessed confidential and proprietary information used in their trade or business, including but not limited to compiled plant-level operational data, production capacity metrics, cost structures, vendor pricing arrangements, restructuring strategy, equipment condition analyses, capital expenditure needs, customer relationships, and operational vulnerabilities (the "Trade Secret Information").

124.    The Trade Secret Information was used in and intended for use in the Alliance Parties' aluminum smelting business and was embodied in compilations, financial models, operational reports, internal assessments, and strategic planning materials.

125.     The Trade Secret Information was not publicly known and was not generally known within the aluminum smelting industry.

126.     The Trade Secret Information cannot be readily ascertained or derived from publicly available sources.

127.     The Trade Secret Information had significant independent economic value, including competitive value in restructuring negotiations, refinancing efforts, operational optimization, and potential acquisition strategies.

128.     The Alliance Parties undertook reasonable efforts under the circumstances to maintain the secrecy of the Trade Secret Information, including limiting access to senior management personnel, restricting dissemination to employees with operational need-to-know responsibilities, maintaining internal confidentiality controls, and providing such information to third parties only in narrow, controlled circumstances for defined business purposes.

129.     Although certain information was voluntarily shared with the Euclid Defendants at the outset of discussions in connection with a potential cooperative transaction, that access was limited to the scope and duration of those discussions. Once the parties' business engagement terminated and the flow of information ceased, the Euclid Defendants had no further authorization to access or obtain any additional confidential information, and the Trade Secret Information remained subject to the Alliance Parties' ongoing confidentiality protections and restricted access controls.

130.     Wayne Perry, as plant manager, owed duties of loyalty and confidence to the Alliance Parties and was entrusted with access to Trade Secret Information solely for purposes of furthering the Alliance Parties' business interests.

131.     After Perry entered into a consulting agreement with the Euclid Defendants, and

while he remained actively employed by the Alliance Parties, the Euclid Defendants intentionally compensated Perry, including payment of at least $5,000.

132.    Pursuant to that consulting arrangement, Perry was to disclose Trade Secret Information to the Euclid Defendants without the knowledge of the Alliance Parties.

133.    The Euclid Defendants acquired or sought to acquire Trade Secret Information through "improper means," including inducement of a breach of confidence and deliberate acts taken for the purpose of gaining access to confidential information of another.

134.    The Euclid Defendants intentionally remunerated a key managerial employee of the Alliance Parties while knowing that he owed duties of confidence and loyalty to his employer, with the intent to induce and facilitate a breach of those duties and to obtain confidential information.

135.    The Euclid Defendants knew that any confidential operational, financial, or restructuring information obtained from Perry was disclosed in violation of his duty of confidence to the Alliance Parties because, at the time the Euclid Defendants entered into and funded the consulting arrangement, Perry remained actively employed as plant manager, occupied a position of trust within the organization, and owed ongoing duties of loyalty and confidentiality to his employer.

136.    The Euclid Defendants' conduct constitutes actual or, at minimum, threatened misappropriation of trade secrets because the Euclid Defendants intentionally remunerated and engaged a key managerial employee who owed duties of confidence to the Alliance Parties, thereby acquiring—or positioning itself to acquire—confidential operational and strategic information through improper means, including inducement of a breach of confidence.

137.    The Euclid Defendants' remuneration of Perry while he remained employed

supports a finding that the misappropriation was willful and malicious Euclid knowingly entered into and funded a consulting arrangement with an active managerial employee who owed ongoing duties of loyalty and confidentiality to his employer, and did so in the context of adversarial commercial positioning.

138.    Rather than inadvertently receiving information, the Euclid Defendants deliberately created a financial incentive for Perry to provide insight into confidential operational and restructuring matters. The intentional payment of compensation to a key employee under circumstances presenting an obvious conflict of interest demonstrates conscious disregard of the Alliance Parties' rights and supports an inference that the Euclid Defendants acted with knowledge, purpose, and bad faith sufficient to constitute willful and malicious misappropriation.

139.    As a direct and proximate result of the Euclid Defendants' misappropriation or threatened misappropriation, the Alliance Parties suffered damages, including loss of control over confidential information, impairment of competitive positioning in restructuring negotiations, operational disruption, and litigation expenses incurred in responding to the Euclid Defendants' conduct.

WHEREFORE, the Alliance Parties respectfully request that this Court enter judgment in their favor and against the Euclid Defendants for recovery of actual damages and any profits or benefits attributable to the misappropriation, for exemplary damages based upon willful and malicious conduct, for reasonable attorneys' fees and costs as permitted under the Alabama Trade Secrets Act, and for such other and further legal and equitable relief as this Court deems just and proper.

## COUNT VII-AIDING AND ABETTING A BREACH OF FIDUCIARY DUTIES (AGAINST ALL)

140.    The Alliance Parties reallege and incorporate the allegations contained in

paragraphs 1 through 41 above as if fully set forth herein.

141.    As the Alliance Parties' employee and officer, Wayne Perry had a fiduciary duty to maintain the Alliance Parties' confidential information as confidential and had a duty of loyalty.

142.    The Euclid Defendants knew that any confidential operational, financial, or restructuring information obtained from Perry was disclosed in violation of his duty of confidence and loyalty to the Alliance Parties because, at the time the Euclid Defendants entered into and funded the consulting arrangement, Perry remained actively employed as plant manager, occupied a position of trust within the organization, and owed ongoing duties of loyalty and confidentiality to his employer.

143.    Wayne Perry breached his duties of confidence and loyalty by providing confidential information to the Euclid Defendants.

144.    The Euclid Defendants provided substantial assistance and encouraged Wayne Perry's breach by entering into the consulting agreement with the express intent of obtaining the Alliance Parties confidential information and by asking him to provide the Alliance Parties confidential information to it.

145.    The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, nominal damages, costs, and all further relief this Court deems just and proper.

STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

## JURY TRIAL DEMAND

The Alliance Parties demand a trial by jury in this action on all issues triable by a jury.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the CM/ECF filer on February 23, 2026.

<div style="margin-left:40%">

Respectfully submitted,

**STOK KON+ BRAVERMAN**
*Attorneys for Alliance Defendants*
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com
*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com
MITCHELL J COHEN, ESQ.
Florida Bar No. 1048683
mcohen@stoklaw.com

</div>