**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(FT. LAUDERDALE DIVISION)

EUCLID TURNAROUND OPPORTUNITY FUND LP, CASE NO.: 1:25-cv-20647-BB

Plaintiff,

v.

AMERANT EQUIPMENT FINANCE, A DIVISION OF AMERANT BANK, N.A., ALLIANCE METALS LLC, TECHNOCON INTERNATIONAL, INC., ALLIANCE METALS ALABAMA, LLC, LARRY Y. GITMAN, JACOB GITMAN, SB ECLIPTICA LLC, TRUEWIND MANAGEMENT LLC, AMERICA1 INDUSTRIES LLC, AMERICA1 HOLDINGS LLC, AND SERGEI BRATUSHEV,

Defendants.
_______________________________/

## ALLIANCE PARTIES FIRST AMENDED COUNTERCLAIM

Counter-Plaintiffs, Alliance Metals LLC, and Alliance Metals Alabama, LLC (collectively, "Alliance Parties"), assert their First Amended Counterclaims against Counter-Defendants, Euclid Turnaround Opportunity Fund LP ("Euclid"), Howard Seigel ("Howard"), and Adam Seigel ("Adam") (collectively the "Euclid Defendants").

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and foreign jurisdictions and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. In the alternative, this Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because they arise out of the same transactions,

occurrences, and operative facts that form the basis of Euclid's claims in this action. The Counterclaims arise from Plaintiff's conduct in connection with the alleged Assignment Agreement, the inspection dispute, the emergency motion practice, and the prosecution of this litigation.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Euclid commenced this action in this District, a substantial part of the events giving rise to the claims and counterclaims occurred in this District, and Euclid invoked this Court's jurisdiction and forum in filing suit.

## PARTIES

4. Counter-Plaintiff, Alliance Metals LLC, is a Florida limited liability company.

5. Counter-Plaintiff, Alliance Metals Alabama, LLC, is an Alabama limited liability company whose principal place of business is in Leighton, Alabama.

6. Counter-Defendant, Euclid Turnaround Opportunity Fund LP, is a Delaware limited partnership that has alleged in its Complaint that it is a citizen of Texas, the United Arab Emirates, and the Cayman Islands.

7. Counter-Defendant, Howard Seigel, is a citizen of Texas and is sui juris.

8. Counter-Defendant, Adam Seigel, is a citizen of Texas and is sui juris.

9. Counter-Defendants Howard Seigel and Adam Seigel control and direct Counter-Defendant Euclid Turnaround Opportunity Fund LP, which is the alter ego of Howard Seigel and Adam Seigel. Howard Seigel, Adam Seigel, and Euclid Turnaround Opportunity Fund LP are collectively referred to herein as the "Euclid Defendants."

## GENERAL ALLEGATIONS

10. Alliance Metals operates and owns a secondary aluminum smelting facility in Leighton, Alabama.

11. The facility and the underlying real property are owned by Alliance Metals Alabama, LLC. The heavy industrial equipment securing the Amerant loans—including the reverb furnace, baghouse system, ingot line, and metal separation system—is permanently installed and physically integrated into that facility.

12. The loans were personally guaranteed by Larry "Ariel" Gitman and Jacob Gitman and guaranteed by Alliance Metals Alabama, LLC. In or around November 2024, while Alliance Metals was experiencing financial distress, Alliance approached the Euclid Defendants, including Howard and Adam Seigel, about pursuing a cooperative turnaround transaction.

13. The Euclid Defendants, through their agent Howard Siegel, affirmatively represented to the Alliance Parties in or around November 2024, that any transaction would require the participation of both Amerant and the Alliance Parties, and that they sought to restart operations in a manner that preserved value for existing stakeholders. The Euclid Defendants positioned themselves as a collaborative restructuring partner, not an adversarial debt acquirer.

14. In reasonable and justifiable reliance on those representations—and specifically in response to requests for confidential company information made by Adam and Howard Seigel on behalf of Euclid in November of 2024, together with their express representations that Euclid was acting as a collaborative restructuring partner—the Alliance Parties provided the Euclid Defendants, including Adam and Howard Seigel, with certain confidential information including, among other things, internal restart projections, an equipment appraisal, a list of debts, and detailed technical information related to operational economics regarding the inside workings of the Lehigh Facility. The Alliance Parties would not have disclosed such sensitive and proprietary information absent Euclid's requests and the representations about a cooperative restart upon which they reasonably relied.


