**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-CV-20647-BB/Elfenbein**

EUCLID TURNAROUND OPPORTUNITY FUND LP,

*Plaintiff*,

*vs*.

AMERANT EQUIPMENT FINANCE, A DIVISION OF AMERANT BANK, N.A., ET AL.,

*Defendants*.

_______________________________________/

**HOWARD SIEGEL'S AND ADAM SIEGEL'S MOTION TO DISMISS THE ALLIANCE DEFENDANTS' AMENDED COUNTERCLAIM**

Counter-Defendants Howard Siegel and Adam Siegel (the "Siegels") move, pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6), to dismiss the claims asserted against them by Defendants/Counterclaim-Plaintiffs Alliance Metals LLC ("Alliance Metals"), Technocon International, Inc. ("Technocon"), Alliance Metals Alabama, LLC ("Alliance Alabama"), Larry Y. Gitman ("L. Gitman"), and Jacob Gitman ("J. Gitman") (collectively, the "Alliance Parties") in the First Amended Counterclaim (ECF No. 281).

As explained in Euclid's motion to dismiss (ECF No. 290), which the Siegels incorporate by reference, the claims asserted by the Alliance Parties—fraudulent inducement (Count I), fraudulent concealment (Count II), abuse of process (Count III), tortious interference with a business relationship (Count IV), and aiding and abetting a breach of fiduciary duties (Count V)—all fail as a matter of law and should be dismissed. The Amended Counterclaim is procedurally improper, the claims are blocked by Florida's litigation privilege, and the claims are inadequately pled.

The claims against the Siegels also should be dismissed for lack of personal jurisdiction. The Amended Counterclaim attempts to drag two Texas residents into a Florida federal court based entirely on conduct they undertook in their capacity as managers and members of Euclid Partners GP LLC, the general partner of Plaintiff Euclid Turnaround Opportunity Fund LP ("Euclid"). That is precisely the conduct from which Florida's corporate-shield doctrine protects nonresident officers. The Siegels are citizens of Texas, own no property in Florida, maintain no office in Florida, and were not physically present in Florida for any of the conduct alleged in the Amended Counterclaim. Every interaction they had with the Alliance Parties—every meeting, every email, every negotiation—was either initiated by the Alliance Parties' own representatives or was directed to Alabama, where the Alliance Parties' facility and operations are located.

The Amended Counterclaim itself confirms the corporate-shield doctrine applies. It pleads time and again that the Siegels acted "on behalf of Euclid" (ECF No. 281 ¶ 14), as "agent[s]" of Euclid (*id.* ¶¶ 13, 48, 64), or as Euclid's "managing agents" (*id.* ¶ 45). These are textbook representative-capacity allegations. Under controlling Florida authority, such allegations do not establish personal jurisdiction over a nonresident corporate officer.

The Alliance Parties' lone effort to evade the corporate-shield doctrine—the conclusory allegation that Euclid is "the alter ego of Howard Seigel and Adam Seigel"—is inadequate as a matter of law to pierce the corporate veil. *See Parisi v. Kingston*, 314 So. 3d 656, 664 (Fla. 3d DCA 2021); *Abdo v. Abdo*, 263 So. 3d 141, 150 (Fla. 2d DCA 2018). The Amended Counterclaim alleges no facts whatsoever that the Siegels failed to observe limited-partnership formalities, that Euclid was undercapitalized, that the Siegels commingled funds with Euclid, or that Euclid was used for any improper purpose distinct from the allegations directed at Euclid itself. And the accompanying Siegel Declarations affirmatively refute each of these elements.

Finally, the Amended Counterclaim's tort allegations cannot satisfy the "intentional tort" exception to the corporate-shield doctrine because the alleged conduct was not "expressly aimed at" Florida or "calculated to inflict a direct injury upon a resident of Florida." *Harrison v. NC3 Sys., Inc.*, 395 So. 3d 657, 663 (Fla. 6th DCA 2024) (internal quotation marks omitted). The harm pleaded in every count of the Amended Counterclaim is to the Alabama smelting facility, to Alabama-based personnel, to Alabama operations, and to negotiations with Alabama-based counterparties. The Amended Counterclaim does not—and cannot—allege that Siegels expressly aimed any tortious act at the State of Florida.

For these reasons and those discussed below, the Court should dismiss the Alliance Parties' frivolous claims against the Siegels.

