**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-CV-20647-BB/Elfenbein**

EUCLID TURNAROUND OPPORTUNITY
FUND LP,

*Plaintiff*,

*vs*.

AMERANT EQUIPMENT FINANCE, A
DIVISION OF AMERANT BANK, N.A.,
ET AL.,

*Defendants*.
________________________________________/

**COUNTER-DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE ALLIANCE DEFENDANTS' FIRST AMENDED COUNTERCLAIM**

## INTRODUCTION

Counter-Defendants Howard Siegel and Adam Siegel submit this reply in support of their Motion to Dismiss [ECF No. 307] the Amended Counterclaim [ECF No. 281] filed by Alliance Metals LLC and Alliance Metals Alabama LLC (collectively, the "Alliance Defendants"). The Alliance Defendants' Response to the Motion [ECF No. 316] confirms that the Amended Counterclaim should be dismissed on multiple grounds.

As an initial matter, the pleading suffers from three fatal flaws: (1) it was not timely amended under Federal Rule of Civil Procedure 15; (2) all five of its counts are barred by Florida's litigation privilege; and (3) each of its counts fail to state a claim. Plaintiff Euclid Turnaround Opportunity Fund LP made these arguments in full in its own motion to dismiss, *see* [ECF No. 290], and the Siegels incorporated them by reference into their Motion. *See* Motion at 1. The Alliance Defendants ask the Court to ignore these arguments because they were incorporated by reference, but the federal rules expressly allow such cross-referencing, and the arguments raised by Euclid apply with equal force to the Siegels, so there was no reason for the Siegels to repeat them verbatim.

Instead, the Siegels' Motion focuses on the ground for dismissal uniquely applicable to them: the Alliance Defendants have failed to establish personal jurisdiction over the Siegels—Texas residents who had no relevant contact with Florida and who, therefore, are protected by Florida's corporate-shield doctrine. The Alliance Defendants contend that its protections are rendered ineffective by the doctrine's intentional-tort exception. But that exception is unavailing for two reasons. First, the Alliance Defendants have not stated an intentional-tort claim: a threshold requirement for the intentional-tort exception to apply. Second, they have not shown that the Siegels engaged in intentional tortious conduct *expressly aimed* at Florida, an additional requirement that Florida courts applying the exception have repeatedly and recently emphasized.

The Alliance Defendants likewise fail to establish "alter-ego" jurisdiction. They do not plausibly allege—as they must to invoke this sharply limited basis for personal jurisdiction—that Euclid lacked an existence independent from the Siegels, that the Siegels used Euclid's legal form fraudulently or for an improper purpose, or that such use of Euclid's legal form caused injury to the Alliance Defendants. And regardless of the counterclaim's allegations, they cannot overcome the uncontradicted evidence from the Siegels' declarations foreclosing alter-ego jurisdiction.

Lastly, exercising personal jurisdiction over the Siegels would violate due process. The

Amended Counterclaim arises out of the Siegels' contact with *Alabama*—not Florida. And the Siegels never purposefully availed themselves of the privilege of conducting activities in Florida.

For these reasons and those explained below, the Court lacks jurisdiction over the Siegels and should dismiss Amended Counterclaim.

## ARGUMENT

### I. Florida's Corporate-Shield Doctrine Bars the Exercise of Personal Jurisdiction Over The Siegels Because The Intentional-Tort Exception Does Not Apply.

The Alliance Defendants concede, as they must, that Florida's corporate-shield doctrine is applicable. *See* Response at 2. The doctrine prohibits the exercise of personal jurisdiction over non-resident corporate officers whose only contacts with Florida were undertaken in a representative capacity, *see Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993), which is true for the Siegels.

The Alliance Defendants then pivot to invoking the intentional-tort exception to the corporate-shield doctrine. But that argument fails at the outset because the Amended Counterclaim fails to state a cause of action for an intentional tort. *See LaFreniere v. Craig-Myers*, 264, So. 3d 232, 239 (Fla. 1st DCA 2018) ("The threshold question raised is whether the complaint sufficiently states a cause of action for an intentional tort."); *see also Villarino v. Joekel*, 2025 WL 2329959, at *6 (11th Cir. Aug. 13, 2025) ("Because the complaint did not state a cause of action for an intentional tort, the district court did not err in finding that the corporate-shield doctrine barred personal jurisdiction over Joekel and Plotkin."). So, if the Court concludes that the Amended Counterclaim fails to state a claim in each of its five counts—as it should, *see* [ECF No. 290] at 4–10—then it need not reach the applicability of the independent-tort exception.[1]