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

15. At no time during these discussions did the Euclid Defendants disclose that they intended to pursue a unilateral strategy to acquire the lender's position and use foreclosure remedies as leverage—either to displace the Alliance Parties from ownership and operational control of the Alabama facility or to strong-arm them into an extremely unfavorable transaction under threat of foreclosure if an agreement could not be reached.

16. To the contrary, at the time Adam and Howard Seigel made the foregoing representations, they knew that they intended to pursue a hostile takeover of the Alliance Parties' business and had no intention of engaging in a cooperative restructuring.

17. In or around early January 2025, after gaining access to the Alliance Parties' confidential and strategically sensitive information, the Euclid Defendants abruptly pivoted away from the collaborative structure they had represented and instead pursued a discounted purchase of the defaulted loans from Amerant without the participation or knowledge of the Alliance Parties, utilizing the very information they had obtained from the Alliance Parties to advance that strategy.

18. After pivoting to acquire the loans from Amerant—on or around January 2025, the Euclid Defendants, including Howard and Adam Seigel, secretly and through improper means solicited Wayne Perry, the Vice President of Alliance Metals and Plant Manager of the Leighton facility, to act as their inside source and continue providing them with confidential, non-public information regarding the Alliance Parties' operations.

19. The Euclid Defendants secretly entered into a "consulting agreement" with Perry on or around January 16, 2025, while he remained employed as Vice President and Plant Manager for Alliance Metals, with the intent to have Perry obtain additional confidential information that the Alliance Parties did not disclose to the Euclid Defendants to utilize in their dealings with Amerant.

20. At all relevant times, Perry was employed by the Alliance Parties and owed them fiduciary duties, duties of loyalty, and obligations of confidentiality as an officer of Alliance Metals. As Vice President and Plant Manager, Perry had access to virtually all aspects of the Alliance Parties' business, including, but not limited to, operational strategy, supplier and customer lists, debt and financial information, nuances of technical production, facility equipment and condition, vendor relationships, inspection logistics, restructuring discussions, and internal communications. His role placed him in a position of significant trust within the organization and Perry had accepted that trust.

21. The Euclid Defendants paid Perry at least $5,000 pursuant to that arrangement, which was procured through improper means, including covertly contracting with an employee of the Alliance Parties to secretly obtain and divert confidential information for their own use and to leverage in their efforts to acquire the loans from Amerant.

22. The Euclid Defendants, including Howard and Adam Seigel, knew that Perry was actively employed by the Alliance Parties at the time they entered into and carried out this arrangement, as they had directly dealt with him in his capacity as plant manager for the Alliance Parties in November and December 2024 and January 2025.

23. The Euclid Defendants' agreement with Perry created a direct conflict between his employment and fiduciary obligations to the Alliance Parties and his financial relationship with the Euclid Defendants. By coordinating with Perry and compensating him while he remained Vice President and plant manager, the Euclid Defendants knowingly worked in active concert with him in January 2025 to induce Perry to act contrary to his duties of loyalty, inducing and facilitating his ongoing breach of those obligations for their own strategic benefit through improper means.

24. During the period in which they were actively positioning themselves to acquire

the secured debt, potentially foreclose on the facility, and effectuate a hostile takeover of the Alliance Parties' business, the Euclid Defendants used Perry as an inside source for operational information, inspection timing, plant-level logistics, and internal strategy.

25. In or around January 13 to 20, 2025, and with the Euclid Defendants' inducement, Perry and the Euclid Defendants coordinated via email and telephone calls to carry out this scheme through improper means, including covertly soliciting and contracting with Perry—while he remained employed by the Alliance Parties—to secretly obtain and transmit confidential and proprietary information for the Euclid Defendants' use and strategic advantage, thereby inducing and facilitating Perry's breach of his duties of confidence and loyalty.

26. The January inspection dispute that the Euclid Defendants later characterized as "interference" occurred against the backdrop of their undisclosed communications and financial relationship with Wayne Perry, and their coordinated efforts with Perry to induce and facilitate his breach of fiduciary duties of loyalty and confidentiality owed to the Alliance Parties.