## BACKGROUND

Howard Siegel and Adam Siegel are individuals who reside in and are citizens of Texas. (H. Siegel Decl. (**Ex. 1**) ¶¶ 2–3; A. Siegel Decl. (**Ex. 2**) ¶¶ 2–3.) Neither owns property nor maintains an office in Florida. (H. Siegel Decl. ¶ 4; A. Siegel Decl. ¶ 4.) The Siegels are the two members of Euclid Partners GP LLC, a Delaware limited liability company with its principal place of business in Texas. (H. Siegel Decl. ¶ 5; A. Siegel Decl. ¶ 5.) Euclid Partners GP LLC is, in turn, the general partner of Euclid Turnaround Opportunity Fund LP, a Delaware limited partnership headquartered in Texas. (*Id.*) The remaining limited partners of Euclid are Delaware LLCs whose sole member is a Cayman Islands segregated portfolio company with its principal place of business in Dubai. (H. Siegel Decl. ¶ 6; A. Siegel Decl. ¶ 6.)

The Amended Counterclaim, filed on April 20, 2026, asserts five counts against "all" three "Euclid Defendants"—that is, Euclid, Howard Siegel, and Adam Siegel: Count I (Fraudulent Inducement), Count II (Fraudulent Concealment), Count III (Abuse of Process), Count IV (Tortious Interference with a Business Relationship), and Count V (Aiding and Abetting Breach of Fiduciary Duties). (ECF No. 281.) The pleading's only effort to establish jurisdiction over the Siegels individually is the single conclusory allegation in paragraph 9 that the Siegels "control and direct" Euclid and that Euclid "is the alter ego of Howard Seigel and Adam Seigel." (*Id.* ¶ 9.) No supporting facts accompany that allegation.

The Siegels' involvement with the Alliance Parties began only after Ariel Gitman, on November 11, 2024, sent an unsolicited email to inquiry@eucinv.com—the general inquiry address on Euclid's website—pitching what he described as a "unique investment opportunity" in "a distressed secondary aluminum smelter in Alabama." (H. Siegel Decl. ¶ 18 & Ex. A; A. Siegel Decl. ¶ 18 & Ex. A.) That email contained no Florida address; Mr. Gitman's signature line listed

a "256" area-code office number, which is the area code for Northern Alabama. (*Id.*) The Siegels did not solicit the Alliance Parties or reach into Florida to initiate the relationship—the Alliance Parties' representatives reached out to Euclid in Texas.

From the start, the Siegels acted in their capacity as managers and members of Euclid Partners GP LLC for the benefit of Euclid, not in their personal capacity. (H. Siegel Decl. ¶ 17; A. Siegel Decl. ¶ 17.) The in-person meetings with Jacob Gitman and Ariel Gitman in late 2024 occurred in Alabama, not Florida. (H. Siegel Decl. ¶ 19; A. Siegel Decl. ¶ 19.) The consulting agreement between Euclid Investment Management LLC and Wayne Perry—a central piece of the Amended Counterclaim—was executed with Mr. Perry, who resided in Alabama, and contemplated services regarding the operation and financial characteristics of the Alabama smelting facility. (H. Siegel Decl. ¶ 20; A. Siegel Decl. ¶ 20.) None of the contemplated services was to be performed in Florida. (*Id.*) Howard Siegel signed that agreement as the manager of Euclid Investment Management LLC, not in his personal capacity. (*Id.*) He likewise signed the Loan Sale and Assignment Agreement with Amerant Equipment Finance solely in his capacity as manager of Euclid Partners GP LLC, on behalf of Euclid, not in his personal capacity. (H. Siegel Decl. ¶ 21; A. Siegel Decl. ¶ 21.)

Euclid is not, and has never been, a shell or instrumentality of the Siegels. (H. Siegel Decl. ¶¶ 7–8; A. Siegel Decl. ¶¶ 7–8.) Euclid has at all times maintained a separate legal existence from the Siegels, observed all required limited-partnership formalities, and maintained its own books and records and decision-making processes. (*Id.* ¶¶ 7–16.) Since January 31, 2023, Euclid has engaged SS&C Technologies, Inc.—the largest global fund administrator, with more than $3 trillion in assets under administration—as its fund administrator. (H. Siegel Decl. ¶ 9; A. Siegel Decl. ¶ 9.) Pursuant to that Services Agreement, SS&C maintains Euclid's general ledger, investor

capital accounts, investor register, quarterly investor reporting, annual audit coordination, and monthly bank-account reconciliations. (*Id.* ¶ 10) Euclid's funds have never been commingled with the Siegels' personal funds; Euclid's funds have not been diverted for the Siegels' personal benefit; and Euclid was formed and operated for a legitimate business purpose. (H. Siegel Decl. ¶¶ 13–14; A. Siegel Decl. ¶¶ 13–14.)