In either event, stating an intentional tort claim against a non-resident corporate officer is

[1] That the arguments concerning the intentional-tort exception and the sufficiency of the claims are inextricably intertwined is reason enough to reject the Alliance Defendants' request, *see* Response at 1 n.1, to disregard the 12(b)(6) arguments. *See, e.g.*, *Wendt. v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002) (collecting cases and explaining that "where the threshold question of personal jurisdiction turns on whether a tort is committed in Florida, the court necessarily must review the allegations of the complaint to determine if a cause of action is stated"); *Klayman v. Judicial Watch, Inc.*, 2013 WL 4780139 at *5 (S.D. Fla. Sept. 5, 2013) ("The Court's consideration of whether personal jurisdiction exists over the Individual Defendants must be undertaken in the light of the claims presented, and the Court should therefore first determine whether the Amended Complaint states any claim for relief against the Individual Defendants, and if so, on what theories."). Additionally, the Federal Rules of Civil Procedure permit incorporation by reference, see Fed. R. Civ. P. 10(c), and such cross-referencing avoids needless repetition, particularly when the arguments for 12(b)(6) dismissal apply to the Siegels and Euclid in the same exact way and have been fully briefed by the Alliance Defendants.

not sufficient, by itself, to invoke the exception to the corporate shield doctrine. Rather, the Alliance Defendants must also establish that the Siegels "personally and intentionally engaged in . . . specific conduct . . . [that] was calculated to inflict a direct injury upon a resident of Florida." *Rensin v. State, Office of Atty. Gen., Dept. of Legal Affairs*, 18 So. 3d 572, 576 (Fla. 1st DCA 2009). That is, the exception becomes available only when out-of-state defendants were "primary participant[s] in fraudulent or intentional misconduct *aimed at Florida*."[2] *Id*; *see LaFreniere*, 264 So. 3d at 239 ("[T]he conduct alleged must consist of intentional and tortious acts '*expressly aimed at*' Florida, with knowledge by the defendant that it 'would have a potentially devastating impact upon the victim.'" (quoting *Calder v. Jones*, 465 U.S. 783, 783-84 (1984)). The Alliance Defendants have not met this requirement.

Courts have rejected requests to apply the intentional-tort exception—and, therefore, have refused exert personal jurisdiction over non-Florida defendants—where the claimant is a non-Florida entity, *see Harrison v. NC3 Sys., Inc.*, 395 So. 3d 657, 665 n.6 (Fla. 6th DCA 2024), or where the claimant submitted, as purported proof of the defendant's tortious conduct toward Florida, documentation merely referencing alleged conduct "in other jurisdictions," *Rensin*, 18 So. 3d at 576. Here, a claimant, Alliance Metals Alabama LLC ("Alliance Alabama"), is, as in *Harrison*, a non-Florida entity. "For this reason alone, the intentional torts alleged . . . could not have been calculated to inflict a direct injury upon a resident of Florida." 395 So. 3d 657, 665 n.6. And it is not sufficient—as was decided in *Rensin*—to allege conduct that pertains only to Alabama, such as the Siegels: (a) negotiating a transaction related to the Alabama smelting facility, *see* Amended Counterclaim ¶ 12; (b) making representations in connection with that specific transaction, *see id*. ¶ 13; (c) entering into a consulting agreement with Wayne Perry, the plant manager of the Alabama smelting facility, *see id*. ¶¶ 18–19; (d) and attempting to coordinate an inspection of the Alabama smelting facility, *see id*. ¶¶ 27–28.

Perhaps perceiving the defects in their pleading, the Alliance Defendants attach to their Response affidavits from Ariel and Jacob Gitman, which purport to attribute the damages to Florida-based Alliance Metals LLC. *See* [ECF No. 316-1, ¶ 10]; [ECF No. 316-2, ¶ 4]. But those assertions are both implausible and insufficient. Any "disrupted plant-level logistics, undermined workforce stability and morale, and caused inefficiencies and breakdowns in ordinary business operations," Amended Counterclaim ¶ 41, would directly impact Alliance Alabama—the entity

[2] Emphasis supplied, unless otherwise noted.

that owns and houses the property that Euclid attempted to acquire—not Alliance Metals, LLC. If anything, the effect on the Florida entity was *indirect*, which is insufficient to invoke the exception. *See Rensin,* 18 So. 3d at 576 (requiring conduct "calculated to inflict a *direct* injury upon a resident of Florida").