27. The inspection involved privately owned industrial property located on real estate owned by Alliance Alabama. The Euclid Defendants had no direct contractual relationship with the Alliance Parties granting it access to the facility. Any inspection rights arose, if at all, under Euclid's agreement with Amerant—an agreement to which the Alliance Parties were not parties and was not enforceable against them.

28. Scheduling confusion arose when Amerant communicated inspection logistics with Perry who was then secretly working for the Euclid Defendants and without proper coordination through ownership and counsel. When the Alliance Parties learned that inspection dates had not been accurately confirmed through appropriate channels, they exercised their right to control access to their industrial facility. Thereafter, inspection was permitted upon proper coordination


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

and court authorization. At no time did the Alliance Parties obstruct a court order, as the state court affirmed at during a hearing.

29. Nevertheless, the Euclid Defendants used the temporary scheduling delay to construct a narrative of tortious interference and collusion and filed their lawsuit based on the same on February 12, 2025.

30. The Euclid Defendants' conduct prior to the filing of this action—including their dealings with the Alliance Parties and their covert coordination with Perry—was undertaken with express malice, in bad faith, and was not related to or in furtherance of any genuinely contemplated litigation. Rather, such conduct was part of a broader scheme to improperly obtain and exploit the Alliance Parties' confidential information, manufacture leverage, and position themselves to force a buyout and ultimately take control of the Alliance Parties' business.

31. After the filing of this Action, the Euclid Defendants then filed repeated emergency motions for temporary restraining orders and preliminary injunctions naming the Alliance Parties and alleging imminent irreparable harm. Those emergency motions were a sham from the outset and objectively baseless, in that no reasonable litigant could have realistically expected success on the merits.

32. The Euclid Defendants' immediate invocation of the emergency motion procedure against the Alliance Parties was not for the procedure's intended purpose of addressing legitimate, time-sensitive harm, but instead solely as an immediate improper strategic tool to exert immediate pressure on the Alliance Parties and attempt to force concessions regarding their business and ownership interests that Euclid could not obtain through this Action. Those motions required expedited briefing, immediate diversion of resources, and substantial legal expense.

33. After imposing those costs, Euclid withdrew its emergency motions following a

stipulation reached solely between Euclid and Amerant. The Euclid Defendants' inclusion of the Alliance Parties in the emergency proceedings served no legitimate purpose and was a sham from the outset. The dispute regarding possession and control of the loan documents was solely between Euclid and Amerant, and the Euclid Defendants knew that the Alliance Parties neither possessed nor controlled the instruments at issue, and injunctive relief was not available or necessary against the Alliance Parties.

34. Nonetheless, the Euclid Defendants deliberately named the Alliance Parties in their emergency filings to create transactional uncertainty, disrupt ongoing restructuring efforts, impose immediate and substantial litigation expense, and exert economic pressure—using the emergency motion procedure for an immediate improper purpose other than that for which it is designed, and unrelated to any proper injunctive objective.

35. The Euclid Defendants' conduct—including their undisclosed consulting arrangement with the plant manager, their pivot from collaborative restructuring to hostile and adversarial debt acquisition, their use of confidential information obtained under cooperative pretenses, and its repeated sham emergency motion practice—was intended to and damaged the Alliance Parties.

36. The Alliance Parties incurred substantial attorneys' fees and costs, suffered disruption to internal operations and restructuring negotiations, experienced severe distrust within management, and were forced to defend against claims premised on conduct they did not commit or could not control of unaffiliated third parties.

37. The Euclid Defendants' actions were not the product of misunderstanding or negligence. Rather, they failed to timely take the necessary steps to make their agreement with Amerant binding, and as a result, forfeited the opportunity at issue.


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

38. When Amerant elected to transact with another buyer at a higher price, the Euclid Defendants expanded their dispute with Amerant into tort claims against the borrowers, guarantors, and property owners whose assets were at issue.

39. As a direct and proximate result of the Euclid Defendants' conduct, the Alliance Parties have sustained substantial damages, including, but not limited to, attorneys' fees and litigation expenses incurred in responding to claims and emergency motions that would not have been necessary but for the Euclid Defendants' improper conduct and abuse of process for an immediate ulterior purpose; disruption of restructuring and refinancing efforts; interference with internal operations, and employee relationships; impairment and misuse of confidential business information; harm to customer relationships and goodwill; and operational, logistical, and financial losses.