## LEGAL STANDARD

A federal court sitting in diversity "ordinarily follow[s] state law in determining the bounds of [its] jurisdiction over persons." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1222 (11th Cir. 2023) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). The personal-jurisdiction inquiry under Florida law proceeds in two steps. *Id.* The Court must first "determine whether the Florida long-arm statute provides a basis for personal jurisdiction," and, if it does, then examine "whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause." *Id.* (internal quotation marks omitted). The plaintiff bears the burden of establishing both prongs. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). Critically, Florida law "strictly construe[s] the long-arm statute in favor of the nonresident defendant." *Abdo*, 263 So. 3d at 145.

## ARGUMENT

### I. Personal Jurisdiction Cannot Be Exercised Over The Siegels Based On Florida's Long-Arm Statute.

#### A. The Corporate-Shield Doctrine Applies.

Florida's corporate-shield doctrine bars personal jurisdiction over nonresident corporate officers where their only contacts with the forum were undertaken in a representative capacity. "Under the corporate shield doctrine, the actions of a corporate employee in a representative capacity do not form the basis for jurisdiction over the corporate employee in their individual

capacity." *Harrison*, 395 So. 3d at 663; *accord Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993). The doctrine reflects "the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Doe*, 620 So. 2d at 1006 (internal quotations omitted). The doctrine "applies equally to nonresidents who act in a representative capacity on behalf of a limited liability company." *Harrison*, 395 So. 3d at 663 (citing *Rensin v. State*, 18 So. 3d 572, 574 n.1 (Fla. 1st DCA 2009)).

The Amended Counterclaim cannot escape the corporate-shield doctrine. Its allegations against the Siegels arise entirely from the Siegels' conduct as managers and members of Euclid Partners GP LLC, the general partner of Euclid. Indeed, the Amended Counterclaim itself describes the Siegels' conduct as occurring through and for Euclid:

• "The Euclid Defendants, through their agent Howard Siegel, affirmatively represented to the Alliance Parties" (ECF No. 281 ¶ 13);

• "requests for confidential company information made by Adam and Howard Seigel on behalf of Euclid in November of 2024" (*id.* ¶ 14);

• "The Euclid Defendants, through their agents Howard and Adam Siegel, affirmatively represented" (*id.* ¶ 48); and

• "Euclid, the corporate entity is liable for the intentional misconduct of its managing agents" (*id.* ¶ 45).

The Amended Counterclaim's repeated invocation of the words "through," "on behalf of," "agent," and "managing agent" is telling. These are the hallmarks of representative-capacity conduct to which the corporate-shield doctrine applies. *See Harrison*, 395 So. 3d at 664 ("[Plaintiff] failed to substantiate its allegations of intentional tortious conduct on the part of

Harrison, focusing instead on attempting to establish jurisdiction based on Harrison's extensive business contacts with Florida."); *Carter v. Estate of Rambo*, 925 So. 2d 353, 356 (Fla. 5th DCA 2006) ("[A]ny activity in one's capacity as a corporate officer or director is exempted from consideration in support of the exercise of long-arm jurisdiction over said officer or director.").

The accompanying Declarations confirm this conclusion. The Siegels attest that "[a]ll of my communications with Jacob Gitman and Ariel Gitman and all of my acts taken in connection with Alliance Metals Alabama, LLC and Alliance Metals, LLC were performed in a limited partnership capacity for the benefit of Euclid Turnaround, not in my personal capacity." (H. Siegel Decl. ¶ 17; A. Siegel Decl. ¶ 17.) Howard Siegel's signature on the consulting agreement with Wayne Perry was given "as the manager of Euclid Investment Management, LLC, not in [his] personal capacity." (H. Siegel Decl. ¶ 20.) His signature on the Loan Sale and Assignment Agreement with Amerant was likewise made "on behalf of Euclid Turnaround Opportunity Fund LP and in [his] capacity as manager of Euclid Partners GP LLC, not in [his] personal capacity." (*Id.* ¶ 20.)