The rest of the facts that the Alliance Defendants cite, including where companies file UCC financing statements against Alliance Metals LLC, from where the underlying loans originated, and where the Gitmans were for certain telephone calls with the Siegels, *see* Response at 5, have no bearing on the analysis. The relevant inquiry focuses on Siegels—either their "physical location," *Kitroser v. Hurt*, 85 So. 3d 1084, 1088 (Fla. 2012) (the corporate-shield doctrine's application "is dependent upon the physical location of the actor"), or the location to which their alleged conduct was directed, *see Villarino*, 2025 WL 2329959, at * 5. And, here, the Siegels had no contact with—much less, directed any conduct towards—Florida. None of the facts in the Gitmans' declarations suggest otherwise.

The requirements for the intentional-tort exception, therefore, have not been satisfied, and Florida's corporate-shield doctrine bars the exercise of personal jurisdiction over the Siegels.

## II. **The Alliance Defendants' Alter-Ego Allegations Are Insufficient to Establish Jurisdiction Over The Siegels.**

"The alter ego theory of long-arm jurisdiction exists as a *limited exception* to the general, two-step process for establishing long-arm jurisdiction as set forth in *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989)." *Parisi v. Kingston*, 314 So. 3d 656, 664 (Fla. 3d DCA 2021) (quoting *Bellairs v. Mohrmann*, 716 So. 2d 320, 322 (Fla. 2d DCA 1998) (footnote omitted)). "Under the alter ego theory, [a pleading] must allege facts sufficient to pierce the corporate veil of the resident corporation." *Id.* (cleaned up). Such factual allegations must establish: (i) that the corporation's "independent existence was non-existent"; (ii) that the corporation's "legal form [was used] fraudulently or for an improper purpose"; and (iii) that the "fraudulent or improper use of [the] legal form caused injury." *Id.* (cleaned up).

*Parisi* and a similar decision, *Abdo v. Abdo*, 263 So. 3d 141, 150 (Fla. 2d DCA 2018), emphasize the requirement to plead *facts*—as opposed to mere conclusory allegations. *See Parisi*, 314 So. 3d at 664 (describing allegations that a corporate entity "is operated as the alter-ego" of a non-resident defendant and "was used fraudulently for the improper purpose of defrauding" the plaintiff as "not only insufficient to pierce the corporate veil . . . but also are wholly insufficient to

establish personal jurisdiction over [the individual] under the alter-ego theory"); *Abdo*, 263 So. 3d at 150 (holding that a complaint's allegation that one entity "was the alter-ego of the defendant was "insufficient to support the exercise of personal jurisdiction under an alter ego theory").

The Amended Counterclaim, however, is comprised exclusively of conclusory allegations. It alleges that Euclid "is the alter ego of Howard Siegel and Adam Siegel," Amended Counterclaim ¶ 9—the same allegation that was repudiated in *Parisi* and *Abdo*. The pleading lacks any factual allegations surrounding, for example, Euclid's observance of limited-partnership formalities, its separation of funds from the Siegels' personal funds, its separate books and records, or its capitalization. So, the Alliance Defendants have failed to plausibly allege that Euclid does not exist independently—the very first element of alter-ego jurisdiction.

Even if they had, their allegations have since been refuted by the Siegels' declarations. *See generally* [ECF Nos. 307-1 ("H. Siegel Decl.") & 307-2 ("A. Siegel Decl.")]. The Siegels—who have first-hand knowledge of Euclid's systems and structure—have established that Euclid: (a) "has observed all required limited partnership formalities," H. Siegel Decl. ¶ 8; (b) has utilized a separate company "to act as its fund administrator," among other things, *see id*. ¶ 9–10; and (c) "has maintained and currently maintains its own separate books and records and decision-making processes," *id*. ¶ 11.

The Siegels' declarations shifted the burden back to the Alliance Defendants "to prove – not merely allege – jurisdiction by affidavits, testimony, or other documents." *Argos Glob. Partner Servs., LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1084 (S.D. Fla. 2020) (Altonaga, J.). But the Alliance Defendants—who say nothing about Euclid's corporate structure in their own declarations—have failed to offer any such proof. Contrary to the Alliance Defendants' claims, then, there is no "factual dispute requiring discovery," Response at 10, because the record *is* sufficient to reject alter-ego jurisdiction.