40. The Euclid Defendants' leveraging of confidential information obtained from the Alliance Parties under false pretenses and through improper means, materially disrupted the Alliance Parties' restructuring efforts, impaired their ability to negotiate and stabilize operations, and caused concrete harm to the business and its operational planning.

41. The Euclid Defendants' covert solicitation and engagement of Wayne Perry, without the knowledge or consent of the Alliance Parties, further disrupted operations during a critical period. While still owing duties to the Alliance Parties, Perry acted contrary to those duties and engaged in conduct that interfered with management's operational decision-making by disregarding his obligations to the Alliance Parties, disrupted plant-level logistics, undermined workforce stability and morale, and caused inefficiencies and breakdowns in ordinary business operations. This included intentionally reducing production output on certain days and, without legitimate operational justification, abruptly halting production during active runs even when


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

additional output was readily achievable, thereby unnecessarily increasing production costs and undermining the economic position of the company.

42. As a result of the foregoing conduct, the Alliance Parties experienced concrete operational and logistical disruptions, including breakdowns in internal coordination, interference with management's ability to direct plant operations, and instability in workforce performance and supervision. These disruptions resulted in increased operating costs, reduced efficiency and productivity, strain on vendor and customer relationships, and harm to the business's financial performance and commercial standing.

43. The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of its actions and the high probability that injury or damage would result to the Alliance Parties.

44. Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

45. The individual Euclid Defendants are personally liable of intentional misconduct. Adam and Howard Seigel had actual knowledge of the wrongfulness of their conduct and the high probability that it would harm the Alliance Parties, but nevertheless intentionally pursued that course of conduct, resulting in said harm. Euclid, the corporate entity is liable for the intentional misconduct of its managing agents.

46. The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

**COUNT I- FRAUDULENT INDUCEMENT (AGAINST ALL)**

47. The Alliance Parties realleges and incorporates the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

48. The Euclid Defendants, through their agents Howard and Adam Siegel, affirmatively represented to the Alliance Parties, both orally and via email, in or around November 2024, that any transaction would require the participation of both Amerant and the Alliance Parties, and that they sought to restart operations in a manner that preserved value for existing stakeholders involving the Leighton smelting facility. The Euclid Defendants positioned themselves as a collaborative restructuring partner, not an adversarial debt acquirer.

49. In connection with those representations, the Euclid Defendants requested and obtained confidential information from the Alliance Parties including, among other things, confidential and internal facility restart projections, an equipment appraisal, a list of debts affecting the facility, and detailed technical information related to operational economics of the facility.

50. The representations made by the Euclid Defendants were statements of material fact because they concerned the Euclid Defendants' present intentions, transaction structure, and the nature of the proposed relationship with the Alliance Parties.

51. At the time those statements were made, the Euclid Defendants knew that they were false and misleading because they were, in fact, intending to pursue a unilateral strategy to acquire the secured debt from Amerant and use enforcement remedies to displace the Alliance Parties from ownership and operational control. The Euclid Defendants intended to engage in purported negotiations with the Alliance Parties not for any genuine collaborative purpose, but as a pretext to obtain confidential and strategically sensitive information to be used in advancing their anticipated transaction with Amerant.

52. Had the Alliance Parties known that the Euclid Defendants were positioning

themselves as a hostile debt acquirer and planned to compensate their Plant Manager while he remained employed, they would not have disclosed confidential information, permitted operational transparency, and engaged in cooperative negotiations. The Alliance Parties were misled and deprived of the ability to make an informed decision, as they did not—and could not—have had an equal opportunity to apprise themselves of these concealed material facts.

53. The Euclid Defendants made these representations with the intent that the Alliance Parties rely on them and provide confidential financial information, operational access, restructuring insight, and plant-level transparency.

54. In reliance on the Euclid Defendants' representations, the Alliance Parties disclosed confidential financial data, projections, vendor relationships, restructuring strategies, and operational vulnerabilities that would not have been disclosed to an adverse debt purchaser, and, in doing so, elected to work with Euclid as a restructuring partner rather than pursue or engage alternative partners at that time.

55. The Alliance Parties also permitted access to key personnel, including the plant manager, and engaged in good-faith discussions regarding restart logistics and capital needs.

56. The Euclid Defendants' representations were false when made because the Euclid Defendants did not intend to limit themselves to a cooperative structure and instead intended to preserve or pursue a strategy directly adverse to the Alliance Parties.