*Harrison* is directly on point. There, the Sixth DCA applied the corporate-shield doctrine to dismiss an action against a nonresident corporate officer despite his "extensive business contacts with Florida," his ownership interest in a Florida LLC, his service as the LLC's Chief Technical Officer, his physical visits to Florida for company meetings, his name on a Florida bank account for an LLC, and his initiation of wire transfers from a Florida bank account. 395 So. 3d at 660–61, 665. Because all of those contacts were in the defendant's "corporate capacity," the Sixth DCA held that the trial court lacked personal jurisdiction. *Id.* at 665.

The Siegels' contacts with Florida are far less than the defendant's in *Harrison*—they reside in Texas, have no Florida bank account, never traveled to Florida to conduct business with

the Alliance Parties, and met with the Alliance Parties' principals only in Alabama. Under *Harrison*, therefore, the corporate-shield doctrine bars jurisdiction over them.

The recent decision in *Frida Kahlo Corp. v. Pinedo*, 172 F.4th 1316 (11th Cir. 2026), confirms this analysis. In *Frida Kahlo*, the Eleventh Circuit declined to apply the corporate-shield doctrine because the cease-and-desist letters at issue explicitly identified themselves as being sent "in our capacity as representatives of Mrs. Mara Cristina Teresa Romeo Pinedo" in her personal capacity as Frida Kahlo's heir. *Id.* at 1322. "We cannot imagine a clearer way for [the agent] to have indicated that he was representing Pinedo in her individual capacity," the court explained, before concluding that personal jurisdiction existed. *Id.* Here, the inverse is true: the Amended Counterclaim and the Siegel Declarations alike establish that the Siegels acted exclusively in their representative capacity for Euclid. *Frida Kahlo* therefore confirms the corporate-shield doctrine's application here.

**B. The Intentional-Tort Exception Does Not Apply.**

The Alliance Parties may attempt to invoke the narrow intentional-tort exception to the corporate-shield doctrine. But the exception does not apply here, for two independent reasons.

First, the exception applies only where the corporate officer "personally and intentionally engaged" in conduct that "was calculated to inflict a direct injury upon a resident of Florida." *Villarino v. Joekel*, 2025 WL 2329959, at *6 (11th Cir. Aug. 13, 2025) (quoting *LaFreniere v. Craig-Myers*, 264 So. 3d 232, 239 (Fla. 1st DCA 2018)); *accord Rensin*, 18 So. 3d at 576. "[T]he conduct alleged must consist of intentional and tortious acts 'expressly aimed at' Florida, with knowledge by the defendant that it 'would have a potentially devastating impact' upon the victim." *LaFreniere*, 264 So. 3d at 239 (quoting *Calder v. Jones*, 465 U.S. 783, 783–84 (1984)). The Alliance Parties' pleading nowhere alleges that Howard or Adam Siegel directed any tortious

communication into Florida, met any Alliance Party representative in Florida, or performed any act in Florida. To the contrary: the Siegel Declarations establish that the relevant events occurred in Alabama, where the smelting facility is located, where the plant manager Wayne Perry resided, and where the in-person meetings with the Gitmans took place. (H. Siegel Decl. ¶¶ 19–20; A. Siegel Decl. ¶¶ 19–20.) The Alliance Parties have not alleged and cannot establish a single tortious act "expressly aimed at" Florida.

Second, the harm pleaded throughout the Amended Counterclaim is harm to Alabama-based operations, not to a Florida resident. The Amended Counterclaim repeatedly identifies the injuries as: (i) "disruption to internal operations and restructuring negotiations" at the Alabama facility (ECF No. 281 ¶ 36); (ii) interference with "plant-level logistics" and "workforce stability" at the Alabama plant (*id.* ¶¶ 41–42); (iii) "internal coordination" and "plant operations" at the Alabama facility (*id.* ¶ 42); and (iv) damages tied to "customer relationships" and "goodwill" associated with the Alabama operations (*id.* ¶ 39). The Amended Counterclaim itself admits that the smelting facility, the heavy industrial equipment securing the loans, and the real property at issue are all located in Alabama. (*Id.* ¶¶ 10–11.) Alliance Metals Alabama, LLC is by its own pleading an Alabama company with its principal place of business in Alabama. (*Id.* ¶ 5.) And although Alliance Metals LLC is described as a Florida limited liability company (*id.* ¶ 4), the Amended Counterclaim alleges no harm uniquely felt in Florida and no Florida-based operations through which any harm could have been inflicted.