They also falter at the second element for alter-ego jurisdiction because they have not shown that the Siegels engaged in improper conduct in the use of Euclid. The Alliance Defendants' argument on this point, in essence, is that Euclid—simply because it entered into a consulting agreement with Perry, the plant manager of the Alabama smelting facility—"was used as the instrumentality to carry out the wrongful scheme." Response at 8. But, in Florida, the *breach* of a contract—much less, the mere formation of one—"does not constitute the type of improper conduct necessary to pierce the corporate veil." *WH Smith, PLC v. Benages & Assocs.,*

*Inc.*, 51 So. 3d 577, 583 (Fla. 3d DCA 2010) (cleaned up) (holding that one corporate entity's instruction to another *to breach* an agreement did not, without more, comprise improper conduct necessary to pierce the corporate veil); *see also Geigo Props., LLP v. R.J. Gators Real Estate Grp., Inc.*, 849 So.2d 1109, 1110 (Fla. 4th DCA 2003) ("The trial court did not err when it found that the mere use of a shell corporation to enter into the lease, and the subsequent breach of the lease by failing to pay rent, did not constitute the type of improper conduct necessary to pierce the corporate veil."). So, the Alliance Defendants' "improper purpose" allegations are also insufficient.

They also stand in stark contrast to what Euclid alleged in its own complaint. In successfully establishing alter-ego jurisdiction over the Gitmans, Euclid alleged specific and improper use of the corporate Alliance Defendants. By alleging that Alliance Alabama and Alliance Metals LLC wrongfully "refused" Euclid's inspection of the Alabama smelting facility, *see* Fourth Amended Complaint [ECF No. 223] ¶ 38, Euclid showed how the Gitmans traveled under the corporate form of Alliance Metals and Alliance Alabama in furtherance of the Defendants' scheme because those two entities, the Gitmans claimed, had to approve the inspection—Alliance Metals as debtor and Alliance Alabama as the owner of the real property that housed the collateral.

Euclid also asserted that the Gitmans misused the form of the corporate Alliance Defendants by alleging that, on February 19, 2025, following the unlawful Amerant-Ecliptica deal, the corporate defendants "took steps to reorganize the business in reasonable reliance on the consummated sale, including entering into agreements and delivering a mortgage on the unsecured real property on which the relevant metal-working equipment now sits." *Id.* ¶ 52. Put another way, Euclid alleged that the Gitmans, with their co-conspirators, reorganized the Alliance Defendants' assets and then invoked that reorganization to shield the collateral from Euclid. The Amended Counterclaim, however, contains no such analog.

Thus, the Alliance Defendants' contention that the Siegels cannot oppose their attempt to invoke alter-ego jurisdiction just because Euclid successfully alleged alter-ego liability, *see* Response at 10, is a non-starter. Nor does such an argument account for the difference between a 12(b)(2) motion, under which the Alliance Defendants were required but failed to rebut the Siegels' declarations, and a Rule 12(b)(6) motion, which focuses only on the adequacy of the pleading. And, because the Alliance Defendants also have failed to plausibly allege improper use

of Euclid's legal form, they cannot establish the requisite nexus to their alleged injuries. *See, e.g.*, *BEO Mgmt. Corp. v. Horta*, 314 So. 3d 434, 438 (Fla. 3d DCA 2020) ("Finally, there is no allegation or evidence that establishes a nexus between Mejia's operations of Cuzco and BEO and the respective injuries to Experience and Caballe Horta. Proof of this nexus is required by [the] third factor [to establish alter-ego jurisdiction]." (cleaned up)).

For all of these reasons, the Alliance Defendants cannot invoke the "limited exception to the general, two-step process for establishing long-arm jurisdiction as set forth in *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla.1989)." *Bellairs*, 716 So. 2d at 322.

### III. **<u>Exercising Personal Jurisdiction Over the Siegels Would Violate Due Process</u>.**

Even if Florida's long-arm statute permitted the Court to exercise personal jurisdiction over the Siegels, doing so would violate the Due Process Clause because the Alliance Defendants have not shown: (1) that their claims "arise out of or relate to" at least one of the Siegels' contacts with Florida; or (2) that the Siegels "purposefully availed" themselves of the privilege of conducting activities in Florida, *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1228 (11th Cir. 2023) (internal quotation marks omitted).

The Amended Counterclaim fails from the start: it does not allege any relevant contacts, at all, between the Siegels and Florida—because there were not any. *See generally* Amended Counterclaim. The Siegels are Texas residents who have no business, office, or property in Florida. *See* H. Siegel. Decl. ¶¶ 2–4; A. Siegel. Decl. ¶¶ 2–4. There is no allegation that the Siegels ever traveled to Florida to meet with the Gitmans. Rather, the Siegels have attested that Ariel Gitman "sent an unsolicited email to . . . the general email address for [Euclid.]" H. Siegel ¶ 18.