57. To the extent the Euclid Defendants' representations included promises of future cooperative action, those promises were made without a present intention to perform them or with a positive intention not to perform in the manner represented.

58. As a direct and proximate result of the Euclid Defendants' fraudulent inducement, the Alliance Parties suffered substantial damages, including, but not limited to, the disclosure of


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

confidential and strategically sensitive business information that was then used against them to exert economic pressure; the loss of opportunity to pursue alternative restructuring or financing partners during a critical period; disruption and impairment of restructuring efforts, including delays in restarting operations at the Alabama facility; internal operational and logistical harm; and reputational injury.

59. The Euclid Defendants' conduct was undertaken with express malice, in bad faith, and was not related to or in furtherance of any genuinely contemplated litigation. Rather, such conduct was part of a broader scheme to improperly obtain and exploit the Alliance Parties' confidential information, manufacture leverage, and position themselves to force a buyout and ultimately take control of the Alliance Parties' business.

60. The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

61. Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position themselves to obtain control over the Alabama facility.

62. The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

**COUNT II- FRAUDULENT CONCEALMENT (AGAINST ALL)**

63. The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

64. The Euclid Defendants, through their agents Howard and Adam Siegel, affirmatively represented to the Alliance Parties, both orally and via email, in or around November 2024, that any transaction would require the participation of both Amerant and the Alliance Parties, and that they sought to restart operations in a manner that preserved value for existing stakeholders. The Euclid Defendants positioned themselves as a collaborative restructuring partner, not an adversarial debt acquirer.

65. In connection with those representations, the Euclid Defendants requested and obtained confidential information from the Alliance including, among other things, confidential and internal facility restart projections, an equipment appraisal, a list of debts, and detailed technical information related to operational economics at the facility.

66. At the time the Euclid Defendants were making those representations and soliciting confidential information, the Euclid Defendants knowingly concealed material facts, including:

a) That they were simultaneously intending to pursue a unilateral strategy to acquire Amerant's secured debt position without the Alliance Parties' participation;

b) That they intended to use the option of using foreclosure or debt enforcement remedies to displace the Alliance Parties from ownership and operational control;

c) That they had entered into, or was in the process of entering into, a consulting arrangement with Wayne Perry, the plant manager of the Leighton facility, while he remained employed by the Alliance Parties; and

d) That they were compensating Perry for consulting services while he owed fiduciary duties and duties of loyalty to the Alliance Parties.

67. These facts were material because, had the Alliance Parties known that the Euclid

Defendants were positioning themselves as a hostile debt acquirer and planned to compensate their Plant Manager while he remained employed, they would not have disclosed confidential information, permitted operational transparency, and engaged in cooperative negotiations. The Alliance Parties were misled and deprived of the ability to make an informed decision, as they did not—and could not—have had an equal opportunity to apprise themselves of these concealed material facts.

68. The Euclid Defendants knew that these material facts should have been disclosed because they had created a relationship of trust and confidence by representing themselves as a cooperative restructuring partner and by soliciting non-public and strategically sensitive information.

69. By affirmatively representing that they sought a consensual turnaround while simultaneously withholding material information about their adverse strategy and its financial relationship with the Plant Manager, which the Alliance Parties could not have had an equal opportunity to apprise themselves, the Euclid Defendants created a misleading partial disclosure that triggered a duty to disclose the full truth.

70. A duty to disclose arose because the Euclid Defendants sought and obtained confidential information under circumstances in which the Alliance Parties had a right to know whether the Euclid Defendants' interests were aligned or adverse, and whether the Euclid Defendants were simultaneously engaging one of their key employees in a conflicting financial relationship through deceit.

71. The Euclid Defendants knew that their concealment of these material facts would induce the Alliance Parties to continue providing information, access, and cooperation.

72. The Alliance Parties relied on the Euclid Defendants' omissions and partial


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

disclosures by continuing to provide confidential operational transparency, plant-level access, and restructuring insight, and by foregoing the pursuit of alternative restructuring partners during that period, which in turn delayed and impaired efforts to restart operations at the Alabama facility.

73. As a direct and proximate result of the Euclid Defendants' fraudulent concealment, the Alliance Parties suffered substantial damages, including disruption and impairment of their restructuring and refinancing efforts; interference with internal operations, and business relationships; and the incurrence of significant attorneys' fees and litigation costs.