*Harrison* is again instructive on this point. The Sixth DCA declined to apply the intentional-tort exception in that case because the record reflected that the alleged tortious "conduct was not expressly directed at a resident of Florida." 395 So. 3d at 665 n.6. Rather, the plaintiff was a corporation "with its principal place of business in San Jose, California." *Id.* The

Amended Counterclaim here suffers from the same defect: the alleged harms are to Alabama operations, an Alabama plant manager, and an Alabama smelting facility—not to a Florida resident.

### C. The Amended Counterclaim's Conclusory Alter-Ego Allegation Cannot Support Exercising Personal Jurisdiction Over The Siegels.

The Amended Counterclaim's only other potential basis for jurisdiction over the Siegels is the single, threadbare allegation in paragraph 9 that they "control and direct" Euclid and that Euclid "is the alter ego of Howard Seigel and Adam Seigel." (ECF No. 281 ¶ 9.) This is precisely the type of conclusory allegation that Florida courts have held is insufficient to establish personal jurisdiction.

Under the "limited exception" for alter-ego jurisdiction, the pleading must "allege facts sufficient to pierce the corporate veil." *Parisi*, 314 So. 3d at 663 (internal quotation marks omitted). Piercing the corporate veil in turn requires facts establishing "both that the corporation is a mere instrumentality or alter ego of the defendant[ ] and that the defendant engaged in improper conduct in the formation or use of the corporation." *Abdo*, 263 So. 3d at 149 (internal quotation marks omitted). To meet this requirement, the pleading must allege facts showing that: "(i) [the individual] dominated and controlled [the corporation] to such an extent that [the corporation's] independent existence was non-existent and [the individual] was the entity's alter-ego; (ii) [the individual] used [the corporation's] legal form fraudulently or for an improper purpose; and (iii) [the individual's] fraudulent or improper use of [the corporation's] legal form caused injury to the [plaintiff]." *Parisi*, 314 So. 3d at 664.

The Amended Counterclaim does not come close to meeting these requirements. Paragraph 9 contains a single sentence stating the legal conclusion that Euclid is the Siegels' "alter ego." (ECF No. 281 ¶ 9.) No facts are alleged regarding (i) failure to observe limited-partnership

formalities; (ii) commingling of personal and Euclid funds; (iii) undercapitalization; (iv) diversion of Euclid funds for the Siegels' personal benefit; (v) lack of separate books and records; (vi) lack of an independent decision-making process; or (vii) any other indicia of disregard for Euclid's separate corporate existence. The Amended Counterclaim simply labels Euclid an alter ego and asks the Court to credit that label.

The Third DCA rejected an identical effort in *Parisi*. There, the complaint alleged that the corporate entity "is operated as the alter-ego" of the nonresident defendant and "was used fraudulently for the improper purpose of defrauding" the plaintiff. 314 So. 3d at 664. The Third DCA held that "[t]hese allegations are not only insufficient to pierce the corporate veil of [the corporation], but also are wholly insufficient to establish personal jurisdiction over [the individual] under the alter-ego theory." *Id.* The Second DCA reached the same conclusion in *Abdo*, holding that a complaint's allegation that one entity "was the alter-ego" of the defendant was "insufficient to support the exercise of personal jurisdiction under an alter ego theory." 263 So. 3d at 150. Under *Parisi* and *Abdo*, the Amended Counterclaim's solitary, conclusory allegation is insufficient to establish personal jurisdiction under an alter ego theory.

Even setting aside the pleading defects, the Siegel Declarations affirmatively negate each element of an alter-ego claim. Euclid "has maintained a separate legal existence from" the Siegels; it has "observed all required limited partnership formalities"; it "has maintained and currently maintains its own separate books and records and decision-making processes"; it was "not . . . operated merely as an extension or instrumentality of" the Siegels' personal interests; the Siegels' personal funds "were not and are not commingled with corporate funds of Euclid"; Euclid's funds "were not and are not diverted for [the Siegels'] exclusive benefit"; Euclid "was not formed for an improper purpose"; and Euclid "was not and is not used for any improper or fraudulent purpose."