Nor have the Alliance Defendants shown that the Siegels took "some act by which [they] purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (internal quotations omitted and cleaned up). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Id*. (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). "They must show that the defendant[s] deliberately 'reached out beyond' [their] home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Id*. (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The Siegels did no such thing.

The Amended Counterclaim makes clear that the Siegels' aim was to acquire control of the

Alabama smelting facility. They negotiated, on Euclid's behalf, a transaction related to *that facility*. *See* Amended Counterclaim ¶ 12. The Siegels entered into a consulting agreement with the *smelting facility*'s plant manager, who was based in Alabama. *See id*. ¶¶ 18–19. And, in connection with the transaction, the Siegels tried to coordinate an inspection *of the smelting facility*. *See id*. ¶¶ 27–28. These interactions have nothing to do with Florida.

Given that reality, the Alliance Defendants turn to the "effects test" to satisfy due process. *See* Response at 13. But the result is the same. Under that test, the Alliance Defendants must show that the Siegels (1) "committed an intentional tort" that was (2) "directly aimed at the forum," and (3) caused "an injury within the forum that the defendant should have reasonably anticipated." *Moore v. Cecil*, 109 F.4th 1352, 1362 (11th Cir. 2024) (internal quotation marks omitted). As discussed above, however, the Siegels *did not* commit an intentional tort—much less one that was aimed at Florida. *See supra* at 2–3. And the mere fact that Alliance Metals LLC is incorporated in Florida is not enough to show that the Siegels should have reasonably anticipated an injury in Florida, to the extent that even occurred. *See Moore*, 109 F.4th at 1363 (holding that "a defendant's actions do not create sufficient contacts with the forum state simply because he allegedly directed his conduct at a plaintiff whom he knew had . . . connections with the forum state" (cleaned up)).

Even the cases cited by the Alliance Defendants cut against them. In *Licciardello v. Lovelady*, the Eleventh Circuit held that a tortious injury was committed in Florida by a music manager who used a singer's name and picture, without authorization, on a website that could be accessed by Florida residents. *See* 544 F.3d 1280, 1282–84 (11th Cir. 2008). Here, of course, the Alabama smelting facility—out of which the Amended Counterclaim arises—exists in Alabama and, naturally, is not accessible in Florida. In *Louis Vuitton, Sa. v. Mosseri*, the defendant was alleged to have distributed counterfeit goods into Florida and to have accepted payment from Florida customers. *See* 736 F.3d 1339, 1356 (11th Cir. 2013). No such Florida-directed transactions are alleged as a basis for the suit here.

In *Narra*, the effects test was met because the defendant "undoubtedly sent its emails into Florida intentionally." 58 F.4th at 1230. Here, on the other hand, the record shows at most that Jacob Gitman—who is not a party to the Amended Counterclaim—was in Florida during telephone calls discussing the transaction related to the Alabama smelting facility. *See* [ECF No. 316-2 ¶ 3]. Notably, however, Jacob Gitman does not allege in his declaration that any inaccurate statements were made to him in Florida, *id.*, and Ariel Gitman does not allege in his declaration that he was

in Florida when any inaccurate statements were made [ECF No. 316-1 ¶¶ 5–8].

And, in *ripKurrent v. Richard Ballard IRA LLC*, 530 F.Supp.3d 1281 (S.D. Fla. 2021) and *Vas AERO Services LLC v. Arroyo*, 868 F.Supp.2d 1374 (S.D. Fla. 2012)—cases that the Alliance Defendants call "especially analogous," Response at 13—the defendants' actions were found to have expressly targeted a Florida company. Not so in this case, as the Amended Counterclaim only alleges that the Siegels targeted property and equipment in Alabama.

**CONCLUSION**

For the foregoing reasons, the Alliance Defendants' Amended Counterclaim against the Siegels should be dismissed.

Dated: July 14, 2026

*/s/ Matthew P. Weinshall*

**PODHURST ORSECK, P.A.**
Peter Prieto (FBN 501492)
Matthew P. Weinshall (FBN 84783)
Jacob H. Koffsky (FBN 1018115)
2525 Ponce de Leon, Suite 700
Coral Gables, FL 33134
T. 305-358-2800
pprieto@podhurst.com
mweinshall@podhurst.com
jkoffsky@podhurst.com