74. The Euclid Defendants' conduct was undertaken with express malice, in bad faith, and was not related to or in furtherance of any genuinely contemplated litigation. Rather, such conduct was part of a broader scheme to improperly obtain and exploit the Alliance Parties' confidential information, manufacture leverage, and position themselves to force a buyout and ultimately take control of the Alliance Parties' business.

75. The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

76. Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position themselves to obtain control over the Alabama facility.

77. The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

**COUNT III- ABUSE OF PROCESS (AGAINST ALL)**

78. The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

79. After failing to secure the loan purchase it sought from Amerant and the Alliance Parties and after the Alliance Parties elected to transact with SB and its affiliated entities (the "SB Parties"), the Euclid Defendants first tried to intervene in the State Court action and sought emergency injunction relief, and then, when that failed, initiated this action.

80. After the filing of this Action, the Euclid Defendants filed repeated sham emergency motions for temporary restraining orders and preliminary injunctions against all Defendants, including the Alliance Parties, and alleging imminent irreparable harm.

81. The Euclid Defendants' immediate invocation of the emergency motion procedure *against the Alliance Parties* was not for the emergency procedure's intended purpose of addressing legitimate, time-sensitive harm, but instead solely as a strategic tool to exert immediate pressure on the Alliance Parties and attempt to force concessions regarding their business and ownership interests that Euclid could not receive from the Alliance Parties in this Action. Those motions required expedited briefing, immediate diversion of resources, and substantial legal expense.

82. After imposing those costs, Euclid withdrew its emergency motions following a stipulation reached solely between Euclid and Amerant. The Euclid Defendants' inclusion of the Alliance Parties in the emergency proceedings was a sham and served no legitimate purpose.

83. The dispute regarding possession and control of the loan documents was solely


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

between Euclid and Amerant, and the Euclid Defendants knew that the Alliance Parties neither possessed nor controlled the instruments at issue. As such, injunctive relief was neither available nor necessary against the Alliance Parties, rendering the injunctive claims against them objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.

84. Nonetheless, the Euclid Defendants deliberately named the Alliance Parties in their emergency filings to create transactional uncertainty, disrupt ongoing restructuring efforts, impose immediate and substantial litigation expense, and exert economic pressure—using the emergency motion procedure for an immediate improper purpose other than that for which it is designed, and unrelated to any proper injunctive objective

85. The Euclid Defendants sought through emergency injunction practice to create uncertainty, delay, and transactional risk sufficient to impair or destroy the Alliance–SB arrangement, thereby positioning themselves to step into SB's shoes and pursue a hostile takeover of the secured debt and collateral.

86. The repeated invocation of emergency judicial process against parties from whom no injunctive relief was properly obtainable constitutes a sham and a perverted and improper use of judicial process for a purpose other than that for which it was designed.

87. The Euclid Defendants used the State Court's and this Court's emergency procedures as a tactical instrument to interfere with an ongoing commercial restructuring and to attempt to gain leverage in a competitive acquisition context, rather than as a legitimate vehicle to preserve rights pending adjudication.

88. In response to each emergency motion, the Alliance Parties timely filed substantive oppositions demonstrating that they were not proper parties to the requested injunctive relief, that they did not possess or control the loan documents, and that the alleged dispute concerned the


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

Euclid Defendants' contractual relationship with Amerant alone.

89. Despite being placed on express notice of these facts through formal briefing, the Euclid Defendants disregarded those clear deficiencies and proceeded to file subsequent renewed emergency motions repeating the same allegations, thereby compounding the improper use of judicial process and escalating litigation costs without any legitimate basis for relief against the Alliance Parties.

90. As a direct and proximate result of the Euclid Defendants' abuse of process, the Alliance Parties suffered damages, including substantial attorneys' fees and costs incurred in responding to expedited emergency motions, disruption of restructuring negotiations with the SB Parties, diversion of management resources, operational interference, and impairment of the Alliance Parties' ability to consummate their transaction free from coercive litigation pressure.

91. The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

92. Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct in order to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

93. The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

**COUNT IV- TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST ALL)**

94. The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

95. At all relevant times, the Alliance Parties maintained an ongoing business relationship with Wayne Perry, who served as Vice President and Plant Manager of their Leighton, Alabama facility.