(H. Siegel Decl. ¶¶ 7, 11–16; A. Siegel Decl. ¶¶ 7, 11–16.) Indeed, since January 2023, the formal administration of Euclid's ledgers, capital accounts, investor register, audit, and bank reconciliations has been performed by SS&C Technologies, Inc.—the world's largest fund administrator. (H. Siegel Decl. ¶ 9; A. Siegel Decl. ¶ 9.) These uncontroverted sworn facts foreclose any alter-ego theory.

**II. Exercising Personal Jurisdiction Over The Siegels Would Violate Due Process.**

Because the Amended Counterclaim fails to establish jurisdiction under Florida's long-arm statute, the Court need not reach the due process inquiry. *See Homeway Furniture Co. of Mount Airy, Inc. v. Horne*, 822 So. 2d 533, 536 (Fla. 2d DCA 2002) ("If Florida's long-arm statute does not provide a basis for personal jurisdiction under the initial statutory prong of this inquiry, the constitutional analysis is unnecessary."). Nevertheless, the exercise of jurisdiction over the Siegels would also violate the Due Process Clause.

The constitutional analysis asks three questions: (1) whether the Alliance Parties' claims "arise out of or relate to" at least one of the Siegels' contacts with Florida; (2) whether the Siegels "purposefully availed" themselves of the privilege of conducting activities in Florida; and (3) whether the exercise of jurisdiction "comports with traditional notions of fair play and substantial justice." *SkyHop*, 58 F.4th at 1228 (internal quotation marks omitted). The Alliance Parties cannot satisfy any of these requirements.

As established above, the Siegels have no relevant contacts with Florida. In addition, the Siegels have not purposefully availed themselves of Florida's laws. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (purposeful availment requires the defendant to "deliberately reach[] out beyond its home" into the forum) (internal quotation marks omitted). They are Texas citizens. They have no Florida office, property, or personal business. Their first contact with the Alliance Parties was not initiated by them; it was Ariel Gitman, on November 11,

2024, who sent an unsolicited email to Euclid's general inquiry address pitching an investment in an "Alabama" smelting facility. (H. Siegel Decl. ¶ 14 & Ex. A; A. Siegel Decl. ¶ 14 & Ex. A.) The subsequent in-person meeting occurred in Alabama. (H. Siegel Decl. ¶ 15; A. Siegel Decl. ¶ 15.) The consulting agreement was executed with an Alabama resident for services regarding an Alabama facility. (H. Siegel Decl. ¶ 16; A. Siegel Decl. ¶ 16.) None of these contacts is the kind of deliberate conduct reaching into Florida that due process requires. *Ford Motor*, 141 S. Ct. at 1025.

Nor can the Alliance Parties rely on the "effects test" to satisfy due process. Under that test, the Alliance Parties must show that the Siegels (1) "committed an intentional tort" that was (2) "directly aimed at the forum," and (3) caused "an injury within the forum that the defendant should have reasonably anticipated." *Moore v. Cecil*, 109 F.4th 1352, 1362 (11th Cir. 2024) (internal quotation marks omitted). As discussed above, the Siegels' alleged conduct was aimed at acquiring an Alabama facility. The Amended Counterclaim points to no act "aimed at" Florida and no injury "within" Florida, let alone any facts establishing the reasonable anticipation of an injury in Florida. As the Eleventh Circuit held in *Moore*, "a defendant's actions do not create sufficient contacts with the forum state 'simply because he allegedly directed his conduct at [a] plaintiff[ ] whom he knew had . . . connections' with the forum state." *Moore*, 109 F.4th at 1363 (quoting *Walden v. Fiore*, 571 U.S. 277, 289 (2014)).

Finally, exercising jurisdiction over the Siegels would not comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Two Texas residents whose only relevant conduct occurred in Texas and Alabama should not be haled into a Florida federal court on the basis of claims that, by the Amended Counterclaim's own telling, arise from conduct undertaken "on behalf of Euclid." That is the very imposition of

inconvenience and unfairness that the corporate-shield doctrine and the Due Process Clause are designed to prevent.

## CONCLUSION

For the foregoing reasons, the Alliance Parties' Amended Counterclaim against Howard Siegel and Adam Siegel should be dismissed.

Dated: May 26, 2026

*/s/ Matthew P. Weinshall*

**PODHURST ORSECK, P.A.**
Peter Prieto (FBN 501492)
Matthew P. Weinshall (FBN 84783)
2525 Ponce de Leon, Suite 700
Coral Gables, FL 33134
T. 305-358-2800
pprieto@podhurst.com
mweinshall@podhurst.com