96. At all relevant times, Perry was employed by the Alliance Parties and owed them fiduciary duties, duties of loyalty, and obligations of confidentiality as an officer of Alliance. As Vice President and Plant Manager, Perry had access to virtually all aspects of the Alliance Parties' business, including, but not limited to, operational strategy, supplier and customer lists, debt and financial information, nuances of technical production, facility equipment and condition, vendor relationships, inspection logistics, restructuring discussions, and internal communications. His role placed him in a position of significant trust within the organization and Perry had accepted that trust.

97. The Euclid Defendants knew of the existing business relationship between Perry and the Alliance Parties because Perry was publicly and internally identified as the Vice President and Plant Manager of the Leighton facility, participated in operational and restructuring discussions on behalf of the Alliance Parties, communicated with the Euclid Defendants in that representative capacity, and held himself out as acting within the scope of his managerial role during the parties' interactions.


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

98. The Euclid Defendants further knew that Perry occupied a position of trust within the organization, had access to sensitive operational and strategic information, and played a central role in plant-level management and restructuring discussions.

99. Without disclosure to or consent from the Alliance Parties, the Euclid Defendants secretly entered into a "consulting agreement" with Perry on or around January 16, 2025, while he remained employed as Vice President and Plant Manager for Alliance Metals, with the intent to have Perry obtain additional confidential information and insights that the Alliance Parties did not disclose to the Euclid Defendants to utilize in their dealings with Amerant.

100. From at least January 13, 2025, onward, Perry in fact did supply the Euclid Defendants with additional information about the Alliance Parties that was not disclosed by them to Euclid including internal operations and decision making and negotiations with other restructuring partners.

101. The Euclid Defendants paid Perry at least $5,000 pursuant to that arrangement, which was procured through improper means, including covertly conspiring and contracting with a key employee of the Alliance Parties with the intent to secretly steal, obtain, and divert confidential information for their own use and to leverage in their efforts to acquire the loans from Amerant.

102. The consulting relationship created a direct conflict between Perry's ongoing business relationship with the Alliance Parties and his financial alignment with the Euclid Defendants, whose interests were directly adverse to the Alliance Parties.

103. By creating and funding that conflicting relationship, the Euclid Defendants intentionally and unjustifiably interfered with the Alliance Parties' ongoing business relationship with Perry and undermined the reasonable expectancy that he would act solely in their interests.

104. The Euclid Defendants were a stranger to the business relationship between Perry and the Alliance Parties and had no legally protected interest in that relationship that would privilege or justify its interference because it was neither a party to, beneficiary of, nor participant in Perry's managerial role with the Alliance Parties, no supervisory authority over Perry, no contractual rights arising from his employment, and no legally protected economic interest in the continuation or structure of that relationship.

105. The Euclid Defendants' interference was undertaken for its own strategic advantage to leverage a hostile takeover of the Alliance Parties business and not to safeguard any preexisting legal or economic right within the Perry relationship.

106. As a direct and proximate result of the Euclid Defendants' covert solicitation and engagement of Wayne Perry, operations were significantly disrupted during a critical period. While still owing duties to the Alliance Parties, Perry acted contrary to those duties and, with the inducement of the Euclid Defendants, engaged in conduct that interfered with management's operational decision-making by disregarding his obligations, disrupted plant-level logistics, undermined workforce stability and morale, and caused inefficiencies and breakdowns in ordinary business operations.

107. This included intentionally reducing production output on certain days and, without legitimate operational justification, abruptly halting production during active runs even when additional output was readily achievable, thereby unnecessarily increasing production costs and undermining the economic position of the company. This conduct eroded internal trust and management cohesion and resulted in operational and logistical disruptions that interfered with plant operations, coordination, and decision-making, leading to increased operating costs and reduced efficiency.


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

108. The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

109. Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct in order to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

110. The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct.

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper

## <u>COUNT V- AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES</u>

111. The Alliance Parties reallege and incorporate the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

112. At all relevant times, Wayne Perry was Vice President and Plant Manager of Alliance Metals, LLC, a Florida limited liability company, and, in that capacity, owed fiduciary duties to the Alliance Parties under Florida Law, including duties of loyalty, confidentiality, and the obligation to act in the best interests of the Alliance Parties.

113. As an officer and senior managerial employee, Perry was entrusted with access to highly confidential and proprietary information, including, but not limited to, internal financial projections and restart models; detailed debt schedules and obligations; vendor and customer

identities, relationships, and pricing arrangements; plant-level operational strategy and logistics; production inputs and outputs, alloy composition requirements, and technical production processes; equipment condition, capabilities, and maintenance needs; cost structures, yield rates, and other operational economics; restructuring strategies and negotiations; and internal communications concerning the Alliance Parties' business operations and financial condition.

114. Perry breached his fiduciary duties by, among other things, secretly providing confidential and proprietary information to the Euclid Defendants, acting in direct conflict with the Alliance Parties' interests, and engaging in conduct that undermined operations, management decision-making, and the economic position of the business while still employed by the Alliance Parties.

115. The Euclid Defendants had actual knowledge of Perry's fiduciary duties and his position of trust within the Alliance Parties. The Euclid Defendants knew that Perry was serving as Vice President and Plant Manager and had direct dealings with him in that capacity in November and December 2024 and January 2025.

116. Despite that knowledge, the Euclid Defendants knowingly, intentionally, and unjustifiably provided substantial assistance to Perry in committing and continuing his breaches of fiduciary duty, including by covertly soliciting him, entering into a secret consulting arrangement with him while he remained employed by the Alliance Parties, compensating him at least $5,000, and directing, encouraging, and facilitating his disclosure of confidential and proprietary information.

117. The Euclid Defendants' assistance was provided through improper means, including covertly contracting with Perry without the knowledge or consent of the Alliance Parties for the purpose of obtaining confidential information to use and leverage in their efforts to acquire


STOK KON + BRAVERMAN
One East Broward Boulevard, Suite 915 | Fort Lauderdale, FL 33180 | Tel: (954) 237-1777 | Fax: (954) 237-1737

the Alliance Parties' secured debt and effectuate a hostile takeover of the business.

118. The Euclid Defendants' conduct created and exploited a direct conflict between Perry's fiduciary obligations to the Alliance Parties and his financial relationship with the Euclid Defendants and was undertaken in active coordination with Perry to induce and facilitate his ongoing breaches of loyalty and confidentiality.

119. The Euclid Defendants' knowing participation in and substantial assistance of Perry's breaches was a direct and proximate cause of harm to the Alliance Parties, including harm to Alliance Metals, LLC, a Florida limited liability company, including, but not limited to, the loss and misuse of confidential information, disruption of operations and restructuring efforts, interference with internal management and employee relationships, increased operational costs, and additional financial and business damages.

120. The Euclid Defendants' conduct, as alleged herein, was intentional, willful, malicious, and undertaken with actual knowledge of the wrongfulness of their actions and the high probability that injury or damage would result to the Alliance Parties.

121. Despite that knowledge, the Euclid Defendants deliberately pursued this course of conduct in order to gain strategic commercial advantage, disrupt the Alliance Parties' restructuring efforts, and position itself to obtain control over the Alabama facility.

122. The Euclid Defendants' actions constituted intentional misconduct and a conscious disregard for the rights of the Alliance Parties within the meaning of section 768.72(2), Florida Statutes. Accordingly, the Alliance Parties are entitled to recover punitive damages in an amount sufficient to punish the Euclid Defendants and deter similar misconduct

WHEREFORE, the Alliance Parties demand judgment against the Euclid Defendants for punitive damages, compensatory damages, consequential damages, costs, and all further relief this Court deems just and proper.

**JURY TRIAL DEMAND**

The Alliance Parties demand a trial by jury in this action on all issues triable by a jury.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed and served via the CM/ECF filer on April 20, 2026.

Respectfully submitted,

**STOK KON+ BRAVERMAN**
*Attorneys for Alliance Parties*
One East Broward Boulevard
Suite 915
Fort Lauderdale, Florida 33301
Tel.: (954) 237-1777
Fax: (954) 237-1737
Email: service@stoklaw.com
*/s/ Joshua R. Kon*
JOSHUA R. KON, ESQ.
Florida Bar No. 56147
jkon@stoklaw.com
YOSEF Y. KUDAN, ESQ.
Florida Bar No. 1010261
ykudan@stoklaw.com
MITCHELL J COHEN, ESQ.
Florida Bar No. 1048683
mcohen@stoklaw.com